**2022-1356**

# United States Court of Appeals
# for the Federal Circuit

MACDERMID ENTHONE INC., fka ENTHONE, INC.,

*Appellant,*

v.

BASF CORPORATION,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board in Case No. IPR2016-00696*

## BRIEF OF APPELLANT
## MACDERMID ENTHONE INC., fka ENTHONE, INC.

ROBERT M. EVANS, JR.
MICHAEL J. HARTLEY
MICHAEL H. DURBIN
LEWIS RICE LLC
600 Washington Avenue, Suite 2500
Saint Louis, MO 63101
T: 314-444-7784
F: 314-612-7784

*Attorneys for Appellant MacDermid*
*Enthone Inc., fka Enthone, Inc.*

May 9, 2022

## U.S. PATENT NO. 7,303,992 (CLAIM 1)

1.    A method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical interconnect features including submicron-sized features having bottoms, sidewalls, and top openings, the method comprising:

immersing the semiconductor integrated circuit device substrate including submicron-sized features having bottoms, sidewalls, and top openings wherein said submicron-sized features include high aspect ratio features having dimensions such that the high aspect ratio features have aspect ratios of at least about 3:1 into an electrolytic plating composition comprising a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features and a polyether suppressor compound comprising a combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1 and bonded to a nitrogen-containing species, wherein the molecular weight of the suppressor compound is between about 1000 and about 30,000; and

supplying electrical current to the electrolytic composition to deposit Cu onto the substrate and superfill the submicron-sized features by rapid bottom-up deposition at a rate of growth in the vertical direction which is greater than a rate of growth in the horizontal direction.

# CERTIFICATE OF INTEREST

Counsel for Appellant Enthone, Inc. certifies the following:

1.    The full name the party represented by me is MacDermid Enthone, Inc. (formerly known as Enthone, Inc.).

2.    There is no additional real party-in-interest.

3.    The parent corporations and publicly held companies that own 10 percent or more of the stock of MacDermid Enthone, Inc. are as follows: MacDermid Enthone, Inc. is a wholly owned subsidiary of Alent USA Holdings, Inc., which is wholly owned by MacDermid, Incorporated, which is wholly owned by Element Solutions Inc.  Element Solutions Inc is a publicly held corporation.

4.    The names of all law firms and the partners or associates that have appeared for the party in the trial court or agency or are expected to appear for the party in this Court who are not already listed on the docket for this case are: Kathleen Markowski Petrillo of Lewis Rice LLC, Paul I.J. Fleischut, Kyle Gottuso, John K. Roedel, Jr., John Schroeder, Marc W. Vander Tuig, Senniger Powers LLP, and Stinson LLP.

5.    Related cases known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are:  *Enthone, Inc. v. BASF Corp.*, Case No. 1:15-cv-233-TJM-DEP (N.D.N.Y).

6.    There are no organizational victims in criminal cases or bankruptcy case debtors and trustees.

May 9, 2022                          */s/   Robert M. Evans, Jr.*
                                     Robert M. Evans, Jr.

ii

# **TABLE OF CONTENTS**

U.S. PATENT NO. 7,303,992 (CLAIM 1) ................................................. i

CERTIFICATE OF INTEREST ............................................................ ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES .............................................................. vii

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT .......................................................2

INTRODUCTION ...............................................................................3

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF THE CASE...............................................................6

I.      THE TECHNOLOGY .................................................................6

        A.      Aspect Ratios and the Superfilling Process ..........................6

        B.      Suppressor Function during Electroplating for Conformal
                Plating as Compared to Superfilling ..................................10

II.     THE ENTHONE '992 PATENT ................................................12

III.    THE PRIOR ART ....................................................................16

        A.      BARSTAD -- U.S. PATENT NO. 6,444,110 .....................16

                1.      Disclosed Surfactants............................................16

                2.      Disclosed Suppressors ..........................................17

                3.      The Working Examples .........................................18

                4.      The BASF Admission ............................................19

        B.      ALLING -- U.S. PATENT PUBL. NO. 2002/0127847......19

        C.      THE BASF CATALOG ....................................................21

D.     MORRISSEY -- U.S. PATENT PUBL. NO. 2002/0043467 .............23

SUMMARY OF ARGUMENT .................................................................25

ARGUMENT ......................................................................................27

I.    THE   BOARD   ERRED   BY   CONSTRUCTING   ITS   OWN
      OBVIOUSNESS THEORY, WHICH WAS NOT IN THE GROUNDS
      OF   THE   PETITION   AS   INSTITUTED   AND   STANDS   IN
      CONFLICT WITH BASF'S STATED POSITION ....................................28

      A.     Standard of Review ...........................................................28

      B.     The Board Changed the Obviousness Theory Found in the
             Petition.............................................................................31

      C.     This Court Must Set Aside the Board's Holding as Not in
             Accordance with the Law...................................................32

      D.     The Procedural History of the Motivation to Combine Argument
             ........................................................................................36

             1.     BASF relied upon Alling as its Motivation to Combine in
                    its Petition ..............................................................36

             2.     The Board Relied On Alling for Motivation to Combine in
                    its Institution Decision and Final Written Decision ................38

             3.     In Reply Before the Board, BASF Alleged that Alling
                    Resolved Barstad's Ambiguity Regarding Tetronic as a
                    Suppressor ..............................................................40

             4.     The Board Has Now Twice Found that Alling Does Not
                    Expressly Teach Tetronic Copolymers as Suppressors for
                    Superfilling which is Fatal to Ground 1 of the Petition............41

                    a)     The Board's Finding Regarding Alling is Supported
                           by Substantial Evidence..................................41

                    b)     The Board's Finding Regarding Alling is Consistent
                           with the Findings in IPR2016-00697 .............................43

E.     *BASF I* Affirmed that the Board Used the Correct Legal Standard in its Original Motivation to Combine Analysis ................................44

II.    THE BOARD MADE INCONSISTENT FINDINGS IN THE JUDGMENT REGARDING ALLING ON THE SAME TECHNICAL ISSUE PRESENTED IN BOTH BARSTAD AND MORRISSEY ..............45

A.     Standard of Review ............................................................45

B.     The Board Made Inconsistent Findings Concerning Alling ..............46

1.     Procedural History ..................................................46

2.     The Board Erroneously Made Inconsistent Findings ..............46

III.   THIS COURT SHOULD REVERSE THE BOARD'S OBVIOUSNESS DETERMINATION AS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ........................................................49

A.     Standard of Review ............................................................49

B.     The Board Erred in Finding that Barstad Teaches Tetronic as a Suppressor for Superfilling ................................................50

1.     Barstad's Description of Suppressors Does Not Teach or Suggest Tetronic Copolymers ..................................50

2.     The Board Erred as a Matter of Law in Conflating Barstad's Surfactants with Suppressors ....................................51

3.     BASF's Admission ..................................................54

4.     The FWD in IPR2016-00697 Did Not Find that Barstad Teaches Tetronic as a Suppressor ............................55

C.     This Court's Precedent Requires Reversal..........................57

IV.    THE BOARD ERRED AS A MATTER OF LAW WHEN IT IGNORED THE UNPREDICTABILITY STANDARD AFFIRMED BY THIS COURT IN ASSESSING ANY REASONABLE EXPECTATION OF SUCCESS ..................................................59

A.     Standard of Review ............................................................59

B.  A PHOSITA would Understand that Effectiveness of a Suppressor for Superfilling is Very Unpredictable ............................60

C.  This Court Quoted and Affirmed the Board's Unpredictability Findings and the Standard to be Applied for the Motivation to Combine Analysis .................................................................61

D.  The Board Failed to Consider that Tetronic Varied in Material Respects from Pluronic and so Tetronics' Performance for Superfilling was *Per Se* Unpredictable ...............................................62

1.  The Significant Differences Between the Structure and Properties of Pluronic as Compared to Tetronic Copolymers Preclude Predictability .........................................63

2.  Literature Identifies Tetronic Copolymers as Not Being Superfilling Suppressors ............................................65

E.  The Board Erroneously Applied the Confirmed Standard of Unpredictability in Assessing Expectation of Success ......................67

V.  THE BOARD ERRED IN ITS TREATMENT OF CLAIMS 2-15, 17-22 AND 26-28 FOR THE SAME REASONS ADVANCED FOR CLAIM 1 ..............................................................................69

CONCLUSION AND RELIEF SOUGHT ..............................................69

CERTIFICATE OF COMPLIANCE .......................................................72

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, 2021 U.S. App. LEXIS 29547 (Fed. Cir. Sep. 30, 2021) ....................................................30

*BASF Corporation v. Enthone, Inc.*, 749 Fed.Appx. 978 (Fed. Cir. 2018) ..... passim

*Burlington Truck Lines v. United States,* 371 U.S. 156 (1962). ..............................29

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353 (Fed. Cir. 2008) ...................44

*EmeraChem Holdings, LLC v. Volkswagen Group of America, Inc.*, 859 F.3d 1341 (Fed. Cir. 2017)........................................................................... 29, 33

*Endo Pharms. Inc. v. Actavis LLC*, 922 F.3d 1365 (Fed. Cir. 2019)......................60

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348 (Fed. Cir. 2017)........................................................................60

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000)......................................................49

*In re NuVasive, Inc.*, 842 F.3d 1376 (Fed. Cir. 2016) .............................................49

*In re Sang Su Lee,* 277 F.3d 1338 (Fed. Cir. 2002).................................................28

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359 (Fed. Cir. 2016) ........................................................................................ 30, 49

*KSR Intl. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)................................................50

*M&K Holdings, Inc. v. Samsung Electronics Co., Ltd.*, 985 F.3d 1376 (Fed. Cir. 2021) ............................................................................... 29, 33, 34, 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..........................................................................................................28

*OSI Pharmaceuticals, LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019)... passim

*Otsuka Pharm Co. v. Sandoz, Inc.*, 678 F.3d 1280 (Fed. Cir. 2012) ......................50

vii

*Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286 (Fed. Cir. 2018)........49

*SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348 (2018) .................................................29

*Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377 (Fed. Cir. 2021).........................................................................................60

*Vicor Corp. v. SynQor, Inc.* 869 F.3d 1309 (Fed. Cir. 2017) ........................... 45, 47

**Statutes**

28 U.S.C. § 1295(a)(4)(A) .........................................................................................2

35 U.S.C. § 142 ..........................................................................................................2

35 U.S.C. § 312(a)(3)................................................................................................30

37 C.F.R. § 42.104(b)(5)...........................................................................................30

37 C.F.R. § 42.22(a)(2).............................................................................................30

37 C.F.R. § 90.3 .........................................................................................................2

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Enthone Inc. states as follows:  The Final Written Decision ("FWD") in Case No. IPR2016-00696 was previously appealed by BASF Corporation to this Court in the appeal captioned, *BASF Corporation v. Enthone, Inc.*, 749 Fed.Appx. 978 (Fed. Cir. 2018) ("*BASF I*").

No other appeals from the same proceeding before the Patent Trial and Appeal Board were previously before this or any other appellate court; and the following cases and IPR proceedings may affect or be affected by this Court's decision in the present appeal:  *Enthone, Inc. v. BASF Corp.*, Case No. 1:15-cv-233-TJM-DEP (N.D.N.Y).

1

## JURISDICTIONAL STATEMENT

The Board entered its Final Written Decision for U.S. Patent No. 7,303,992 ("the '992 Patent") on September 11, 2017. Appx628-655. BASF filed a notice of appeal on October 24, 2017. Appx656-659; *see also* 35 U.S.C. § 142; 37 C.F.R. § 90.3. This Court vacated and remanded in *BASF Corporation v. Enthone, Inc.*, 749 Fed.Appx. 978 (Fed. Cir. 2018). The Board entered a Final Written Decision on Remand ("Judgment") for the '992 Patent on November 9, 2021. Appx1-37. Enthone timely filed a notice of appeal from the Judgment on January 11, 2022. Appx772-776; *see also* 35 U.S.C. § 142; 37 C.F.R. § 90.3. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

**INTRODUCTION**

The '992 Patent is directed to an electroplating process that fills submicron, high-aspect ratio trenches and vias on a semiconductor substrate with copper. These electroplated copper deposits form tiny "wires" that connect to circuits formed in the semiconductor substrate. As integrated circuits have become increasingly tiny, the "wires" on the substrates used to connect the circuits have likewise become very tiny.

The difficulty with filling these submicron features is that the electroplating must preferentially occur at the bottom of the feature thus filling the feature with copper from the bottom upwardly toward the top. Such bottom up filling is known as "superfilling." Critically, during superfilling, copper deposition must be suppressed along the feature's sidewalls so that copper does not form on the sidewalls and bridge over or "pinch off" the trench or via during copper filling.

The magic that produces superfilling is the use of a special suppressor that adheres to the side walls to suppress copper deposition along the side walls while that same suppressor is released from the feature's bottom to allow copper deposition to build upwardly from the feature's bottom.

Not surprisingly, the Board found in its original FWD that the chemistry for superfilling is highly unpredictable. This Court affirmed that determination and quoted the Board, "a PHOSITA would not have had any basis for predicting the

3

effectiveness for superfilling of any suppressor whose structure or properties varied *in any material respect* from the suppressors that had already been demonstrated to be effective for superfilling . . ." *BASF I*, 749 Fed.Appx. at 982 (emphasis added *by this Court*, internal quotations omitted).

The Board on remand also repeated its finding from the original FWD that a PHOSITA would have "an understanding of the differences between conformal and superfilling electrolytic plating and an appreciation that it was unpredictable whether a given molecule would have served as a suppressor effective for superfilling." Appx8, n.9.    This understanding is particularly important because **most** "suppressors" will cling to the substrate and promote conformal plating, but will not release from the bottom of the feature nor promote superfilling.

Given these established principles, the Board erred in the Judgment in several respects.  First, after correctly rejecting the argument presented in the Petition based on Alling, the Board impermissibly went outside the Petition and reached the new and unsupported conclusion that Barstad alone taught Tetronic copolymer as a suppressor for superfilling.  Second, the Board reached the internally inconsistent finding that the combination of Barstad, Alling and the BASF Catalog rendered all of the patent claims invalid as obvious, but that the nearly identical disclosure found in the combination of Morrissey, Alling and the BASF Catalog did not render any of the patent claims invalid.  Third, the Board improperly found that Barstad taught

Tetronic copolymer as a suppressor for superfilling despite undisputed evidence to the contrary including BASF's admission that Barstad was ambiguous on this issue. Finally, the Board erroneously relied upon materially different chemistry in direct violation of the express language of this Court's unpredictability finding (during the first appeal) when the Board erroneously concluded that a PHOSITA would have an expectation of success in using Tetronic copolymers as a suppressor for superfilling.

It follows that there is no basis for finding any of the claims of the '992 patent invalid as obvious under Barstad, Alling and the BASF Catalog. The Judgment should be reversed, and the validity of the patent claims affirmed, or, at minimum, vacated and remanded.

## STATEMENT OF THE ISSUES

1.     Whether the Board erred as a matter of law in finding the patent claims invalid based on arguments not found in the Petition and that were inconsistent with positions taken by the Petitioner during this IPR.

2.     Whether the Board's internally inconsistent analysis of Alling in view of Barstad and Morrissey, and the conclusions based thereon were arbitrary and capricious and unsupported by substantial evidence.

3.     Whether the Board's finding that Barstad teaches Tetronic copolymer as a suppressor for superfilling was arbitrary and capricious and unsupported by substantial evidence.

4.      Whether the Board erred as a matter of law in failing to apply the correct motivation to combine standard given the unpredictability in this art as articulated by this Court in the first appeal.

## STATEMENT OF THE CASE

### I.      THE TECHNOLOGY

#### A.      Aspect Ratios and the Superfilling Process

The feature's aspect ratio is the ratio of the Feature's depth divided by the feature's width.  Appx800 at ¶15.  Claim 1 of the '992 Patent, for example, recites an aspect ratio of "at least about 3:1."  This means that the feature is at least about 3 times as deep as it is wide.

The superfilling process is used to fill very narrow features, such as trenches and vias, on a semiconductor substrate with copper.  Appx799-801 at ¶13-15.  The copper "wires" thus formed are used to connect circuits positioned in the semiconductor substrate.  Appx799 at ¶13.

Shown below on the left is a cross-section through a six-level copper wiring structure formed by electroplating copper where the "wires" formed without voids.  Appx896.  As seen, the "wires" in the first circuit layer at the bottom of the diagram adjacent the semiconductor are the smallest.  *Id.*  The "wires" get progressively bigger in the circuit layers above the first layer.  *Id.*  Shown below on the right is a perspective view again showing the increasing "wire" size from those on the semiconductor rising up to the larger "wires" in the top circuit layer.  Appx372.




Appx896                                        Appx372

The upper layers formed to make the higher level electrical connections of an integrated circuit can use conformal plating. Appx2360 at ¶97, Appx1158 at 154:11-155:3, Appx1159-1160 at 160:3-161:1. This is because these higher level electrical connections have shallow aspect ratios and are much larger than the high aspect ratio trenches in the first layer of electrical connections that are formed directly on the semiconductor substrate (with superfilling). *Id*.

For the superfilling process to work in filling very narrow trenches and vias, the filling must begin by preferentially filling upwardly from the feature's bottom until the feature is filled to the top with copper. Appx799-800 at ¶14. This means that the electroplating must substantially occur at the feature's bottom and not along the feature's side walls. Appx782 at 2:23-30.

7

Here follows a diagram showing a cross-section through eight "wires" running parallel to each other at the point of cross-section being formed through superfilling:



Appx2309.  The green arrows show copper deposition growing upwardly from the trench bottom while growth off the side walls in the direction of the red arrows is suppressed.  Appx782 at 2:23-30, Appx2308-2312 at ¶¶ 15, 20.

In contrast, if the electroplating occurs at the same rate along the narrow side walls of the feature as it occurs at the feature's bottom (as with a suppressor for conformal plating), then the deposited copper at the top of each side wall will grow across the feature and close off, *i.e.,* pinch off, the trench at the top thus leaving a hollow, unfilled area beneath the pinched off section.  Appx800-804 at ¶¶15, 17.

Such a hollow trench does not form a suitable "wire" for connecting the circuits formed in the semiconductor substrate.

Here follows a diagram with a suppressor for conformal plating where the trench thus did not superfill. As seen, the copper deposition on the side walls in the left-hand figure reached across the trench and "pinched off" at the top of the trench, leaving a hollow void in the trench. Such a "wire" with a hollow interior or with a seam as shown in the right-hand figure makes a poor conductor:



Appx898 at Fig. 4. Voids and seams cause failures and are very undesirable.

Very few suppressors have been found suitable for superfilling. These superfilling suppressors are displaced at the trench bottom (but not on the side walls) which allows the electroplating process to grow from the bottom up while electroplating is suppressed on the side walls as shown above by the green and red arrows.

Early semiconductor substrates with relatively large trenches and vias were filled with aluminum using an electroplating process.  Appx821 at 1:51-65.  As the dimensions of trenches and vias became smaller, the connecting "wires" formed in those smaller trenches likewise became smaller with a reduced cross-sectional area. Aluminum has too much inherent electrical resistivity to be used with such smaller trenches and so the industry moved to copper which is far more electrically conductive than aluminum.  *Id*.

**B.    Suppressor Function during Electroplating for Conformal Plating as Compared to Superfilling**

The function of a suppressor in a plating bath is to adsorb to the substrate's surface being plated and thereby provide increased electrical resistance to the electroplating current across the substrate's surface.

During conformal plating, the suppressor remains adsorbed to the entire substrate surface, which provides relatively even electrical resistance across the substrate surface.  Because the electrical resistance is relatively even across the surface, the electrical current density across the surface is relatively uniform during the plating process.  Appx2330 at ¶48.  Because the electrical current density is relatively uniform, the electrodeposition rate, *i.e.* plating, is relatively uniform across the substrate surface, which provides an electroplated plating that is conformal to the substrate.  *Id*.  Small narrow trenches and vias will thus "pinch off" when plated with a conformal suppressor.  Appx800-804 at ¶¶15, 17.

10

During superfilling, the suppressor adsorbs to the narrowly spaced trench walls and provides electrical resistance along the walls, which greatly reduces the current density along the walls and substantially lessens the deposition of copper on the trench walls. Appx800-801 at ¶15, Appx2330 at ¶48. In sharp contrast, the suppressor used for superfilling is displaced along the trench bottom. Appx2331 at ¶49. This greatly reduces the electrical resistance at the trench bottom as compared to the electrical resistance along the narrowly spaced walls to which the suppressor is still adsorbed. *Id.* This means the electrical current density (and copper deposition rate) at the trench bottom is much higher than the electrical current density (and copper deposition rate) along the trench walls. Appx2313 at ¶22. Because copper is thus deposited at a higher rate at the trench bottom than on the trench walls, the trench is "superfilled" upwardly from the bottom of the trench. Such is shown, again, by the green and red arrows in the diagram, above, in Section I.A.

Both parties' experts agree that all suppressors (conformal and superfilling) are surfactants, but most surfactants are not suppressors. Appx2563 at 6:12-19, Appx2564-2565 at 12:24-14:18, Appx1156 at 146:11-16, Appx1144 at 98:15-99:3. Both parties' experts also agree that there are many suppressors that may be used for conformal plating, but very few of these suppressors will function as a suppressor for superfilling. Appx399, Appx2563 at 7:14-8:2. Suppressors that function to superfill will also function to conformal plate under conformal plating conditions.

Appx2334-2335 at ¶57, Appx2364-2365 at ¶103, Appx2563 at 7:14-19. However, suppressors that function to conformal plate will not typically function to superfill high aspect ratio features. Appx2563 at 7:24-8:2.

Many chemicals that function as a suppressor for conformal plating do not function as a suppressor for superfilling because: (i) a conformal suppressor remains in place at the trench bottom during electroplating where it provides increased electrical resistance and thus lower current density and a consequent lower rate of copper deposition at the bottom of the trench; as compared to (ii) a superfilling suppressor that is removed, displaced or excluded at the trench bottom to provide a much lower electrical resistance and thus a much higher current density and a consequent higher copper deposition rate at the trench bottom. Appx2330-2331 at ¶¶48-49.

It follows that a suppressor that sticks well to the substrate surface and is not susceptible to being removed, displaced or excluded along the trench bottom would be an excellent suppressor for conformal plating, but a complete failure for superfilling. *Id*.

## II.    THE ENTHONE '992 PATENT

The Enthone inventors discovered a suppressor compound that superfills submicron sized interconnect features with high aspect ratios of at least about 3:1. Appx783 at 4:26-36. This cationic suppressor comprises a nitrogen-containing

species substituted with a polyether comprising a combination of propylene oxide (PO) and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1. The molecular weight of the suppressor compound is between about 1000 and about 30,000.   Appx783 at 3:16-30, Appx2302-2303 at ¶4, Appx2324-2325 at ¶41.

Enthone's inventors ran tests comparing their suppressors to a conventional suppressor being used commercially at the time.  Surprisingly, the bottom-up growth achieved by Enthone's invention was 50% greater than the state-of-the-art suppressor.  Appx789-790 at 16:49-17:26, Appx2303-2304 at ¶5.  These surprising results are illustrated in Fig. 1 of the Enthone patent:



Appx779 (comparing superfilling results of a plating bath using the "S900" cationic suppressor to a bath using a commercially available nonionic suppressor).

In a stark departure from the literature—which had consistently focused on nonionic polyalkylene oxide suppressors—Enthone's inventors identified several counterintuitive features of their suppressor driving these unexpected results: (1) the positive charge of the cationic nitrogen species, which attracts the suppressor compound to copper deposited into interconnect features; (2) the relatively hydrophobic nature of the PO repeat units, which form a polarizing film over the copper that suppresses copper deposition; (3) the suppressor's susceptibility to removal, displacement, or exclusion within the electroplating composition, despite the suppressor's strong affinity for the cathodic copper surface; (4) variation along a vertical gradient within the trench or via of the degree to which the suppressor is subject to removal, displacement, or exclusion thus promoting faster bottom-up growth by directing electrical current disproportionately to the bottom of the interconnect feature; and (5) the hydrophilic EO repeat units, which enhance the suppressor's solubility and raise the copper plating solution's cloud point. Appx784 at 6:19-37, Appx784-785 at 6:60-7:18, Appx2304-2305 at ¶6, Appx2325-2326 at ¶42.

Despite the strong attraction for the cathodic copper surface, the Enthone suppressor surprisingly provided enhanced bottom-up filling of a submicron, high aspect ratio feature without forming voids and seams.

The positive charge on the suppressor has also been found to be important for promoting suppressor migration to the locations where suppression is most needed, *i.e.,* where the field strength is otherwise greatest, such as the upper lip of the trench or via.  Appx2325-2326 at ¶42.

The hydrophobic film formed by the suppressor causes the current to be more evenly distributed at any given level within the via, without diminishing the vertical gradient in surface accelerator concentration or the corresponding vertical gradient in polarization and current density.  Appx784 at 6:60-65, Appx2326 at ¶43.

References cited by BASF (Barstad and Morrissey) disclosed that nonionic surfactants such as PEG, bifunctional propylene oxide/ethylene oxide copolymers, and alkoxylated alcohols had been found to function as suppressors for superfilling. But the references of record provided no basis for any prediction or reasonable expectation that a cationic surfactant—especially a nitrogenous, cationic surfactant having a polyether substituent comprising hydrophobic propylene oxide (PO) repeat units—would possess the critical balance of properties necessary to promote superfilling.  Appx2326-2327 at ¶44.  The literature provided numerous reasons

militating against an expectation that Enthone's suppressors would work. Appx2327-2330 at ¶¶45-47.

Enthone filed a patent application to protect its discovery and was issued the '992 Patent on December 4, 2007.  Appx777.

## III.   THE PRIOR ART

### A.   BARSTAD -- U.S. PATENT NO. 6,444,110

#### 1.   Disclosed Surfactants

Barstad describes surfactants as an additive to a common plating bath. Appx821 at 1:19-26 ("A common plating solution would be an acid copper plating solution containing (1) a dissolved copper salt . . ., (2) an acidic electrolyte (such as sulfuric acid) . . . and (3) additives (such as **surfactants**, brighteners, levelers **and suppressants**) to enhance the effectiveness and quality of plating.") (emphasis added).

Barstad describes "[m]ore specifically, **surfactants useful in the present invention**" to include various non-polymeric compounds (*e.g.,* amines such as ethoxylated amines, alkanol amines; amides; complexing surfactants such as alkoxylated diamines; and complexing agents for cupric or cuprous ions which include entprol, citric acid, edetic acid, tartaric acid, potassium sodium tartrate, acetonitrile, cupreine and pyridine) and various polymeric compounds (*e.g.,* polyoxyalkylene amines; polyglycol-type wetting agents, such as polyethylene glycols, polyalkylene glycols and polyoxyalkyene glycols; high molecular weight

polyethers; polyethylene oxides (mol. wt. 300,000 to 4 million); block copolymers of polyoxyalkylenes; and alkylpolyether sulfonates).  Appx823 at 6:39-50 (emphasis added).

Barstad describes particularly suitable surfactants for its plating composition as commercially available polyethylene glycol copolymers.  The only recitation of Tetronic is in this <u>surfactant</u> paragraph, which reads:

> Particularly ***suitable surfactants for plating compositions of the invention are commercially available polyethylene glycol copolymers***, including polyethylene glycol copolymers. Such polymers are available from e.g. BASF (sold by BASF under ***Tetronic*** and Pluronic tradenames), and copolymers from Chemax. A butylalcohol-ethylene oxidepropylene oxide copolymer having an MW of about 1800 from Chemax is particularly preferred.

Appx823 at 6:51-58 (emphasis added).

## 2.   Disclosed Suppressors

Barstad's plating bath contains "a surfactant-type suppressor agent," a term that unambiguously includes **<u>all</u>** suppressors.  Appx822 at 3:19-21; Appx2563 at 6:12-19.   Indeed, the Parties' experts agree there is no difference between a "surfactant-type suppressor" and a "suppressor."  Appx2563 at 6:12-19 ("Q.  Isn't it

true . . . that all suppressors are surfactants?   A. That's correct."), Appx1156 at 146:11-16, Appx1144 at 98:15-99:3 ("All suppressors are surfactants.")

Barstad's preferred suppressors are:   (a) "polymeric materials, preferably having hetero atom substitution, particularly oxygen linkages"– a genus so broad as to read on **every** polymer and to suggest no species within the genus, (Appx823 at 6:23-38); or (b) of the formula R-O-$(CXYCX'Y'O)_nH$ which excludes Tetronic copolymers.  Appx823 at 6:23-38, Appx712-713.

### 3.    The Working Examples

BASF's expert, Dr. Pound, suspected that the first of the three working examples in Barstad concerned conformal plating and **not** superfilling.  Appx2566 at 17:7-16.   Barstad's second working example used a high concentration of brightener and was said to have superfilled the microvia under test.   Appx824 at 8:41-67.  Barstad's third working example, a "Comparative Example" as against the second working example, used a low concentration of brightener and failed because the deposited copper contained voids, seams and inclusions.  Appx825 at 9:32-25. The "Suppressor" used in Barstad's second and third working examples was L62D, a Pluronic copolymer.

Tetronic was **not** used in any working examples in Barstad.

#### 4.    The BASF Admission

BASF repeatedly admitted that Barstad contains an "ambiguity" concerning the use of Tetronic copolymer as a suppressor for superfilling. Appx108, Appx448, Appx451, Appx459, Appx564, Appx568, Appx749, Appx1205 at ¶10. Indeed, BASF only cited Alling as teaching Tetronic copolymer as a suppressor to purportedly resolve the ambiguity in BASF's favor. *Id*.

### B.    ALLING -- U.S. PATENT PUBL. NO. 2002/0127847

Alling does not mention superfilling, bottom-up filling, or aspect ratios. Appx2342-2343 at ¶69, Appx2356-2359 at ¶¶93-95. Enthone's expert, Dr. Barkey, testified that "Alling has nothing to do with superfilling, and could not be used for plating semiconductor substrates with submicron interconnect features." Appx2359-2360 at ¶¶96-97, Appx2379-2380 at ¶124.

Alling uses compositionally modulated plating methods where a single plating bath is used to deposit different metals to electrically segregate traces to minimize copper electromigration and current leakage. Appx867 at [002], [0010]-[0013], Appx2378 at ¶122. Although Alling's method can have a semiconductor device interconnect as a substrate, the method requires depositing multiple metal layers of copper and a metal with a different reduction potential on the substrate. Appx. 871-872 at claim 10, Appx2379 at ¶124.

The working example in Alling often used the present tense and was therefore prophetic.  Appx871 at [0057]-[0059].  The electroplating bath in Alling's working example contained two metals, copper and nickel; however, nickel cannot be used to superfill a submicron feature.  Appx1161 at 165:16-166:19, Appx1388-1389 at ¶40.  BASF's expert, Dr. Pound, agreed that the working example in Alling concerned conformal plating and NOT superfilling.  Appx2569 at 30:14-31:4, Appx495 at Observation #9.  Dr. Pound also agreed that Alling teaches in ¶[0017] (at Appx868) that the invention can be used to produce a solderable finish or a metal resist, used for printed circuit boards, or packaging devices; and further agreed that ¶[0053] of Alling (at Appx871) emphasizes a wide variety of substrates that can be plated, a number of which would use conformal plating.  Appx2569 at 30:14-31:4.

Alling discloses over 20 different "suppressors" with a generic chemical name as well as many additional chemical structures (providing numerous additional permutations and combinations) that Alling also refers to as "preferred suppressor agents."  Appx870 at ¶¶40-43.  As Dr. Barkey explained, a POSITA would have no expectation of success in using the varying chemistries presented by these numerous "suppressors" in trying to superfill.  Appx2348-2349 at ¶82.

As the Board found in the Judgment now on appeal, "Alling does not expressly teach that Tetronic products are suitable suppressors for a superfilling process….Alling does not link the use of Tetronic products as suppressors to a

superfilling process…" Appx34-35.  These factual conclusions by the Board that Alling does not teach Tetronics products as suppressors for superfilling are supported by substantial evidence as addressed in Section I.D.4(a), below.

### C.    THE BASF CATALOG

The BASF Catalog is titled, "Pluronic & Tetronic Surfactants."  It includes the chemical formulas for many Pluronic and Tetronic surfactants.

As shown in the BASF Catalog at Appx837, the central group for the Pluronic surfactant is a polyoxypropylene with two side polyoxyethylene blocks forming a non-ionic triblock copolymer *containing three oxygen atoms but no nitrogen atoms*:



Appx837.

As shown in the BASF Catalog at Appx839, the central group of the Tetronic surfactant is a single ethylenediamine *containing two nitrogen atoms but no oxygen atoms:*



Figure 5.
The structure of TETRONIC surfactants.

Appx839.

BASF's expert admitted that the BASF Catalog states that Pluronic and Tetronic surfactants allow a wide range of surfactant functions and physical properties. Appx2570 at 33:6-34:16; 35:2-36:1 and 36:11-20. They range from flowable liquids of varying viscosities to pastes, prills, and cast solids with molecular weights from 1000 to 30,000. *Id.* They have very diverse properties, including wetting performance, and some are insoluble. *Id.* Notably, superfilling is ***not*** mentioned in the BASF Catalog at all.

It is <u>undisputed</u> that:

- Tetronic copolymers have a positive charge with two cationic sites when they are added to an acidic solution such as the Damascene

22

plating baths used for superfilling.  Appx2571 at 37:1-38:15, Appx2572 at 42:8-25.

- Pluronic copolymers are non-ionic in a Damascene plating bath. Appx2457 at 84:18-19.

The BASF Catalog does not disclose plating baths, suppressors or superfilling; however, whether a copolymer is cationic or non-ionic is directly material to whether it is suitable for superfilling.  A suppressor used to superfill must be removed or displaced at the feature's bottom to lower the electrical resistance at the feature's bottom and thus increase the current density there, which is the mechanism that allows for "bottom up filling," i.e., superfilling.  Appx2331 at ¶49. Because of the ion pairing effect between the positively charged Tetronic copolymer and the anionic species at the negatively grounded copper surface of the substrate during electroplating, Tetronic copolymer, like most suppressors, would be expected to simply stick to the bottom of the feature and thus prevent superfilling.  Appx800-804 at ¶¶15, 17, Appx2323 at ¶38.  Tetronic copolymer is also hydrophobic which would further exacerbate the problem of sticking to the feature's bottom wall and preventing superfilling.  Appx2323 at ¶38.

### D.    MORRISSEY -- U.S. PATENT PUBL. NO. 2002/0043467

Morrissey describes surfactants as an additive to a common plating bath. Appx828 at [0002] ("A common plating solution would be an acid copper plating

solution containing (1) a dissolved copper salt . . ., (2) an acidic electrolyte (such as sulfuric acid) . . . and (3) additives (such as **surfactants**, brighteners, levelers **and suppressants**) to enhance the effectiveness and quality of plating.") (emphasis added).

Morrissey describes that "surfactants may optionally be added to the electroplating baths." Appx831 at [0042]. Morrissey describes particularly suitable surfactants for its plating composition as commercially available polyethylene glycol copolymers. The only recitation of Tetronic is in this surfactant paragraph that reads:

> Particularly **suitable surfactants for plating compositions of the invention are commercially available polyethylene glycol copolymers**, including polyethylene glycol copolymers. Such polymers are available from e.g. BASF (sold by BASF under **TETRONIC** and PLURONIC tradenames), and copolymers from Chemax.

Appx831 at [0042] (emphasis added).

Morrissey's plating bath contains "a suppressor agent." Appx831 at [0039]-[0040]. The Parties' experts agree there is no difference between a "surfactant-type suppressor" and a "suppressor." Appx2563 at 6:12-19, Appx1156 at 146:11-16, Appx1144 at 98:15-99:3.

Morrissey's preferred suppressors are identical to Barstad's and are "polymeric materials, preferably having hetero atom substitution, particularly oxygen linkages"–a genus so broad as to read on **<u>every</u>** polymer and to suggest no species within the genus–or suppressors of formula R-O-(CXYCX'Y'O)$_n$H which do not include Tetronic or Pluronic copolymers.  Appx823 at 6:23-38, Appx712-713.

Morrissey does not include any working examples.

## SUMMARY OF ARGUMENT

The Board erred in several respects:

First, the Board found that Barstad taught Tetronic copolymer as a suppressor for superfilling even though that assertion was never made in the Petition and even though Petitioner conceded that Barstad was ambiguous on this issue.  Appx2687, *quoting,* Appx448, Appx451.  The Petitioner's obviousness theory was that Alling motivated the use of Tetronic copolymer as a suppressor for superfilling.  But the Board found that Alling does <u>not</u> teach Tetronic copolymer as a suppressor for superfilling.  Given the Board's rejection of Petitioner's obviousness theory, it was error for the Board to go outside of the Petition and find the patent claims obvious based on a theory never raised by Petitioner.  Further, there is nothing in the record to support the Board's revisionist view of Barstad.

Second, the Board determined that the combination of Barstad, Alling and the BASF Catalog rendered all of the patent claims invalid as obvious, but that the nearly identical disclosure found in the combination of Morrissey, Alling and the BASF did not render any of the patent claims invalid. Such internally inconsistent findings are arbitrary and capricious and unsupported by substantial evidence.

Third, the Board improperly conflated surfactants with suppressors to find that Barstad taught Tetronic copolymer as a suppressor for superfilling despite undisputed evidence to the contrary and BASF's admission that Barstad was ambiguous on this issue.

Fourth, the Board wholly failed to apply the correct legal principles set forth in this Court's unpredictability determination during the first appeal. The Board erroneously concluded that Tetronic copolymer was a suppressor suitable for superfilling when none of the prior art used Tetronic as a suppressor for superfilling and the only chemistry shown in the prior art for superfilling varied significantly in both its structure and properties from Tetronic copolymer in direct violation of the standard of unpredictability applicable here as previously affirmed by this Court.

It follows that there is no basis for finding any of the claims of the '992 patent invalid as obvious under Barstad, Alling and the BASF Catalog. The Judgment should be reversed, and the validity of the patent claims affirmed, or, at minimum, vacated and remanded.

## ARGUMENT

Throughout the IPR proceeding, the first appeal and the remand to the Board, BASF argued that a PHOSITA would have been motivated in view of Alling to replace the suppressor in Barstad or Morrissey with the Tetronic surfactant in the BASF Catalog.  In direct conflict with this argument, the Board now concludes that Barstad <u>itself</u> taught that Tetronic was a suppressor for superfilling.  The Board's unsupported conclusion is squarely in conflict with BASF's stated position heretofore and was rendered without notice to Enthone in violation of Enthone's rights under the APA and the statutes and regulations governing IPR proceedings. Given that there is no evidence to support this new theory of obviousness, the Judgment should be vacated and the validity of the claims affirmed.

The Board independently erred when it determined that the combination of Barstad, Alling and the BASF Catalog rendered all of the patent claims invalid as obvious, but that the nearly identical disclosure found in the combination of Morrissey, Alling and the BASF Catalog did not render any of the patent claims invalid.  The Board's internally inconsistent analysis of Barstad and Morrissey and conclusions based thereon were arbitrary and capricious and unsupported by substantial evidence.

The Board further erred in failing to apply the correct legal standard for unpredictability as articulated by this Court during *BASF I*.  Indeed, Tetronic was

never used as a suppressor for superfilling in any of the cited prior art. Although Pluronic was used as a superfilling suppressor for superfilling in Barstad, Pluronic has a very different structure and very different properties than Tetronic. And under the Board's explicit definition of a PHOSITA, such person would understand the material differences between Pluronic and Tetronic, again precluding the PHOSITA from having any expectation of success with Tetronic.

As explained more fully below, there is no basis for finding any of the claims of the '992 patent invalid as obvious under Barstad, Alling and the BASF Catalog. The Judgment should be reversed, and the validity of the patent claims affirmed, or, at minimum, vacated and remanded.

## I.   THE BOARD ERRED BY CONSTRUCTING ITS OWN OBVIOUSNESS THEORY, WHICH WAS NOT IN THE GROUNDS OF THE PETITION AS INSTITUTED AND STANDS IN CONFLICT WITH BASF'S STATED POSITION

### A.   Standard of Review

Under the Administrative Procedure Act ("APA"), this Court sets aside agency actions that are contrary to law, arbitrary and capricious, or unsupported by substantial evidence. The Board must make findings of fact, state its conclusion, and "explain the reasoning by which the findings are deemed to support the agency's conclusion." *In re Sang Su Lee,* 277 F.3d 1338, 1344 (Fed. Cir. 2002); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) ("the agency must examine the relevant data and articulate a satisfactory explanation

for its action including a 'rational connection between the facts found and the choice made'") (*citing Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

This Court reviews "the Board's procedures for compliance with the Administrative Procedure Act ("APA") *de novo*, under which we must "hold unlawful and set aside agency action ... not in accordance with the law [or] ... without observance of procedure required by law." *EmeraChem Holdings, LLC v. Volkswagen Group of America, Inc.*, 859 F.3d 1341, 1345 (Fed. Cir. 2017).

"In a formal adjudication, such as an ***inter partes*** review, the Administrative Procedure Act ("APA") imposes particular procedural requirements on the Board." *M&K Holdings, Inc. v. Samsung Electronics Co., Ltd.,* 985 F.3d 1376, 1383 (Fed. Cir. 2021). "The agency must timely inform the patent owner of "the matters of fact and law asserted," give all interested parties the opportunity to submit and consider facts and arguments, and allow a party "to submit rebuttal evidence . . . as may be required for a full and true disclosure of the facts." *EmeraChem,* 859 F.3d at 1345.

"[T]he petitioner's petition … is supposed to guide the life of the litigation," and is "the centerpiece of the proceeding both before and after institution." *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1356 & 1358 (2018). "It is of the utmost importance that petitioners in IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds

for the challenge to each claim.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016), *quoting,* 35 U.S.C. § 312(a)(3).

This Court has accordingly delineated between the introduction of new theories of unpatentability—which are not permissible post-institution—and mere elaborations on existing theories in response to patent owner's arguments—which are permissible. *See, e.g., AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, 2021 U.S. App. LEXIS 29547, at *19 (Fed. Cir. Sep. 30, 2021). The statutes and regulations applicable to *inter partes* review establish the required content of the petition-stage and post-petition stage filings, and strict adherence to these requirements is essential to promote the expedition- and efficiency-based policies of *inter partes* reviews. *Id*.

A petition must set forth "the evidence that supports the grounds for the challenge to each claim. 35 U.S.C. § 312(a)(3); *see also* 37 C.F.R. § 42.22(a)(2) (requiring "[a] full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence including material facts, and the governing law, rules, and precedent"); 37 C.F.R. § 42.104(b)(5) (stating that a petition must set forth "[t]he exhibit number of the supporting evidence relied upon to support the challenge and the relevance of the evidence to the challenge raised, including identifying specific portions of the evidence that support the challenge").

**B.      The Board Changed the Obviousness Theory Found in the Petition**

BASF's obviousness theory has always been that in view of Alling, a PHOSITA would have substituted Barstad's suppressor with the BASF Catalog's Tetronic surfactant copolymer when superfilling submicron, high aspect ratio interconnect features of at least about 3:1.  *See* Section I.D, below.  During the first appeal, this Court framed the issued as follows:

> [T]he central issue is whether, ***in view of Alling***, a PHOSITA would have been motivated to ***replace*** either of Barstad's or Morrissey's suppressor with the BASF Catalog's Tetronic® surfactant copolymer.

*BASF I*, 749 Fed.Appx. at 982. (emphasis added).

But then on remand, the Board ***altered*** BASF's theory of obviousness in the Judgment without any notice to Enthone.   Rather than ***replacing*** Barstad's suppressor with the BASF Catalog's Tetronic copolymer in view of Alling as BASF contended, the Board found Barstad ***itself*** taught that the Tetronic copolymer ***was*** a suppressor for superfilling submicron interconnects.   Specifically, the Board concluded:

- "We now find that the term 'surfactant-type suppressor agent' [in Barstad] indicates a suppressor that also has qualities as a surfactant." Appx13.

31

- "[W]e are persuaded that one of ordinary skill would have understood Barstad to suggest that Tetronic copolymer would act *as a suppressor* for superfilling submicron interconnects." Appx15 (emphasis added).

- "This association between BASF products [Pluronic and Tetronic copolymers] persuades us that one of ordinary skill would have understood Barstad to teach that Tetronic copolymers as surfactants *with suppressor activity*." *Id.* (emphasis added).

- "In summary, on remand we find that Barstad teaches the use of Tetronic copolymer *as a suppressor* that can be used *in superfilling*, such as for microvias." Appx17 (emphasis added).

- "Furthermore, we agree with BASF that those of ordinary skill would have had a reasonable expectation of success because Barstad teaches using Tetronic polymers with superfilling." Appx21.

The Board thus violated the APA and the statutes and regulations governing *inter partes* review by dramatically altering BASF's theory of obviousness and constructing its own obviousness theory without notice to Enthone and for the first time in the Judgment.

### C. This Court Must Set Aside the Board's Holding as Not in Accordance with the Law

This Court reviews the Board's procedures for compliance with the APA *de novo*, and must hold unlawful and set aside agency action not in accordance with the

law. *EmeraChem,* 859 F.3d at 1345. The Board must not depart markedly from the evidence and theories presented by the petition or institution decision. *M & K,* 985 F.3d at 1383.

For example, in *EmeraChem*, this Court reversed, without a remand, a Board's final decision because it found that the Board had denied the patent owner's rights under the APA. Specifically, the Court concluded that the Board in its final decision, relied upon Stiles to meet the limitations of dependent claims 3, 16, and 20. However, at all times before that, including the Petition and Institution Decision, a different prior art reference to Saito was used to meet the limitations of these claims. This Court concluded in *EmeraChem* that the Board erred—as a matter of law—by adopting a new rationale for unpatentability in the Final Written Decision. *EmeraChem*, 859 F.3d at 1350-52.

Likewise, in *M & K,* this Court reversed a finding of unpatentability because the Board "deviated impermissibly from the invalidity theory set forth in Samsung's petition." *M & K,* 985 F.3d at 1385. In its Petition, Samsung contended that claim 3 was invalid as obvious based on a combination of WD4-v3, Park and Zhou. Samsung never asserted that claim 3 was invalid as anticipated by any one reference. *Id.* at 1384. In its final written decision, however, the Board found that claim 3 was anticipated by WD4-v3 alone. This Court reversed, concluding the Board deviated impermissibly from Samsung's theory of invalidity because:

33

Although M&K was aware of the prior art used to invalidate claim 3

given the obviousness combination asserted against that claim, M&K

was not put on notice that the Board might find that WD4-v3 disclosed

all of the limitations in claim 3 and might invalidate claim 3 based on

anticipation.

*M & K,* 985 F.3d at 1385.

Here, just as in *EmeraChem* and *M & K*, the Board denied Enthone its

procedural rights guaranteed under the APA and violated the statutes and regulations

governing *inter partes* review.  To wit:

First, the Board relied on an interpretation of Barstad (*i.e.*, that Barstad taught

Tetronic as a suppressor for superfilling submicron features with high aspect ratios)

that was not advocated by BASF in its Petition—nor found in the Institution

Decision.  In fact, the Board's interpretation of Barstad stands in stark contrast to

BASF's own position, which has always been that Barstad is ambiguous on the issue

of whether Barstad teaches Tetronic as a suppressor.  Appx2687, *quoting,* Appx448,

Appx451.

Second, the Board used its interpretation of Barstad to support a motivation

to combine finding, which dramatically altered BASF's obviousness theory.

Specifically, BASF's obviousness theory has always been that Alling would have

motivated the ordinarily skilled artisan to replace the suppressor in Barstad with the

Tetronic copolymer in the BASF Catalog.  Indeed, that is the obviousness theory identified in BASF's Petition and the Board's Institution Decision, and that is the one that was expressly restated by this Court in *BASF I*.  *BASF I*, 749 Fed.Appx. at 982.

In stark contrast, the Board used Barstad on remand for the motivation—not to replace Barstad's suppressor—but to use Tetronic copolymer as a suppressor for superfilling in Barstad's plating bath.  Additionally, the Board used Barstad as the basis for concluding that a PHOSITA "would have had a reasonable expectation of success because Barstad teaches using Tetronic polymers with superfilling." Appx21.  Thus, by adopting an interpretation of Barstad never advocated by BASF and, then, using that interpretation to find a motivation to combine and a reasonable expectation of success, the Board "impermissibly deviated" from BASF's theory of obviousness and denied Enthone's rights guaranteed by the APA.

Moreover, the materiality of this error is demonstrated by the Board reaching contrary conclusions with respect to the two proffered combinations:  (1) Barstad, Alling and BASF Catalog and (2) Morrisey, Alling, and BASF Catalog.  *See* Section II, below.  As it relates to the first combination, the Board used its interpretation of Barstad as support for a motivation to combine and, therefore, found the claims unpatentable.  With respect to the second combination, the Board correctly concluded: "we are not persuaded that Morrissey provides a reason to use

a Tetronic product for its superfilling process" and because "Alling does not link the use of Tetronic products as suppressors to a superfilling process [it] fails to cure the deficiency in Morrissey. Appx34-35. While unnecessary for finding error, this disparity demonstrates that the Board's error in altering BASF's obviousness theory was *__the__* reason the Board erroneously found the claims unpatentable over Barstad, Alling and BASF Catalog.

For all of these reasons, just as in *EmeraChem* and *M & K,* this Court should reverse the Board's Judgment because the Board failed to observe the correct procedures required by law and specifically denied Enthone's rights guaranteed by the APA.

### D.    The Procedural History of the Motivation to Combine Argument

From the Petition forward, BASF and the Board consistently considered the combination of Barstad, Alling and the BASF Catalog from the perspective that Alling taught the use of Tetronic as the suppressor in the combination for superfilling. It was not until the Judgment now on appeal that the Board improperly switched theories to rely on Barstad alone.

#### 1.    BASF relied upon Alling as its Motivation to Combine in its Petition

The Petition cites to Alling 26 separate times for the proposition that Tetronic should be used as the suppressor for superfilling in the combination of Barstad,

36

Alling and BASF Catalog. *See* Appx94, Appx96, Appx98, Appx103-106, Appx108, Appx110, Appx113, Appx117- Appx121, Appx138-142, Appx146-149.

In sharp contrast, the Petition does not cite to Barstad for the use of Tetronic as a suppressor for superfilling. Appx84-149. Rather, the Petition cites to Barstad for an electroplating composition for superfilling of submicron features of high aspect ratio. Appx108-112 (claim elements 1a-1d, 1h). Further, Barstad's composition can contain a "surfactant-type suppressor agent." Appx108, Appx110-111 (claim element 1e), *citing*, Appx822 at 3:19-21. The Petition further notes that Barstad states "particularly suitable surfactants…are available from e.g. BASF (sold by BASF under Tetronic and Pluronic tradenames)…." Appx110-111 (claim element 1e), *citing,* Appx823 at 6:51-58.

But the Petition explicitly relies upon Alling for the proposition that Alling discloses Tetronic copolymers are "[p]articularly suitable suppressor agents for plating compositions." Appx110 (claim element 1e), *citing,* Appx870 at [0043]. The Petition concludes, "Accordingly, a person of ordinary skill in the art would have been motivated to use Tetronic® polymers as suppressors in Barstad's compositions." Appx108.

Ground 1 of the Petition, therefore, relies on Alling to provide the reason to combine Barstad, Alling and the BASF Catalog.

## 2.    The Board Relied On Alling for Motivation to Combine in its Institution Decision and Final Written Decision

The Institution Decision, the original FWD here, and the FWD in related Case IPR2016-00697 could not be more definite in finding that BASF asserted Alling for the addition of Tetronic as a suppressor for superfilling in the combination of Barstad, Alling and the BASF Catalog.

To quote the Board in these three separate documents:

BASF acknowledges that ***Barstad does not disclose the use of Tetronic® polymers as suppressor agents*** in its electroplating solution, but argues that Alling provides that Tetronic polymers are particularly suitable as suppressor agents"

Appx2682, Appx326, Appx643-644 (emphasis added).

The IPR was instituted on this basis – where use of Tetronic copolymer as a suppressor was missing from Barstad, and Alling provided the motivation to combine Tetronic copolymer with Barstad.  Appx333 ("Alling provides sufficient motivation to utilize a Tetronic® surfactant as a suppressor in the processes of Barstad. . . . we are persuaded that Alling would have lead one of ordinary skill in the art to have used Alling's suppressor in the plating solution of Barstad.")

In the Institution Decision, the Board never took the position that Barstad disclosed Tetronic as a suppressor, let alone for superfilling, and instead specifically

38

noted that BASF acknowledged that Barstad made no such disclosure.  Appx315-338.

Further, in the original FWD, the Board required a specific reason to use a Tetronic copolymer as a suppressor with a reasonable expectation of success that the modified Barstad composition would superfill, "given the general unpredictability in the field and the art."  Appx646-648.  The Board found that the Grounds in the Petition did not rest on the description of Tetronic as a suppressor or surfactant in Barstad since BASF considered Alling to resolve the issue:

> **BASF argues that any ambiguity in Barstad and Morrissey is resolved by Alling**, such that it is apparent that neither ground rests on the distinctiveness of descriptions of 'suppressors' and 'surfactants.' . . . although Alling makes clear that Tetronic copolymers are particularly suitable suppressor agents, it **does not, however, specify that they would have particular or any applicability to methods requiring superfilling**. . .

Appx649-650 (internal citations omitted) (emphasis added).

Thus, the Board consistently and correctly interpreted the Petition and BASF's stated position to require Alling for the motivation to combine the Tetronic copolymer with Barstad in the Institution Decision and FWD.

**3.     In Reply Before the Board, BASF Alleged that Alling Resolved Barstad's Ambiguity Regarding Tetronic as a Suppressor**

In Reply and at Oral Argument, BASF expressly admitted that Barstad contains an "ambiguity" concerning the use of Tetronic as a suppressor, but that Alling's teaching concerning Tetronic as a suppressor resolves the ambiguity. Appx448, Appx459, Appx451 ("Barstad implies that Tetronic® copolymers may be used as ***suppressors***.  Alling resolves any ambiguity by explicitly stating that '[p]articularly suitable ***suppressor*** agents' include copolymers 'sold by BASF under Tetronic and Pluronic trade-names.'" (internal citations omitted)); Appx564, Appx569, Appx568 ("[T]here is ***admittedly some ambiguity*** which is ***when we get to Alling, but it comes very close***, I think, ***to identifying Tetronic*** and Pluronic copolymers ***as the actual suppressor*** to be used in the plating composition in Barstad."(emphasis added)).

Importantly, BASF did not refute the Board's statement that BASF acknowledges that Barstad does not disclose Tetronic® copolymers as suppressor agents.  Instead, BASF admitted the ambiguity and argued that Alling resolved the ambiguity in BASF's favor.  Appx2687, *quoting*, Appx448, Appx451.  Yet on remand, the Board reversed itself and found no admission by BASF that Barstad lacked Tetronic as a suppressor—yet another finding that is not supported by

substantial evidence and a finding that is in direct conflict with the FWD in related Case IPR2016-00697. *See* Section III.B.4.

### 4. The Board Has Now Twice Found that Alling Does Not Expressly Teach Tetronic Copolymers as Suppressors for Superfilling which is Fatal to Ground 1 of the Petition

On remand in its Judgment, the Board correctly found that "Alling does not expressly teach that Tetronic products are suitable suppressors for a superfilling process . . . Alling does not link the use of Tetronic products as suppressors to a superfilling process . . ." Appx34-35. Given the procedural history of BASF's argument for the combination of Barstad, Alling and the BASF Catalog as explained immediately above, this renewed finding that Alling fails to teach Tetronic as a suppressor for superfilling is both supported by substantial evidence and fatal to Ground 1 of the Petition.

### a) The Board's Finding Regarding Alling is Supported by Substantial Evidence

It is no surprise that the Board found that Alling does not teach Tetronic as a suppressor for superfilling. The evidence was overwhelming in the other direction:

- Alling does not mention superfilling, bottom-up filling, or aspect ratios. (Appx2342-2343 at ¶69, Appx2356-2359 at ¶¶93-95).

- The electroplating bath in Alling's prophetic example contained two metals, copper and nickel; however, nickel cannot be used to superfill

41

a submicron feature.  Appx1161 at 165:16-166:19, Appx1388-1389 at ¶40.

- BASF's expert, Dr. Pound, agreed that the working example in Alling concerned conformal plating and *not* superfilling.  Appx2569 at 30:14-31:4, Appx495 at Observation #9.

- Enthone's expert, Dr. Barkey, testified that Alling "has nothing to do with superfilling."  Appx2359-2360 at ¶¶96-97, Appx2379-2380 at ¶124.

- Alling discloses over 20 different "suppressors" with a generic chemical name as well as many additional chemical structures that Alling also refers to as "preferred suppressor agents."  Appx870 at ¶¶ 40-43.  A POSITA following Alling would have no expectation of success in using the varying chemistries presented by these numerous "suppressors" in trying to superfill because this art is very unpredictable for any chemical whose structure or properties varied *in any material respect* from suppressors that had already been demonstrated to be effective for superfilling.  *See* Section IV.  And here, there is no evidence in any of the prior art of record that Tetronic was ever actually used to superfill a submicron feature.

42

This Court affirmed the Board's determinations regarding a PHOSITA's ability to understand the difference between conformal plating and superfilling, and the unpredictability associated with suppressors used for superfilling:

> The PTAB found that a PHOSITA would understand "the differences between [conventional,] conformal plating and superfilling electrolytic plating," and "would have appreciated that it was unpredictable whether a given molecule would have served as a suppressor effective for superfilling."

*BASF I*, 749 Fed.Appx. at 983.

Understanding that Alling's teaching of Tetronic was as a conformal plating suppressor and not as a suppressor for superfilling, a PHOSITA would not have looked to Alling for a reason to use a Tetronic copolymer as a suppressor for superfilling. None of the remaining art *as presented in the Petition* teaches the use of Tetronic as a suppressor for superfilling. Ground 1 of the Petition fails for lack of motivation to combine.

### b)    The Board's Finding Regarding Alling is Consistent with the Findings in IPR2016-00697

The Board found in the FWD in IPR2016-00697 that "Alling would have led one of ordinary skill in the art to use Alling's suppressor in the ***conventional or conformal*** plating solution of Barstad or Morrissey." Appx2689-2690 (emphasis added). Unlike the method claims of the '992 Patent, the product claims of the '786

Patent read on conformal plating and did not contain any feature limiting use of the product to superfilling. *Id*. The Board noted that a newly discovered use in superfilling could not establish patentability for an obvious product. *Id*. Thus, the Board found Alling's use of Tetronic as a suppressor in conformal plating to be motivation to combine Alling with Barstad's conformal plating solutions.

Here, the method claims are limited to use in superfilling and so the findings regarding Alling based on conformal plating in IPR2016-00697 do not apply in this proceeding. Appx5 ("The claimed method also requires superfilling . . .").

### E.    *BASF I* Affirmed that the Board Used the Correct Legal Standard in its Original Motivation to Combine Analysis

In *BASF I*, this Court affirmed the legal standard used by the Board in determining motivation to combine and that "there must be some specific motivation to employ specific plating bath components, given the general unpredictability in the field and the art." *BASF I*, 749 Fed.Appx. at 982. This Court also acknowledged, "To the extent an art is *unpredictable*, . . . *KSR*'s focus on these identified, predictable solutions *may present a difficult hurdle* because potential solutions are less likely to be genuinely predictable." *BASF I*, 749 Fed.Appx. at 983, *citing, Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) (emphases added by this Court) (internal quotation marks omitted). This Court remanded to the Board to reconsider whether either ground provided the requisite motivation to combine in light of Alling. *BASF I*, 749 Fed. Appx. at 985.

44

Given Alling's lack of a specific motivation to use a Tetronic copolymer for superfilling submicron features, the Board erred in deriving an alternative reason outside the Petition to combine from Barstad alone.  As there is no evidence to support this new conflicting theory of obviousness based on Barstad alone, this Court should vacate the Judgment or, at minimum, remand.

## II. THE BOARD MADE INCONSISTENT FINDINGS IN THE JUDGMENT REGARDING ALLING ON THE SAME TECHNICAL ISSUE PRESENTED IN BOTH BARSTAD AND MORRISSEY

### A. Standard of Review

This Court sets aside Board actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Vicor Corp. v. SynQor, Inc*. 869 F.3d 1309, 1320 (Fed. Cir. 2017).  Where the Board reaches inconsistent conclusions on the same technical issue, this Court will reverse and remand for further consideration. *Id*. at 1321-22.

For example, in *Vicor*, the Board reached inconsistent conclusions concerning the weight to be accorded objective indicia concerning two related patents. *Id.* at 1321.  As to one patent, the Board found the objective evidence so persuasive that the claims were patentable, but as to the second patent, the Board found the objective evidence so lacking a nexus that the claims were unpatentable.  Because the Board reached inconsistent conclusions on the same technical issue without a rational explanation to justify the inconsistency, this Court reversed and remanded.

45

**B.    The Board Made Inconsistent Findings Concerning Alling**

**1.    Procedural History**

In the original FWD, the Board found that Alling did not provide the requisite motivation to combine the BASF Catalog's Tetronic copolymer, as the suppressor, for either Barstad's or Morrissey's superfilling methods.  Appx651.  The Board reasoned that a PHOSITA would not have had any basis for predicting the effectiveness for superfilling of any suppressor whose structure or properties varied *in any material respect* from the suppressors that had already been demonstrated to be effective for superfilling.  Appx647-648 (emphasis added).  In addition, the Board required "some specific motivation to employ specific plating bath components, given the unpredictability in the field and the art."  *Id*.

While this Court upheld the Board's unpredictability standard, this Court also noted that the Board's finding that Alling was inapplicable to superfilling was not supported by a correct record citation and remanded for reconsideration.  *BASF I*, 749 Fed.Appx. at 984-85.

**2.    The Board Erroneously Made Inconsistent Findings**

The Board in its Judgment has now made inconsistent findings with respect to Alling on the very same technical issue.  Specifically, the Board found that Alling would have motivated a PHOSITA to replace Barstad's suppressor with Tetronic copolymer (Appx21), *but would not* have motivated a PHOSITA to replace Morrissey's suppressor with Tetronic copolymer.  Appx34-35.

46

As in *Vicor*, the Board here was confronted with the same technical issue. Both obviousness combinations presented by BASF in its Petition begin with one of two references—Barstad or Morrissey, that are directed to copper superfilling of submicron, high aspect ratio interconnects—and the Petition then cites Alling to motivate a PHOSITA to replace separately both Barstad's and Morrissey's suppressor with the Tetronics copolymer in the BASF catalog. Appx108-109. But, as it relates to this same technical issue, the Board impermissibly reached opposite conclusions.

With regard to Barstad, the Board found that because Alling is generally directed to superfilling, "there would have been a motivation to combine the teachings of including these same Tetronic copolymers taught in Barstad with Alling." Appx21.

In direct conflict, with regard to Morrissey, the Board determined that while "Alling is directed to superfilling, Alling does **not** expressly teach Tetronic products are suitable suppressors for a superfilling process." Appx34 (emphasis added). Instead, the Board found that "Alling merely discloses that Tetronic products are particularly suitable suppressor agents *for its invention*." Appx34-35 (emphasis added). The Board concluded: "Thus, Alling does **not** link the use of Tetronic products as suppressors to a superfilling process and fails to cure the deficiency of Morrissey." Appx35 (emphasis added).

Accordingly, on this same technical issue, the Board arrived at diametrically opposite conclusions. The Board's only explanation was that unlike Morrissey, Barstad provided "*a reason* to use a Tetronic product for its superfilling process" because it disclosed "a surfactant-type suppressor agent" and a Pluronic product as a suppressor in the working examples. Appx34 (emphasis added). But these explanations merely confirm, as detailed above, that the Board "impermissibly deviated" from BASF's obviousness theory in its Petition when it found that ***Barstad (not Alling)*** provided the motivation to use a Tetronic copolymer as a suppressor for superfilling.

On remand, as it relates to BASF's obviousness theory, the Board explicitly rejected any notion that Alling would have motivated a PHOSITA to look to the BASF catalog for superfilling suppressors. The Board found Alling does not teach "Tetronic products as *suitable* suppressors for a superfilling process." Appx34 (emphasis added). The Board then impermissibly constructed a new obviousness theory by searching through Barstad and Morrissey for motivation to combine when Alling failed to provide such motivation. Appx27 (". . . the reasons for using Tetronic polymers is . . . based . . .on the teachings of Barstad. . ."), Appx34 ("Therefore, we are not persuaded that Morrissey provides a reason to use a Tetronic product for its superfilling process.").

48

It follows that this Court should vacate the Judgment or, at minimum, reverse and remand.

## III.   THIS COURT SHOULD REVERSE THE BOARD'S OBVIOUSNESS DETERMINATION AS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    Standard of Review

This Court reviews the Board's factual findings for substantial evidence and its legal conclusions *de novo*. *Intelligent Bio-Sys., Inc.*, 821 F.3d at 1366. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re NuVasive, Inc.*, 842 F.3d 1376, 1379-80 (Fed. Cir. 2016) (internal quotation marks and citations omitted). The substantial evidence standard "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

Obviousness "is a question of law based on underlying findings of fact." *Id.* at 1316. An obviousness determination requires that a PHOSITA would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so. *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018). Motivation to combine with a reasonable expectation of success are questions of fact. *Id.*

Under *KSR*, "predictability is a vital consideration in the obviousness analysis." *Otsuka Pharm Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1298 (Fed. Cir. 2012) (*citing KSR Intl. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)). "To the extent an art is unpredictable, . . . *KSR*'s focus on . . . identified, predictable solutions are less likely to be genuinely predictable." *Eisai Co. v. Dr. Reddy's Labs.*, Ltd., 533 F.3d 1353 (Fed. Cir. 2008).

**B.  The Board Erred in Finding that Barstad Teaches Tetronic as a Suppressor for Superfilling**

**1.  Barstad's Description of Suppressors Does Not Teach or Suggest Tetronic Copolymers**

Barstad's uses three different terms to identify suppressors. None of these terms teach or suggest Tetronic copolymers as suppressors:

- <u>Term 1</u>: "Surfactant-type suppressor agent," which unambiguously includes **<u>all</u>** suppressors. Appx2563 at 6:12-19.

- <u>Term 2</u>: Barstad's preferred suppressors of formula R-O-$(CXYCX'Y'O)_nH$, *which excludes Tetronic copolymers*. Appx823 at 6:23-38.

- <u>Term 3</u>: "Polymeric materials, preferably having hetero atom substitution, particularly oxygen linkages"—a genus so broad as to read on **<u>every</u>** polymer and to suggest no species within the genus. Appx823 at 6:23-38. This broad genus provides no indication of which

parameters are critical for a polymer to function as a suppressor for superfilling, and no direction as to which of many possible choices is likely to be successful. Appx567 at 13-20. It does not teach or suggest Tetronic copolymers in any respect.

Barstad's only disclosed suppressor species—PEG 8000 and L62D—are materially different than Tetronic copolymers. Appx824-825 at Examples 1-3. It follows that Barstad includes no disclosure of Tetronic copolymers as a suppressor, let alone for superfilling.

### 2. The Board Erred as a Matter of Law in Conflating Barstad's Surfactants with Suppressors

The Board defined a "surfactant-type suppressor agent" as "a suppressor that also had qualities as a surfactant." Appx13. This definition is unsupported by substantial evidence because it is undisputed that all suppressors are surfactants. Appx1144 at 98:15-99:3, Appx2563 at 6:12-19. The Board thus had no evidentiary basis to conclude that Barstad's express disclosure of "surfactants" did not create "sharp distinctions between compounds acting as suppressors or surfactants." Appx13.

Given that Barstad expressly states that Tetronic copolymers are "particularly suitable surfactants," **__not__** suppressors, *see* Appx823 at 6:51-56, the Board further erred in failing to consider the following undisputed evidence:

51

- ***The experts agree there is no difference between a "surfactant-type suppressor" and a "suppressor."*** Appx2563 at 6:12-19 ("Q. Isn't it true . . . that all suppressors are surfactants?   A. That's correct."), Appx1156 at 146:11-16, Appx1144 at 98:15-99:3 ("All suppressors are surfactants."), Appx1144 at 98:15-99:3 (There is no "surfactant-type" category within a broader category of suppressors.)

- Not only are all suppressors surfactants, but all accelerators (brighteners) and levelers are also surfactants.  Appx1144 at 97:17-22 ("The fact is that all of these additives, suppressors, accelerators, levelers, they're surfactants.")  This means that the term "surfactants" covers a broad genus, and brighteners, suppressors and levelers are species within that genus.

- Barstad, Alling and Morrissey each describe surfactants as an additive to its plating bath ***in addition to*** accelerators, levelers and suppressors.  Appx823 at 6:39-62, Appx828 at [002], Appx821 at 1:19-26 ("A common plating solution would be an acid copper plating solution containing (1) a dissolved copper salt . . ., (2) an acidic electrolyte (such as sulfuric acid) . . . and (3) additives (such as ***surfactants***, brighteners, levelers ***and suppressants***) to enhance the effectiveness

52

and quality of plating.") (emphasis added), Appx870 at [045], Appx829-830 at [026], Appx831 at [042].

In view of this undisputed evidence, all suppressor, brightener and leveler species are in the <u>surfactant genus</u>. It was thus arbitrary for the Board to assume that Barstad's disclosure of Tetronic copolymer as a surfactant somehow taught Tetronic as a suppressor species when there is no explicit disclosure or evidence in Barstad that a Tetronic surfactant functions as a suppressor, especially given this unpredictable art.

Indeed, Barstad disclosed many surfactants including amines, ethoxylated amines, alkanol amines, amides, alkoxylated diamines, entprol, citric acid, edetic acid, tartaric acid, potassium sodium tartrate, acetonitrile, cupreine, and pyridine. None of these surfactants are encompassed by any of the three terms Barstad uses to define its suppressors. Appx823 at 6:39-50, Appx2565 at 13:13-14:7. This is further evidence that Barstad's surfactants were just that – surfactants -- and not a disclosure of suppressors.

The Board also erred in asserting that Enthone "conten[ded] that a person of ordinary skill would have understood Barstad as disclosing that a suppressor cannot also be a surfactant." *Id.* This is false. All suppressors are surfactants and Enthone never said otherwise. Indeed, the Judgment later quotes Enthone for this very principle, "all suppressors qualify as surfactants…." Appx14-15 (*quoting* Enthone).

The Board further erred in faulting Enthone for failing to show that Barstad "limit[s] [Tetronic] copolymers to suppressors with no surfactant action."  Appx13. First, there is no disclosure in Barstad of Tetronic copolymers as suppressors. Appx823 at 6:51-56.  Second, the Board's new-found requirement for "suppressors with no surfactant action" is nonsensical and contrary to basic chemistry because, again, it is undisputed that all suppressors are surfactants, which necessarily means that all suppressors exhibit "surfactant action."  Such internal inconsistencies in the Board's decision and mischaracterization of Enthone's position on a material issue render these decisions arbitrary and capricious, and unsupported by substantial evidence.

For all of these reasons, the Board erred in finding Barstad to teach Tetronic as a suppressor for superfilling.

### 3.    BASF's Admission

BASF admitted in the Petition and at Oral Argument that Barstad is at least "ambiguous" as to whether Barstad teaches Tetronic copolymer as a suppressor for superfilling.    *See, e.g.,* Appx108, Appx568 (". . . there is admittedly some ambiguity . . . but it comes very close, I think, to identifying Tetronic and Pluronic copolymers as the actual suppressor to be used in the plating composition in Barstad.")).  BASF further asserted that Alling resolved that ambiguity in BASF's

favor.   Appx108, Appx448, Appx451 Appx459, Appx564, Appx568, Appx749, Appx1205 at ¶10.

In the context of this very unpredictable art, coming "very close . . . to identifying Tetronic as a suppressor" is not the "profound predictability" required by this Court in *BASF I* and is certainly not a teaching by Barstad of Tetronic as a suppressor for superfilling as the Board erroneously concluded in its Judgment.   Indeed, absent an instance of actual use of Tetronic copolymer as a suppressor for superfilling, a PHOSITA would have had no basis to predict success under the legal standard for unpredictability adopted by the Board, and quoted and affirmed by this Court.   *BASF I*,  749 Fed.Appx. at 982-83.

### 4.    The FWD in IPR2016-00697 Did Not Find that Barstad Teaches Tetronic as a Suppressor

In the original FWD, the Board found that suppressors and surfactants were disclosed as separate components, and that Barstad's disclosure of Tetronic copolymers was limited to their use as surfactants.  Appx649-650.  But on remand, this Court considered this finding inconsistent with the following statement in the '786 FWD:

> ***As noted above (Sec. II.B.1),*** Barstad discloses polyethylene glycol copolymers as preferable "surfactant-type suppressor agents," and expressly discloses the polyethylene glycol copolymers that were

> commercially available from BASF under the Tetronic tradename. *Id*.
> at 6:51-56 [Appx823 at 6:51-56].

Appx2688 (emphasis added).

The citation back to Section II.B.1 of the '786 FWD does not support the above quoted language. Nothing in Barstad draws a connection between the surfactant-type suppressor (Appx822 at 3:19-30) and the surfactants/polyethylene glycol polymers/Tetronic (Appx823 at 6:5-38, 51-56). *Compare* Appx2679 *to* Appx2688. Thus, the Board's paraphrase in the '786 FWD took Barstad's disclosure out of context regarding its suppressors. Sec. II.B.1 of the '786 FWD accurately states that Barstad discloses: a "surfactant-type suppressor agent"; and that "particularly suitable surfactants" are "commercially available polyethylene glycol copolymers," such as those available from BASF under the Tetronic tradename. Appx2679.

The Judgment relies on the incorrect '786 FWD paraphrase while omitting the phrase "As noted above (Sec. II.B.1))" without any indication of the omission from the quoted text. Appx13, Appx17. The Board now finds that Barstad teaches the use of Tetronic as a suppressor for superfilling, which is consistent with the *inaccurate* paraphrases in '786 FWD and the Judgment, but inconsistent with Sec. II.B.1 of the '786 FWD and with the actual teachings of Barstad.

## C.    This Court's Precedent Requires Reversal

This case is analogous to *OSI Pharmaceuticals, LLC v. Apotex Inc*., 939 F.3d 1375 (Fed. Cir. 2019).  In *OSI*, the claims at issue were directed to a method of treating non-small cell lung cancer (NSCLC) by administering a composition comprising erlotinib.  *Id*. at 1378-79.  The Board determined that the claims would have been obvious from a combination of two references.  Reference 1 disclosed erlotinib to treat lung cancer, but does not discuss NSCLC.  *Id*.  Reference 2 disclosed that erlotinib and another ATP-binding inhibitor "are currently in clinical trials. . . . However, these compounds appear to have good anti-cancer activity in preclinical models, . . . particularly in patients with non-small cell lung cancer."  *Id*. at 1383.  Reference 2 cited two publications in support of its disclosure—the first describing antitumor activity in NSCLC tumors using the other ATP-binding inhibitor and the second describing anticancer activity in head and neck tumors using erlotinib.

This Court decided that the Board erred in finding a clear inference in Reference 2 that erlotinib had anti-cancer activity against NSCLC.  This Court reasoned that when read in the context of its cited publications, the statement about NSCLC in Reference 2 could not be referring to erlotinib because there was no evidence of erlotinib's effect on NSCLC when Reference 2 was published.  *Id*.  The

Board erred by not properly considering that the cited publications did not support the Board's reading of Reference 2.

Like Reference 1 in *OSI* which taught erlotinib for treating lung cancer but not specifically NSCLC, Alling discloses a Tetronic copolymer as a suppressor for conformal plating, but does not teach Tetronic copolymers as suppressors for superfilling. Appx16, Appx34. Thus, both references as applied in their respective IPRs fall short of teaching or suggesting the claimed compound for the use as claimed.

Like Reference 2 in *OSI* which had no explicit teaching of erlotinib for treating NSCLC, Barstad has no explicit teaching of Tetronic copolymer as a suppressor for superfilling. Rather, Barstad describes electroplating compositions: (a) with suppressors that result in conformal plating (as in its Example 1, but **not** relevant to superfilling here); and (b) with suppressors that are able to achieve superfilling (as in Example 2), but then only with L62D, a Pluronic copolymer, as the suppressor and not with Tetronic copolymer as the suppressor. Appx824, Appx2566 at 17:7-16.

In *OSI*, the Board erred in finding that Reference 2 inferred that erlotinib treated NSCLC based on the mention of erlotinib along with another ATP-binding inhibitor in Reference 2 that had known efficacy for treating NSCLC. Here, the Board similarly erred when interpreting Barstad analogous to *OSI*'s

58

misinterpretation of Reference 2.  More particularly, the Board here on remand was persuaded that, from the mere association of Pluronic and Tetronic copolymers as surfactants, a PHOSITA "would have understood Barstad to teach Tetronic copolymers as surfactants with suppressor activity."  Appx15.  Properly read in context, Barstad discloses only that Tetronic copolymers are preferred surfactants in its electroplating compositions, not suppressors for superfilling.

Simply put, given the established unpredictability in this art, Barstad's recitation of Pluronic and Tetronic copolymers in the same sentence is no more relevant to the use of Tetronic as a suppressor for superfilling than was the mention of erlotinib with the known ATP-binding inhibitor in Reference 2 in *OSI*.

Just as there was no substantial evidence to support use of erlotinib in treating NSCLC for References 1 and 2 in *OSI*, there is no substantial evidence in the combination of Barstad and Alling to support use of Tetronic copolymers as suppressors for superfilling.  This Court should reverse the Board's obviousness finding as arbitrary and capricious and unsupported by substantial evidence.

## IV.    THE BOARD ERRED AS A MATTER OF LAW WHEN IT IGNORED THE UNPREDICTABILITY STANDARD AFFIRMED BY THIS COURT IN ASSESSING ANY REASONABLE EXPECTATION OF SUCCESS

### A.    Standard of Review

"'The presence or absence of a reasonable expectation of success is ... a question of fact,' which we review for substantial evidence." *Teva Pharmaceuticals*

*USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1380-81 (Fed. Cir. 2021),

*quoting, Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366

(Fed. Cir. 2016). "Whether the Board applied the correct standard in assessing

reasonable expectation of success, however, is a question of law that we review *de*

*novo*." *Teva Pharmaceuticals USA, Inc.*, 18 F.4th at 1381, *citing, Endo Pharms. Inc.*

*v. Actavis LLC*, 922 F.3d 1365, 1377-78 (Fed. Cir. 2019).  "Unpredictability of

results equates more with non-obviousness rather than obviousness." *Honeywell*

*Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1356 (Fed.

Cir. 2017).

## B.    A PHOSITA would Understand that Effectiveness of a Suppressor for Superfilling is Very Unpredictable

The Board defined a PHOSITA using the same definition as in the first FWD.

The definition included, in part, "a process engineer with an understanding of the

differences between conformal and superfilling electrolytic plating and an

appreciation that it was unpredictable whether a given molecule would have served

as a suppressor effective for superfilling."  Appx8, n.9.

The Board also found that superfilling chemistry is very unpredictable.

Appx639, Appx647-649.

**C.** **This Court Quoted and Affirmed the Board's Unpredictability Findings and the Standard to be Applied for the Motivation to Combine Analysis**

This Court *quoted and affirmed* the Board in *BASF I* concerning the unpredictability of this technology and the standard to be applied for the motivation to combine analysis. *BASF I*, 749 Fed.Appx. at 982. To quote this Court:

- "The PTAB determined that a PHOSITA 'would not have had any basis for predicting the effectiveness for superfilling of any suppressor whose structure or properties varied *in any material respect* from suppressors that had already been demonstrated' to be effective for superfilling, and that 'there must be some specific motivation to employ specific plating bath components, given the general unpredictability in the field and the art.'" *Id.* (italics in original)

- "We have explained that, under *KSR*, 'predictability is a vital consideration in the obviousness analysis.'" *BASF I*, 749 Fed.Appx. at 983 (internal citation omitted)

- "The PTAB was entitled to consider BASF's asserted combinations of references in light of this unpredictability." *BASF I*, 749 Fed.Appx. at 982.

61

- "Therefore, we looked to *the record* to determine whether a PHOSITA would find the 'claimed results profoundly predictable.'" *BASF I*, 749 Fed.Appx. at 983.

- "We conclude that the PTAB did not apply an incorrect legal standard in its motivation to combine analysis…" *Id*.

The Federal Circuit thus affirmed that superfilling is an unpredictable art and that a PHOSITA would not have had any basis for predicting the effectiveness of any suppressor for superfilling whose structure or properties ***varied in any material respect*** from suppressors that had already been demonstrated to be effective for superfilling. *BASF I*, 749 Fed.Appx. at 982.

### D.   The Board Failed to Consider that Tetronic Varied in Material Respects from Pluronic and so Tetronics' Performance for Superfilling was *Per Se* Unpredictable

Not a single Tetronic copolymer was ***ever used*** in any of the prior art as a suppressor ***for superfilling***.  Alling's sole example is a prophetic ***conformal*** plating example that used L62D, a Pluronic copolymer, as a suppressor.  Appx1161 at 165:16-166:19, Appx1388-1389 at ¶40.  In Barstad, the only suppressor demonstrated to be effective as a suppressor for superfilling is L62D found in Example 2.  The BASF Catalog does not disclose superfilling at all.

Under the clear language quoted and affirmed by the Federal Circuit, the performance of a Tetronic copolymer as a suppressor for superfilling could not have

been predicted because its structure and properties varied *in many material respects* from L62D, the only suppressor that had been demonstrated to be effective for superfilling in Barstad.  *BASF I*, 749 Fed.Appx. at 982.  The Board erred in applying this legal standard of unpredictability in its Judgment.

### 1. The Significant Differences Between the Structure and Properties of Pluronic as Compared to Tetronic Copolymers Preclude Predictability

It is undisputed that the structure and properties of Pluronic copolymers are very different than the structure and properties of Tetronic copolymers.

As shown in the BASF Catalog, the central group for the L62D (Pluronic) surfactant is a polyoxypropylene block with a polyoxyethylene block on each end, forming a non-ionic triblock copolymer.  The central group and the triblock copolymer as a whole *contain a plurality of oxygen atoms but no nitrogen atoms*.  Pluronic copolymers are *non-ionic* in a Damascene plating bath.  Appx837, Appx2457 at 84:18-19.

As shown in the BASF Catalog, the central group of the Tetronic surfactant is an ethylenediamine *containing two nitrogen atoms but no oxygen atoms*.  When added to a Damascene plating bath, Tetronic has a positive charge with *two cationic sites* at the two nitrogen atoms.  Appx839, Appx2571 at 37:1-38:15, Appx2572 at 42:8-25.

Both Parties agreed that there are many suppressors for conformal plating; however, most suppressors are not capable of functioning as a suppressor during superfilling. Appx399, Appx2563 at 7:14-8:2. L62D was one of only a few suppressors that have been found suitable for superfilling. The reason for this is that a suppressor used to superfill must be removed or displaced at the feature's bottom to lower the electrical resistance at the feature's bottom and thus increase the current density there, which is the mechanism that allows for "bottom up filling," *i.e.*, superfilling. Appx2331 at ¶49. Most suppressors will simply stick to the bottom of the feature, which increases the electrical resistance there, prevents bottom up filling, and creates pinch off which causes voids and ruins the copper deposit. Appx800-804 at ¶¶15, 17.

Tetronic copolymer is positively charged when in an acidic plating bath, as used here, and thus would be expected to stick to the bottom wall of a feature and prevent superfilling because of the ion pairing effect between the positively charged Tetronic copolymer and the anionic species at the negatively grounded copper surface of the substrate during electroplating. Appx2323 at ¶38, Appx2462 at 103:10-23, Appx2573-2574 at 48:24-49:14. Tetronic is also hydrophobic which would further exacerbate the problem of sticking to the bottom wall of a feature and preventing superfilling. Appx2323 at ¶38.

64

Under the unpredictability standard affirmed by this Court, performance of a Tetronic copolymer as a suppressor for superfilling could not have been predicted since its structure varied materially from that of L62D (a Pluronic copolymer). The structural difference would have been expected to result in stronger adsorption by the Tetronic copolymer to the bottom wall of a submicron trench, making it more difficult to be removed or displaced as necessary for superfilling.

### 2. Literature Identifies Tetronic Copolymers as Not Being Superfilling Suppressors

BASF scientist, Broekmann, organized suppressor chemistry into three different types more than five years *after* the priority date for the '992 patent. Appx2425. Type I suppressors are deactivated by an accelerator (*i.e.,* "accelerator beats suppressor" scenario) and would promote superfilling. Appx2423.

Type II suppressors in Broekmann are not deactivated by an accelerator and so Type II suppressors provide a high level of suppression and function as levelers. *Id. See* Appx2573 at 46:24 to 47:7 and 47:20-23. Type II suppressors tightly adsorb to the substrate because of the ion pairing effect between the positively charged Type II suppressor and the anionic species at the negatively grounded copper surface of the substrate during electroplating. Appx2425. *See* Appx2573 at 48:2-16.

Nitrogen was not known to "play a major role" in filling trenches. Appx2573-2574 at 48:24-49:14. Broekmann concluded that cationic nitrogen-containing compounds would be Type II suppressors and would not function as superfilling

suppressors. *Id.* ***Broekmann would thus characterize Tetronic as a nitrogen containing cationic Type II suppressor that would function as a leveler and would NOT function as a superfilling suppressor****. Id.*

Broekmann would characterize Tetronic in a Damascene electroplating bath in the context of the "classical" additive nomenclature as a "*suppressor beats accelerator*" scenario. Appx2425.

For all of these reasons, it follows that L62D (Pluronic) molecules and Tetronic molecules have materially different structures and properties and that, under the correct legal standard, a PHOSITA would not have been able to predict the effectiveness of Tetronic as a suppressor for superfilling based on results using Pluronic as a suppressor for superfilling.

Finally, Barstad grouped the BASF products in a paragraph directed to ***commercially available*** particularly preferred ***surfactants***, including a Chemax copolymer that is neither a Pluronic nor a Tetronic copolymer. Appx823 at 6:51-56. The Board erroneously gave significance to this commercial grouping of particularly preferred ***surfactants***. Such a commercial grouping does not create predictability given the applicable legal standard and the significant differences in the chemical structure and properties of these disparate chemical structures which a PHOSITA would understand and appreciate. Appx8 at n. 9.

It follows that the Board erred as a matter of law in failing to consider: (1) the differences in the structure and properties of Pluronic as compared to Tetronic; and (2) the unpredictable nature of the underlying chemistry in its obviousness analysis despite the substantial evidence on this issue. Appx20-21. A PHOSITA would not have been motivated to combine Alling with Barstad because there would have been no reasonable expectation of success in so doing given the established unpredictability in the art and the lack of any actual use of Tetronic as a suppressor for superfilling.

### E. The Board Erroneously Applied the Confirmed Standard of Unpredictability in Assessing Expectation of Success

*OSI* is squarely on point and requires reversal of the Board's obviousness finding. In *OSI*, there was an absence of data regarding efficacy for the claimed use of erlotinib to treat NSCLC and no indicator or mechanism on which a PHOSITA would rely to reasonably expect success for such treatment:

> The lack of erlotinib-NSCLC efficacy data or other indication of success here is significant because of the highly unpredictable nature of treating NSCLC. . . . it is undisputed that a drug's success in treating one type of cancer does not necessarily translate to success in treating a different type of cancer, which underscores the unpredictability in cancer treatment generally.

67

*OSI*, 939 F.3d at 1384-85.  This Court found that the prior art references "provide no more than hope—and hope that a potentially promising drug will treat a particular cancer is not enough to create a reasonable expectation of success in a highly unpredictable art such as this." *Id*.  This Court concluded that "the only reasonable expectation at the time of the invention was failure, not success.  It is only with the benefit of hindsight that a [PHOSITA] would have had a reasonable expectation of success . . ." *Id*.

In particular, the two drugs in *OSI* were both ATP-binding inhibitors—which did not alter the expectation of failure in using erlotinib in an unpredictable art of cancer treatment even though the other drug showed efficacy in treating NSCLC.  Here, Pluronic and Tetronic copolymers were both suppressors for conformal plating—which did not alter the expectation of failure in using Tetronic copolymers in an unpredictable art of superfilling even though Pluronic was reported as a suppressor for superfilling.

As in *OSI*, the only reasonable expectation here was failure—or at least no expectation of success—and the Board's determination was based on hindsight without consideration of the unpredictability in the superfilling art.

The Board erroneously applied the wrong legal standard in its motivation to combine analysis when it ignored the unpredictability of the superfilling art as quoted and affirmed by this Court.  This happened on a material issue that, had it

been considered, would have proven that a PHOSITA would not have been motivated to combine Barstad, Alling and the BASF Catalog with a reasonable expectation of success.

## V.    THE BOARD ERRED IN ITS TREATMENT OF CLAIMS 2-15, 17-22 AND 26-28 FOR THE SAME REASONS ADVANCED FOR CLAIM 1

The Board's errors as discussed in Sections I to IV, above, were explained in the context of claim 1. Appx4-23. Enthone's arguments apply equally to claims 2-15, 17-22 and 26-28. The Judgment should be reversed, or, at a minimum, vacated and remanded.

## CONCLUSION AND RELIEF SOUGHT

The Board erred as a matter of law in: (1) reaching a conclusion of obviousness never asserted in the Petition; (2) reaching an internally inconsistent result with respect to the asserted prior art combination that included Barstad as compared to the asserted prior art combination that included Morrissey; (3) conflating surfactants with suppressors to find that Barstad taught Tetronic as a suppressor for superfilling; and (4) failing to apply the correct legal standard of unpredictability applicable here (as quoted and affirmed by this Court in the first appeal but ignored by the Board).

Under the correct legal standards, there was abundant evidence that a PHOSITA would not have been motivated to make the combination and would have had no expectation that such a combination would be successful.

69

This Court should reverse the Board's Judgment and affirm the validity of the Challenged Claims or, at a minimum, vacate the Judgment and remand.

Dated: May 9, 2022                          /s/   *Robert M. Evans, Jr.*

ROBERT M. EVANS, JR.
MICHAEL J. HARTLEY
MICHAEL H. DURBIN
LEWIS RICE LLC
600 Washington Avenue,
Suite 2500
Saint Louis, MO 63101
T: 314-444-7784
F: 314-612-7784

*Attorneys for Appellant MacDermid
Enthone Inc., fka Enthone, Inc.*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32 and Fed. Cir. R. 32(b) because:

    X          this brief contains 13,895 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), or

    _____        this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    X          this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

    _____        this brief has been prepared in a monospaced typeface using _____ with ___ characters per inch _____ font.


Dated: May 9, 2022                */s/   Robert M. Evans, Jr.*
                                      ROBERT M. EVANS, JR.
                                      LEWIS RICE LLC
                                      600 Washington Avenue,
                                      Suite 2500
                                      Saint Louis, MO 63101
                                      T: 314-444-7784
                                      F: 314-612-7784

# ADDENDUM

Trials@uspto.gov                                    Paper No. 40
571-272-7822                                 Date: November 9, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

BASF CORPORATION,
Petitioner,

v.

ENTHONE, INC.,
Patent Owner.

————————

IPR2016-00696
Patent 7,303,992 B2

————————

Before MICHAEL P. TIERNEY, *Vice Chief Administrative Patent Judge*,
DEBORAH KATZ, and KEVIN W. CHERRY, *Administrative Patent Judges*.

*Per curiam.*

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. §§ 144, 318(a)*

IPR2016-00696
Patent 7,303,992 B2

# I.  INTRODUCTION

The Board issued a Final Written Decision ("FWD") holding that BASF failed to show by a preponderance of the evidence that claims 1–15, 17–22, and 26–28 of U.S. Patent No. 7,303,992 B2 (Ex. 1001, "the '992 patent") owned by Patent Owner Enthone, Inc. ("Enthone" or "Patent Owner"), were unpatentable. (*See* FWD 26.)  Petitioner BASF Corporation ("BASF" or "Petitioner") appealed the Board's Final Written Decision (Paper 31, "FWD") in this *inter partes* review to the U.S. Court of Appeals for the Federal Circuit, which vacated it and remanded to us for reevaluation.  *See BASF Corp. v. Enthone, Inc.*, 749 F. App'x 978 (Fed. Cir. 2018).  The Federal Circuit held that aspects of the Board's decision were not supported by substantial evidence and that the Board acted arbitrarily and capriciously.  *Id.* at 984–986.  In light of the Federal Circuit's decision and for the reasons discussed below, we now determine that Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–22, and 26–28 are unpatentable.

## A.    *Procedural History*

The Petition in this proceeding requests an *inter partes* review of all claims of the Enthone's '992 patent.  Paper 4 ("Pet.").  Following Patent Owner's Preliminary Response (Paper 8, "Prelim. Resp."), the Board instituted review of the argued claims on the following grounds.

IPR2016-00696
Patent 7,303,992 B2

| Basis | References | Claims |
|---|---|---|
| § 103(a)[1] | Barstad,[2] Alling,[3] BASF Catalog[4] | 1–15, 17–22, 26–28 |
| § 103(a) | Morrissey,[5] Alling, BASF Catalog | 1–15, 17–22, 26–28 |

Paper 10, 2, 24 ("Institution Decision" or "Inst. Dec.").

Enthone filed a Patent Owner Response (Paper 17, "PO Resp.") and Petitioner filed a Reply (Paper 20, "Reply"). The Board held an oral argument in the proceeding (Paper 30, "Transcript") and issued a FWD holding that BASF failed to show by a preponderance of the evidence that the challenged claims were unpatentable.

Following the Federal Circuit's decision vacating and remanding the FWD, BASF filed a Supplemental Brief (Paper 33, "Pet. Remand Br.") and Enthone filed a Supplemental Opening Brief (Paper 34, "PO Remand Br."). Enthone filed a Response to Petitioner's Supplemental Brief (Paper 35, "PO Remand Resp."), and BASF filed a Supplemental Response Brief (Paper 36, "Pet. Remand Resp.").

### B.    Related Matters

The '992 patent was asserted in *Enthone, Inc. v. BASF Corp.*, Case No. 1:15-cv-233-TJM/RFT, in the U.S. District Court for the Northern District of New

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), revised 35 U.S.C. § 103, effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA version of § 103 in this Decision.
[2] U.S. Patent No. 6,444,110 B2; issued Sept. 3, 2002 (Ex. 1003, "Barstad").
[3] U.S. Patent Publication No. 2002/0127847 A1; published Sept. 12, 2002 (Ex. 1006, "Alling").
[4] BASF, Pluronic and Tetronic Block Copolymer Surfactants (1989) (Ex. 1005) ("BASF Catalog").
[5] U.S. Patent Publication No. 2002/0043467 A1; published Apr. 18, 2002 (Ex. 1004, "Morrissey").

3

IPR2016-00696
Patent 7,303,992 B2

York.  Pet. 1; *see also* Prelim. Resp. 21.  That civil action also included litigation about U.S. Patent No. 7,815,786 B2 ("the '786 patent"), owned by Enthone and issued from a divisional application based on the patent application that issued as the '992 patent.  The '786 patent was the subject of the *inter partes* review in IPR2016-00697 based on a petition filed by BASF.  The Board determined that claims 1–6, 8, and 11–18 of the '786 patent are unpatentable in that proceeding.  *See BASF Corporation v. Enthone Inc.*, IPR2016-00697, Paper 31 (PTAB September 11, 2017) (Final Written Decision).[6,7]  Enthone did not appeal that decision.

## II.  ANALYSIS ON REMAND

### A.  Asserted Ground of Obviousness of Claims 1–15, 17–22, and 26–28 over Barstad, Alling, and BASF Catalog

We begin by addressing BASF's asserted grounds of unpatentability over Barstad, Alling, and BASF catalog, which was the focus of the Federal Circuit's remand.

### 1. Claim 1

Claim 1 of the '992 patent recites:

> 1. A method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical

---

[6] Available at 2017 WL 4015000.

[7] Previously, the '992 Patent and the '786 Patent were subject to requests for *inter partes* review, namely IPR2014-00243 and IPR2014-00246, respectively, by Moses Lake Industries, Inc., the petitioner therein.  The Board declined to institute review based on those petitions.  *See* IPR2014-00243, Paper 6.  Moses Lake Industries, Inc. filed additional petitions directed to the same patents, IPR2014-01394 and IPR2014-01395, but the parties settled and the requests were terminated.

IPR2016-00696
Patent 7,303,992 B2

    interconnect features including submicron-sized features having
bottoms, sidewalls, and top openings, the method comprising:

        immersing the semiconductor integrated circuit device substrate
including submicron-sized features having bottoms, sidewalls, and top
openings wherein said submicron-sized features include high aspect
ratio features having dimensions such that the high aspect ratio
features have aspect ratios of at least about 3:1 into an electrolytic
plating composition comprising a source of Cu ions in an amount
sufficient to electrolytically deposit Cu onto the substrate and into the
electrical interconnect features and *a polyether suppressor compound
comprising a combination of propylene oxide (PO) repeat units and
ethylene oxide (EO) repeat units present in a PO:EO ratio between
about 1:9 and about 9:1 and bonded to a nitrogen-containing species,
wherein the molecular weight of the suppressor compound is between
about 1000 and about 30,000*; and

        supplying electrical current to the electrolytic composition to
deposit Cu onto the substrate and *superfill the submicron-sized
features by rapid bottom-up deposition at a rate of growth in the
vertical direction which is greater than a rate of growth in the
horizontal direction.*

Ex. 1001, 18:19–45 (emphasis added). The electroplating method recited in

claim 1 requires immersing a semiconductor integrated circuit device into an

electrolytic plating composition that includes a polyether suppressor compound of

propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units with the

recited PO:EO ratio and molecular weight. The claimed method also requires

superfilling of the submicron-sized features of the integrated circuit device by

rapid bottom-up deposition. The parties agree that "superfilling" refers to filling a

feature from the bottom up to avoid the defects of seams and pinching off. *See* Pet.

12; PO Resp. 6–7.

    Previously, the Board determined there must be a specific motivation to

employ specific plating bath components, given the general unpredictability in the

IPR2016-00696
Patent 7,303,992 B2

field and the art. *See* FWD 21. The Federal Circuit approved of this determination and evaluated whether the findings in the FWD were supported by substantial evidence. *See BASF*, 749 F. App'x at 983.

### a. Alling

Alling is directed to compositions and methods for electrolytic deposition of metal on devices requiring traces to be electrically segregated from adjacent traces, such as semiconductor wafers. *See* Ex. 1006, abstract. Alling teaches methods of depositing or plating two or more metals for these traces in alternating layers from a single bath at differing current densities or reduction potentials. *See id.* at 11–13. Alling teaches that suppressors can be included in the plating compositions, including polymers available from BASF under the Tetronic and Pluronic tradenames. *See id.* at 43.

The Federal Circuit determined that the Board failed to support its finding that one of ordinary skill would not have found Alling applicable to superfilling. *See id.* at 984. The Court determined that even though Alling teaches chip interconnects with critical dimensions of 200 nm or less, the Board cited only one passage in Enthone's expert declaration for the position that chip interconnects at dimensions of 200 nanometers or less could be effectively plated without superfilling. *See id.* On review of that passage, the Court found that it does not support Enthone's argument that Alling is not applicable to superfilling. *See id.*

Enthone's expert, Dr. Barkey,[8] acknowledged that Alling references interconnects of 200 nm and stated "beyond that the reference offers no description

---

[8] Dr. Barkey testifies that he has been a Professor of Chemical Engineering at the University of New Hampshire since 1987. Ex. 2031, ¶ 1. He testifies that he researches electrochemical engineering, including copper electrodeposition for superfilling and other semi-conductor applications. *See id.* His curriculum vitae

6

IPR2016-00696
Patent 7,303,992 B2

of or allusion to filling submicron features of a semiconductor substrate with copper or any other metal." Ex. 2031, ¶ 69.  Dr. Barkey testifies that Alling does not mention superfilling.  *See id.*  Dr. Barkey summarizes that Alling

> did not encounter, acknowledge, or deal with the much more complex phenomenon of superfilling which requires that the suppressor have balanced properties that allow it to adsorb to the cathodic copper surface but be subject to removal, displacement, or exclusion by an accelerator that is also present in the electrodeposition solution, and to a degree that varies along a vertical gradient within the submicron feature so as to promote superfilling.

Ex. 2031, ¶ 69.  As the Federal Circuit indicated, Dr. Barkey does *not* testify that interconnects of 200 nm could effectively receive electrodeposition without superfilling, contrary to the Board's previous finding.  *See* FWD 21–22.

The Federal Circuit also noted that Enthone's own expert acknowledged that superfilling was needed for interconnects as discussed in Alling.  *See id.* at 985.  Specifically, as noted by the Federal Circuit, Enthone's expert was asked on cross-examination whether successful plating copper and chip interconnects of 200 nanometers or less would involve superfilling, and the expert responded "[f]or those interconnects of that dimension, 200 nanometers or less, yes.  For larger interconnects perhaps not."  *Id.*

Under these circumstances the Federal Circuit determined that the Board failed to provide an adequate evidentiary basis for its findings that Alling lacks

---

indicates that he has published research articles and obtained research grants in the field of electrochemistry.  *See* Ex. 2031.  We find Dr. Barkey qualified to provide opinion testimony on the subject matter of this proceeding and will review his testimony in light of the supporting references to publications or other materials he provides.

IPR2016-00696
Patent 7,303,992 B2

utility relevant to superfilling, rendering the analysis of a motivation to combine the cited references insufficient. *See id.* The Court vacated the Board's decision and remanded to reconsider whether either of the asserted combinations of prior art provide the requisite motivation to combine, in light of the discussion of Alling above. *See id.*

We begin by addressing anew whether one of ordinary skill in the art[9] would have understood Alling to refer to superfilling. BASF argues that it was known the size of an interconnect to be electroplated, as well as the aspect ratio, can indicate a need for superfilling. Pet. Remand Resp. 3. In support, BASF cites to the background discussion in the '992 patent, which indicates the need for superfilling in bottom-up scenarios, wherein "[s]maller feature size [*e.g.*, < 100 nm] *or* higher aspect ratio generally requires faster bottom-up speed to avoid pinching off." Ex. 1001, 13:41–3 (emphasis added). The '992 patent also states:

> As Cu is deposited on the feature side walls and top entry of the feature, deposition on the side walls and entrance to the feature can pinch off and thereby close access to the depths of the feature especially with features which are small (e.g., <100 nm) and/or which have a high aspect ratio (depth: width) if the bottom-up growth rate is not fast enough. Smaller feature size or higher aspect ratio generally requires faster bottom-up speed to avoid pinching off.

---

[9] As the Board previously found, one of ordinary skill in the art would have had at least a bachelor's degree in materials science, chemistry, or a related discipline, and would have had approximately two or more years of experience as a process engineer with an understanding of the differences between conformal and superfilling electrolytic plating and an appreciation that it was unpredictable whether a given molecule would have served as a suppressor effective for superfilling. *See* FWD 12–13. We look to the teachings of the prior art to determine specifically what one of ordinary skill in the art would have known at the time.

Ex. 1001, 2:33–46; *see also id.* at 13:43–48.  BASF directs us further to an example in the '992 patent that describes superfilling of a "small diameter/low aspect ratio integrated circuit device feature . . . ."  Ex. 1001, 15:30–48; *see* BASF Remand Resp. 3.

BASF cites further to the cross-examination of Enthone's witness, Dr. Barkey, who agreed that successful plating of copper and chip interconnects 200 nanometers or less would involve superfilling.  Pet. Remand Br. 6, (citing Ex. 1028, 154:20–155:1) ("Q. And I believe we discussed earlier successfully plating copper and chip interconnects of 200 nanometers are less is going to involve superfilling, correct?  A. For those interconnects of that dimension, 200 nanometers or less, yes. For larger interconnects perhaps not.").

We find that BASF's evidence demonstrates on this record that it was known in the art that an interconnect of 200 nm or less, as well as interconnects with higher aspect ratios, would require superfilling.  Our finding is further supported by the testimony of Enthone's expert that interconnects of 200 nm or less "is going to involve superfilling."  Ex. 1028, 154:20–155:1; *see BASF*, 749 F. App'x at 985.

Enthone argues that one of ordinary skill in the art would have recognized that the process described in Alling is incompatible with superfilling submicron features having high-aspect ratios, for example greater than or equal to 3:1 because superfilling requires a current density difference "on the order of 50 A/ft$^2$."  *See* PO Remand Br. 3; *see* PO Resp. 36–42.  In contrast, Alling teaches "that a 20 A/ft$^2$ difference in current density, or less, will result in plating different compositions of metals."  *Id.* at 3.  Enthone argues that this difference indicates the teachings of Alling regarding superfilling of submicron vias indicate deposits that are not uniform in composition or conductivity would result.  *See id.* at 3–4.  Enthone cites

9

IPR2016-00696
Patent 7,303,992 B2

Dr. Barkey's testimony to support its argument. Dr. Barkey concludes: "Alling has nothing to do with superfilling, and could not be used for plating semiconductor substrates with submicron interconnect features." *See* Ex. 2031, ¶ 96, *see also id.* at ¶¶ 97, 124.

Even if Alling does not expressly discuss superfilling, we disagree with Patent Owner's contention that one of ordinary skill in the art would not have known that the interconnects within the scope of the Alling disclosure would require superfilling. As BASF argues, Enthone does not argue that interconnects appropriate for superfilling *must* have a high aspect ratio, only that an aspect ratio taught in Alling would be inconsistent with superfilling. *See* Pet. Remand Resp. 2–3.

Enthone argues that BASF's petition relies only on an isolated passage in Alling stating that interconnects are required at dimensions of 200 nm or less and that this passage only acknowledged why the industry had moved from aluminum to copper plating of interconnects. PO Remand Br. 6, (citing Ex. 1006, ¶¶ 6, 7). Even if the discussion of industry trends is only a part of the disclosure of Alling, we are persuaded that it indicates that the invention will address such smaller interconnects. Given the understanding in the art, as evidenced by the background of the '992 patent and Enthone's counsel, and not disputed by Dr. Barkey, we find that the requirement for interconnects of 200 nm or less also means a requirement for superfilling to prevent "pinch-off" defects, which indicates the need for superfilling.

Enthone argues further, relying on Dr. Barkey's testimony, that one of ordinary skill would not have known the composition used in Alling would be effective for superfilling because the dimensions of the interconnects taught would require multiple alternating metal layers and because some of the metals or

10

**Appx10**

suppressors listed or exemplified would not be appropriate for superfilling.  *See* PO Remand Br. 7–8, (citing Ex. 2031, ¶¶ 95, 98–100, 103).

We are not persuaded by these arguments because even if Alling teaches electroplating methods in addition to superfilling, Alling also contemplates electroplating microvias that require superfilling.  For example, Enthone relies on Dr. Barkey's testimony that Alling states such suppressor agents are typically added to copper electroplating solutions in a wide range of concentrations between 1 and 10,000 ppm, preferably 5 to 10,000 ppm (*see* Ex. 1006, ¶ [0044]), which is the same range given by Barstad for a Tetronic compound as a surfactant (*see* Ex. 1003, 6:59–62).  *See* Ex. 2031, ¶ 68; *see* PO Resp. 42; *see also* PO Remand Br. 8.  Dr. Barkey testifies that in the center of that range, and throughout 90% of the range, one skilled in the art would have expected a Tetronic compound to promote conformal plating and that the suppressors in Alling are to be added in a concentration range that extends far outside the useful range of superfilling suppressors.  *See id.*; *see* PO Remand Br. 8.  We note that Dr. Barkey does not testify that the concentrations of Tetronic copolymer taught by Alling exclude superfilling, even if they include other types of electroplating.

Dr. Barkey testifies that one of ordinary skill would have understood the entire disclosure of Alling to be directed to conformal planting, not superfilling, but he does not reconcile this opinion with his cross-examination testimony that superfilling is necessary for interconnects of less than 200 nm.  *See* Ex. 2031, ¶ 69; *see* Ex. 1028, 154:20–155:3. We are not aware of, and Ethnone does not direct our attention to, evidence that interconnects of 200 nm or less would not require superfilling.  Thus, we disagree with Patent Owner's contention that the disclosure of Alling does not include superfilling.

IPR2016-00696
Patent 7,303,992 B2

The Board previously found that 200 nm or less "need not connote vias or features with high aspect ratios." FWD 21. After reviewing the evidence in light of the Federal Circuit's remand, we are persuaded that the preponderance shows that even if a high aspect ratio is not present in the interconnects expressly described in Alling, the 200 nm or less dimension reported to be a requirement at the time would have suggested to one of ordinary skill in the art that the compositions of Alling could be used for superfilling.

### b. Barstad

The Federal Circuit also determined that the Board acted arbitrarily and capriciously regarding findings about Barstad because the findings contradict those of a different, but related, *inter partes* review between the same parties regard U.S. Patent 7,815,786. *See BASF*, 749 F. App'x at 985. Previously, the Board found that "Barstad discloses polyethylene glycol copolymers as preferable *surfactant-type suppressor agents*, and expressly discloses the polyethylene glycol copolymers that were commercially available from BASF under the Tetronic tradename." IPR2016-00697, Paper No. 31, at 17 (emphasis added) (internal quotation marks and citation omitted). In the FWD in this proceeding, though, the Board found that the Tetronic compositions taught in Barstad are surfactants, not a type of suppressor. FWD 22. The Federal Circuit characterized the two opinions as being inconsistent without a satisfactory explanation. *See BASF*, 749 F. App'x at 985–68. Because the issue of what Barstad teaches about Tetronic copolymer is highly relevant to a determination of obviousness, the Federal Circuit vacated and remanded the Board's decision in this *inter partes* review to reevaluate whether Barstad discloses Tetronic copolymers for use in superfilling. *See BASF*, 749 F. App'x at 986.

12

**Appx12**

IPR2016-00696
Patent 7,303,992 B2

Barstad states that common electroplating solutions contain "additives (such as surfactants, brighteners, levelers and suppressants) to enhance the effectiveness and quality of plating." Ex. 1003, 1:24–26. Barstad also teaches that plating baths preferably contain "a surfactant-type suppressor agent [and that it] has been surprisingly found that use of such a suppressor agent in combination with elevated brightener concentrations can result in effective 'bottom-fill' copper plating of a microvia or other aperture without defects such as inclusions or voids." Ex. 1003, 3:21–25. Barstad teaches further that "[p]articularly suitable surfactants for plating compositions of the invention" include Tetronic polyethylene glycol copolymer. Ex. 1003, 6:51–55.

In the FWD issued in this proceeding, the Board found that the Tetronic compounds of Barstad and Morrissey are described as "a surfactant and not as a suppressor" because surfactants and suppressors are provided as separate compounds. *See* FWD 22–23. We now find that the term "surfactant-type suppressor agent" indicates a suppressor that also has qualities as a surfactant. The plain language of Barstad does not create sharp distinctions between compounds acting as suppressors or surfactants. Enthone does not direct us to a teaching in Barstad overcoming this plain language and limiting copolymers to suppressors with no surfactant action. Thus, we disagree with Patent Owner's contention that a person of ordinary skill would have understood Barstad as disclosing that a suppressor cannot also be a surfactant.

Enthone argues that the perceived inconsistency between the Board's opinion in this proceeding and in IPR2016-00697 is based on an "incorrect paraphrase" in IPR2016-00697. PO Remand Br. 11–13. According to Enthone, the disclosures of Barstad do not connect the use of surfactant-type suppressors with the "particularly suitable surfactants" for plating compositions, including

13

IPR2016-00696
Patent 7,303,992 B2

Tetronic polyethylene glycol copolymers, listed elsewhere in Barstad.  *See id.*; *see also* PO Resp. 35–36.

We disagree with Enthone.  We determine based on the record presented that the "particularly suitable surfactants" provided in Barstad are useful as suppressors in the disclosed filling method for interconnect vias of 200 nm or less because Barstad teaches that plating baths preferably contain "surfactant-type suppressors." *See* Ex. 1003, 3:19–21; 6:51–56.  Barstad thus indicates that the preferable ingredients are compositions that include characteristics of both suppressors and surfactants.

First, we find that Alling teaches that Tetronic copolymers can be suppressor agents.  *See* Ex. 1006, ¶ 43; *see* Pet. Remand Br. 6, 13.  The Board recognized that Alling characterized Tetronic copolymer as a suppressor for at least some types of electroplating in IPR2016-00697, supporting that role in Barstad.  *See* IPR2016-00697, Paper 31, 19.

We find, too, that Barstad contemplates using BASF's Tetronic and Pluronic products as suppressor in the examples.  *See* Pet. Remand Br. 11–12.  Specifically, Barstad's Examples 2 and 3 use a BASF compound called "L62D" as a suppressor. *See* Ex. 1003, 8:46–48, 9:5–7.  L62D is a BASF Pluronic product.  *See* Ex. 1005, 27.  Like Tetronic copolymers, though, Barstad describes Pluronic copolymers as "surfactants" elsewhere in the disclosure.  *See* Ex. 1003, 6:51–56.  These descriptions support BASF's argument that "surfactant-type suppressors" can be suppressors, even if they are sometimes characterized as surfactants.  *See* Pet. Remand Br. 11–12.

Enthone argues that BASF interprets the use of Pluronic copolymers too broadly.  *See* PO Remand Resp. 5–6.  Specifically, Enthone argues that "all

14

IPR2016-00696
Patent 7,303,992 B2

suppressors qualify as surfactants, yet few surfactants were known to function as suppressors for superfilling submicron features." *Id.* According to Enthone,

> [t]he few surfactants such as Pluronics that had been discovered to function as a suppressor were all "surfactant-type suppressors" and thus it is not surprising that the surfactants listed in Barstad overlap to some extent with the listed suppressors. Similarly since suppressors are surfactants, the use of Pluronic L62D as a suppressor in the working examples is consistent with reading surfactants and suppressors as separate components.

PO Remand Resp. 6. Enthone argues further that BASF's witness, Dr. Pound acknowledged that many of the surfactants listed in Barstad do not act as suppressors. *See* PO Remand Resp. 6, (citing Ex. 2044, 12:24–14:18).

Despite Enthone's arguments, we are persuaded that one of ordinary skill would have understood Barstad to suggest that Tetronic copolymer would act as a suppressor for superfilling submicron interconnects. Barstad specifically groups Pluronic and Tetronic copolymers as surfactants in column 6 and then expressly characterizes Pluronic copolymers as suppressors in the examples. The other surfactants listed in Barstad are not specifically grouped with Pluronic copolymers. This association between the BASF products persuades us that one of ordinary skill would have understood Barstad to teach that Tetronic copolymers as surfactants with suppressor activity.

Enthone argues further that BASF admitted at oral argument that Barstad does not teach the use of Tetronic as a suppressor. PO Remand Br. 9. We disagree. Counsel for BASF stated:

> And so, for example -- so while it is certainly acknowledged in the background section that a surfactant can be a separate component, I think that what Barstad teaches is the use of a surfactant-type suppressor, surfactant compounds as a suppressor. And we would acknowledge -- and this is presented as an obvious in this case in part

15

**Appx15**

IPR2016-00696
Patent 7,303,992 B2

> because Barstad leaves some ambiguity on that question.  We think
> that is completely resolved by the Alling reference, which specifically
> states that the Tetronic copolymer is useful as a suppressor.

Transcript, Paper 30, 18:11–20.  We do not find this statement to be an admission, but rather a discussion of the term "surfactant-type suppressors" and the dual role Barstad teaches they play.

Enthone also argues that in the prior *inter partes* review the Board found BASF to have admitted that Barstad does not use Tetronic polymers as suppressors in electroplating solutions.  *See* PO Remand Br. 9.  Although the Board's decision includes the phrase "BASF acknowledges that Barstad does not disclose the use of Tetronic polymers as suppressor agents in its electroplating solution," the Board also acknowledged, and agreed with, BASF's position that one of ordinary skill would have understood Tetronic copolymers to be suppressors from the teachings of Alling.  *See* IPR2016-00697, Paper 31, 11 ("BASF argues that a person of ordinary skill in the art would have been motivated to use Tetronic polymers as suppressors in Barstad's compositions and that a person of ordinary skill in the art would have consulted BASF Catalog to identify the available Tetronic polymers."); *see also id.* at 18 ("Alling provides adequate motivation to a person of ordinary skill in the art to use the known Tetronic copolymers as possible suppressor agents in conventional or conformal plating processes as disclosed in Barstad and Morrissey.").  Thus, we are not persuaded that BASF's position in the prior *inter partes* review is contrary to its position in this *inter partes* review.

On remand, Enthone argues that Barstad contemplates conformal plating, in addition to superfilling, and that Barstad discloses "a nearly infinite number of potential permutations of plating bath additives."  PO Remand Br. 10.  We do not agree with Enthone because Barstad discloses only a finite, not infinite, number of

**Appx16**

IPR2016-00696
Patent 7,303,992 B2

suppressors and identifies polymers such as Tetronic polymers as being "particularly suitable." Ex. 1003, 6:51–56. We agree that Barstad identifies Tetronic polymers among the other possible additives.

Enthone argues further that Barstad fails to provide a working example of a plating bath containing a Tetronic copolymer. *See id.* According to Enthone, this lack of disclosure would not have conveyed a reasonable expectation of success to one of ordinary skill in the art. *See id.* Enthone's argument conflates several distinct findings required for a determination of obviousness. Nevertheless, "[a]ll the disclosure of a reference must be evaluated, including non-preferred embodiments, to determine the scope and content of the reference." *In re Mills*, 470 F.2d 649, 651 (CCPA 1972); *see also In re Burckel*, 592 F.2d 1175, 1179 (CCPA 1979). Thus, in determining what Barstad alone teaches or suggests, it need not provide a detailed working example. We consider Patent Owner's reasonable expectation of success arguments below when considering the combined teachings of both Barstad and Alling.

In summary, on remand we find that Barstad teaches the use of Tetronic copolymer as a suppressor that can be used in superfilling, such as for microvias. This finding is consistent with the statement by the Board in IPR2016-00697, characterizing Barstad as "disclos[ing] polyethylene glycol copolymers as preferable 'surfactant-type suppressor agents,' and expressly disclos[ing] the polyethylene glycol copolymers that were commercially available from BASF under the Tetronic tradename." IPR2016-00697, Paper No. 31 at 17. This finding is also consistent with the teaching in Alling of Tetronic copolymer as a "particularly suitable suppressor agent." Ex. 1006, ¶ 43; *see* Pet. Remand Resp. 8.

17

IPR2016-00696
Patent 7,303,992 B2

### c. Obviousness

In light of our findings above, we review BASF's arguments for the obviousness of claim 1 of Enthone's '992 patent. We consider whether all of the elements of the claimed method are taught or suggested by the prior art and if there was a reason one of ordinary skill in the art would have combined these teachings or suggestions.

A claimed invention is not patentable under 35 U.S.C. § 103 if it is obvious. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426–27 (2007). In *Graham v. John Deere Co.*, the Supreme Court established the facts underlying an obviousness inquiry:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). In addressing the findings of fact, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416. As explained in *KSR*:

> If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*Id.* at 417. Accordingly, a central question in analyzing obviousness is "whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.*

18

As the Board previously found, both Barstad and Alling are directed to compositions and methods for electroplating semiconductors. *See* FWD 13–15. BASF argues that Barstad teaches copper electroplating solutions for "bottom-up" superfilling of high-aspect ratio, sub-micron features, such as vias or trenches. *See* Pet. 7, (citing Ex. 1003, abstract, 2:48–54). BASF argues further that Alling also teaches copper electroplating solutions. Pet. 15, (citing Ex. 1006, ¶ 43). BASF argues further that Barstad teaches including "surfactant-type suppressors" in the solutions and characterizes Tetronic polymers as surfactants and that Alling teaches that Tetronic polymers are "[p]articularly suitable" suppressors. *See* Pet. 15–16, (citing Ex. 1003, 3:19–21, 6:51–55; Ex. 1006, ¶ 43).

BASF argues that in light of these teachings, a person of ordinary skill in the art would have been motivated to use Tetronic polymers as suppressors in Barstad's compositions and would have consulted BASF Catalog to identify the available Tetronic polymers because Barstad teaches using "surfactant-type suppressors" to reduce void formations that were known to occur in small, high-aspect ratio features such as vias. *See* Pet. 19. According to BASF, it would have been obvious to a person of skill in the art to use Tetronic polymers as suppressor agents in the electroplating solutions of Barstad because the "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *See* Pet. 15–16 (citing *KSR*, 550 U.S. at 416).

Enthone disputes BASF's arguments, asserting instead that Barstad describes the Tetronic compound as a surfactant, not a suppressor. *See* PO Resp. 35–36. Enthone also argues that Alling is not directed to superfilling. *See id.* at 36–37. Enthone argues that BASF fails to address the unpredictability in this

19

field and fails to provide a sufficient basis that would have motivated one to replace the suppressors in Barstad with a Tetronic surfactant. *See* PO Resp. 2–3.

As discussed above, we agree with BASF that an ordinarily skilled artisan would have understood the methods taught in Alling to be applicable to superfilling as recited in Enthone's claims because Alling discusses the requirements at the time for chip interconnects of 200 nm or less. *See* Ex. 1006, ¶ 7. As also discussed above, we agree with BASF that those of ordinary skill in the art would have understood Barstad to teach using Tetronic copolymers as suppressors because of its teaching that they are surfactants and that "surfactant-type suppressors" are useful and the teaching in Alling that they can be used as suppressors. *See* Ex. 1003, 3:19–21, 6:51–55; Ex. 1006, ¶ 43.

Enthone argues further that one of ordinary skill in the art would have had no motivation to modify or combine the references because the conventional suppressors used for purposes of conformal plating differ functionally from a surfactant effective as a suppressor for superfilling. *See* PO Resp. 45–50. According to Enthone, these distinct differences in function between conventional suppressors and suppressors effective for superfilling would not have given one of ordinary skill a reason to substitute a cationic Tetronic surfactant for the exclusively nonionic suppressors taught by Barstad for use in a process for superfilling submicron features in a semiconductor substrate. *See id.* Enthone argues further that BASF's arguments are based on an "obvious to try" rationale that is improper because the teaching in Barstad of a surfactant-type suppressor would not have provided enough reason for one of ordinary skill in the art to try a Tetronic surfactant and that there would not have been a reasonable expectation of success. *See* PO Resp. 50–56.

IPR2016-00696
Patent 7,303,992 B2

We do not agree with Patent Owner because both Barstad and Alling teach using Tetronic copolymers in electroplating solutions. We agree with BASF that Alling identifies an industry demand for plating interconnects that require superfilling and discloses various plating bath additives that include Tetronic copolymers as suppressors. *See* Pet. Remand Resp. 1. Thus, there would have been a motivation to combine the teachings of including these same Tetronic copolymers taught in Barstad with Alling. *See id.* Furthermore, we agree with BASF that those of ordinary skill would have had a reasonable expectation of success because Barstad teaches using Tetronic polymers with superfilling. *See* Pet. 15–16, citing Ex. 1002, ¶ 29.

In light of our determination that one of ordinary skill in the art would have been motivated to use a Tetronic copolymer as taught in Alling in the method of Barstad, we determine that the element in claim 1 of the '992 patent of a "polyether suppressor compound comprising a combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1 and bonded to a nitrogen-containing species," as taught in BASF catalog (Ex. 1005, 6), is taught or suggested by the prior art. *See KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). Enthone does not argue that the combination of Barstad, Alling, and BASF catalog fails to teach any other limitations of Enthone's claim 1.

### d. Secondary Considerations

Enthone argues that secondary considerations render claim 1 of the '992 patent nonobvious. *See* PO Resp. 56–58. First, Enthone argues the claimed

IPR2016-00696
Patent 7,303,992 B2

invention solved a long-felt need for the problem of void formation during superfilling of submicron interconnect features in advanced integrated circuits. *See* PO Resp. 56–58. Enthone argues that the failure of documents by the Shipley company, specifically Barstad or Morrissey, to provide a solution to the problem of void formation during superfilling of the submicron interconnect features in advanced integrated circuits is evidence of this long-felt need. *See id.*

We do not agree that in the evidence Enthone presents demonstrates a long felt need in the art. Specifically, the lack of an express teaching in the prior art does not indicate that there had been a need for the claimed method of electroplating for any significant length of time. The evidence Patent Owner presents merely shows that the claimed method was not anticipated by the prior art. After considering Enthone's evidnce of secondary considerations of non-obviousness and according them appropriate weight along with all of the *Graham* factors and we agree with the Petitioner that the claimed invention would have been obvious.

Enthone argues further that others praised the invention as providing "identifying chemistries for suppressing void formation in the filled features and vias" and cites to the disclosure of the '992 patent as support for the praise. PO Resp. 58 (citing Ex. 1012, 66, 78). We are not persuaded because Enthone does not provide a nexus between the claimed invention and the praise. Ex. 1012, 66, 78. It is not clear that praise for identifying chemistries that suppress void formation in the filled features and vias refers to the claimed invention. Enthone cites Exhibit 1012 as support for its argument, but on the cited page, Exhibit 1012 refers to U. S. Patent Application 2007/0289875, which is a divisional of the application that became the '992 patent. *See* PO Resp. 58 (citing Ex. 1012, 66, 78). Enthone does not discuss the claims recited in this application publication or

22

how they relate to the currently claimed method.  Praising the disclosure of the
'992 patent does not necessarily show that the actually claimed method was being
praised.

### e. Conclusion for Claim 1

After weighing all of the evidence before us, including the evidence for
obviousness and the evidence of nonobviousness due to the asserted secondary
consideration, we conclude that a preponderance of the evidence supports a
conclusion that claim 1 would have been obvious over Barstad, BASF Catalog, and
Alling.

We rely on our findings and determinations in regard to claim 1 in our
analysis of BASF's assertions of unpatentability of the other claims of Enthone's
'992 patent.

### 2. Independent Claims 2 and 17

Claim 2 of the '992 patent recites:

A method for electroplating a copper deposit onto a semiconductor
integrated circuit device substrate with electrical interconnect features
including submicron-sized features having bottoms, sidewalls, and top
openings, the method comprising:

immersing the semiconductor integrated circuit device substrate into
the electrolytic plating composition comprising a source of Cu ions in an
amount sufficient to electrolytically deposit Cu onto the substrate and into
the electrical interconnect features, an accelerator, and a suppressor; and

supplying electrical current to the electrolytic composition to deposit
Cu onto the substrate and superfill the submicron-sized features by rapid
bottom-up deposition at a vertical Cu deposition growth rate in features from
the bottoms of the features to the top openings of the features which is
greater than 50% faster than a comparable vertical Cu deposition growth rate
of comparable process which is equivalent in all respects except that it
employs a comparative suppressor having the formula:

IPR2016-00696
Patent 7,303,992 B2

$$H_2C\!-\!O\!-\!(C_3H_6O)_e\!-\!(C_2H_4O)_h\!-\!H$$
$$HC\!-\!O\!-\!(C_3H_6O)_f\!-\!(C_2H_4O)_i\!-\!H$$
$$H_2C\!-\!O\!-\!(C_3H_6O)_g\!-\!(C_2H_4O)_j\!-\!H$$

wherein the sum of e+f+g=21 and the sum of h+i+j=27.

Ex. 1001, 18:46–19:9.

Claim 2 recites an electroplating method that uses an electrolytic plating composition to deposit Cu. The electrolytic plating composition includes a suppressor. The method of claim 2 also includes supplying electrical current to the electrical composition to deposit copper and superfill features "by rapid bottom-up deposition at a vertical Cu deposition growth rate in features from the bottoms of the features to the top openings of the features which is greater than 50% faster than a comparable vertical Cu deposition growth rate of comparable process. . . ." *Id.* at 18:58–19:9. Thus, claim 2 recites a method using an electrolytic plating composition and a certain growth rate when compared to a comparable process using a comparative suppressor.

Claim 17 of the '992 patent recites:

> A method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical interconnect features including submicron-sized features having bottoms, sidewalls, and top openings, the method comprising:
> immersing the semiconductor integrated circuit device substrate into the electrolytic plating composition comprising a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features, an accelerator, and a suppressor; and
> supplying electrical current to the electrolytic composition to deposit Cu onto the substrate and superfill the submicron-sized features by rapid bottom-up deposition at a vertical Cu deposition growth rate in features from the bottoms of the features to the top openings of the features which is greater than 15 times faster than a field deposition growth rate on substrate surfaces outside the features.

24

IPR2016-00696
Patent 7,303,992 B2

Ex. 1001, 20:40–59.

Like claim 2, claim 17 recites a copper electroplating method that uses an electrolytic plating composition having a suppressor. Claim 17 requires superfilling "submicron-sized features by rapid bottom-up deposition at a vertical Cu deposition growth rate in features from the bottoms of the features to the top openings of the features which is greater than 15 times faster than a field deposition growth rate on substrate surfaces outside the features" when electrical current is supplied to the composition. *Id.* at 20:40–59.

Both claims 2 and 17 recite electroplating methods that use compositions with a suppressor to achieve superfilling, wherein the method has a certain bottom-up growth rate in comparison to a field deposition growth rate. Due to these similarities with a claimed growth rate, we address these independent claims together. We note that many of the limitations of claims 2 and 17 are similar to those of claim 1, for example all of these independent claims require immersing the circuit device substrate into an electrolytic plating composition with a source of Cu ions and supplying an electric current to deposit the Cu onto the substrate and superfill the submicron-sized features. *See* Pet. 43–47.

BASF argues that because the genus of Tetronic polymers is small, "it would have been obvious for a person of ordinary skill in the art to try the entire Tetronic genus when improving over electroplating compositions containing the reference suppressors in claim 2." Pet. 49–50, (citing BASF Catalog 26). Specifically, BASF asserts that "Tetronic® copolymers are a single family that is limited to just 22 members." Reply 22, (citing Ex. 1005, 28). BASF argues further that, as shown in the '992 patent, one of the Tetronic polymers, Tetronic 704, causes a 50% faster growth rate as required in claim 2 or a 15 times faster growth rate as

25

**Appx25**

IPR2016-00696
Patent 7,303,992 B2

required in claim 17.  *See* Pet 50–51, citing Ex. 1001, 14:41–45, Ex. 1002, ¶¶ 28–33.

Enthone argues that there would not have been a reason for those in the art to explore such cationic compounds as possible suppressors for superfilling.  *See* PO Resp. 59.  As discussed above with regard to claim 1, we find that Barstad suggests a copper electroplating method for a semiconductor integrated circuit substrate that uses an electrolytic plating composition with a suppressor, such as a Tetronic polymer for superfilling.  We are persuaded that because there a limited number of Tetronic polymers, it would have been obvious for one of ordinary skill in the art to have used Tetronic 704, which inherently provides the faster growth rates recited in claims 2 and 17.  We rely on our additional findings and determinations about the prior art and secondary considerations in regard to claim 1 in our analysis of claims 2 and 17 of the '992 patent.

BASF argues further that Tetronic copolymers can provide growth rates that are 50% faster, as required in claim 2.  In support, BASF cites the testimony of Dr. Pound,[10] who states that in Example 7 of the '992 patent, Tetronic 704

---

[10] Dr. Pound testifies that he has a Ph.D. in electrochemistry and has worked as a consulting scientist at Exponent since 1998 and as Director of the Electrochemistry Department at SRI International prior to that.  *See* Ex. 1002, ¶¶ 2, 3.  Dr. Pound testifies further that he has authored over 60 papers in scientific journals as well as chapters in Modern Aspects of Electrochemistry and the Encyclopedia of Electrochemistry.  *See id.* ¶ 5.  Enthone argues that Dr. Pound lacks a general understanding of superfilling mechanisms and does not have actual experience as a process engineer.  *See* PO Resp. 43, n.6.  On cross-examination, though, Dr. Pound explained that he has "experience in electrodeposition in general and more accurately superconformal filling is electrodeposition, and . . . electrodeposition is subject to the usual electrochemical principles and the use of additives."  Ex. 2038, 23:13–17.  We find Dr. Pound to be qualified to provide opinion testimony on the subject matter of this proceeding, given that he must support his opinions with

26

IPR2016-00696
Patent 7,303,992 B2

achieves the "50% faster" growth rate recited in claim 2.  Pet. 50, (citing Ex. 1001, 14:41–45; Ex. 1002, ¶¶ 28–30).  Dr. Pound testifies that other Tetronic compounds would provide a growth rate as recited in claim 2 due to the structural similarities amongst the Tetronic products.  *See* Ex. 1002, ¶ 30.  Dr. Pound's testimony is supported by Example 7 of the '992 patent, which states that bottom-up growth rate was 15 times faster than the growth rate on planar surfaces outside features and "1.5 times, or 50%, (e.g., between 1.5 and 3 times) greater than processes comparable in all respects except that they employ the stated commercially available suppressor."  Ex. 1003, 17:2–8, 17:22–26.

Dr. Pound cites to the claims of the '992 patent to support his testimony.  *See* Ex. 1002, ¶ 30.  Claim 3 recites a suppressor compound having a PO:EO ratio between about 1:9 and about 9:1 and claim 4 recites a suppressor having a molecular weight range between about 1000 and about 30,000, and twenty-one of the twenty-two Tetronic compounds listed in BASF Catalog meet both of these limitations.  *See id.*, *see* Ex. 1001, 19:9–17.  Dr. Pound provides similar testimony regarding claim 17.  *Id.* ¶¶ 32–33.  We agree that the claims of the '992 patent support Dr. Pound's testimony.

Enthone disputes BASF's argument regarding the inherent nature of growth suppression for Tetronic copolymers, arguing that BASF uses only the '992 patent as a guide, violating the principle that the inventors' own insights cannot be cited against them.  PO Resp. 59–60.  We do not agree with Patent Owner's argument because the reasons for using Tetronic polymers is not based on the teachings of the '992 patent, but on the teachings of Barstad and BASF Catalog.  Ex. 1003,

---

references to publications or other materials.

IPR2016-00696
Patent 7,303,992 B2

17:2–8, 17:22–26.  The '992 patent merely demonstrates the inherent characteristics of the Tetronic polymers once employed.

Enthone also argues that Dr. Pound does not support his conclusions regarding growth rates.  *See* PO Resp. 60.  But Enthone does not dispute Dr. Pound's comparison of Tetronic® 704 to the structure provided in Examples 1 and 7 of the '992 patent or Dr. Pound's testimony that 21 of the 22 Tetronic compounds in BASF Catalog would meet both the EO:PO ratio and molecular weight requirements within the scope of claims 2 and 17.  *See* Ex. 1002, ¶¶ 24–25, 28, 30, 33, Table 1; *See* Ex. 1003, 8:15–20, 14:42–44, 16:54–56.

Given the teachings of Barstad, Alling, and the small size of the class of Tetronic compounds disclosed by BASF Catalog, the undisputed structural similarity between at least Tetronic 704 and the claimed invention, and our findings, above, regarding the secondary considerations argued by Enthone, we are persuaded that one of ordinary skill would have considered it obvious to use the Tetronic compounds to achieve an electroplating process that addresses that defect issue and that the result would achieve the growth rates of claims 2 and 17.

### 3.  Claim 19

Claim 19 depends from claim 17 and recites "wherein the vertical Cu deposition growth rate is greater than 20 times faster than the field deposition thickness growth rate."  Ex. 1001, 20:65–67.

BASF contends that claim 19 is obvious for the same reasons as claim 17, which, as discussed above, recites vertical Cu deposition growth rate greater than 15 times faster than a field deposition growth rate on substrate surfaces outside the features.  *See* Pet. 58.

Enthone presents similar arguments as presented against BASF's assertions regarding claim 17.  *See* Resp. 59–60; PO Remand Br. 13–14.  Enthone does not

dispute BASF's arguments, but argues that BASF's arguments are not based on the knowledge in the art at the time of the invention and that BASF cites nothing to demonstrate an expectation of success that any suppressor would satisfy the performance requirements of the claims.  PO Resp. 59–60; PO Remand Br. 13–14.

We are persuaded by BASF's arguments for the reasons we discuss above in regard to claims 2 and 17.  Therefore, we agree that claim 19 would have been obvious over the combination of Barstad, BASF Catalog, and Alling.

*4. Claims 3, 4, 6–13, 15, 18, 21, and 26–28*

Claims 3, 4, and 18 depend from claims 2 or 17 and recite limitations regarding the PO:EO ratio, bonds to a nitrogen-containing species, and molecular weight of the suppressor of claims 2 and 17.  Ex. 1001, 19:10–17, 20:60–64. BASF argues that Tetronic compounds disclosed by BASF Catalog possess these features.  Pet. 51–52, 58 (citing Ex. 1005, 26; Ex. 1002, ¶¶ 23–24, 35, Table 1). Similarly, claims 6–13, 15, 21, and 26–28 depend from claims 1, 2, or 17 and recite limitations regarding the chemical composition or chemical structure of the claimed suppressor.  Ex. 1001, 19:21–20:12, 20:16–27, 21:4–5, 22:1–12.  BASF asserts that Tetronic compounds disclosed by BASF Catalog have such chemical compositions and structures.  Pet. 53–60 (citing Ex. 1005, Fig. 5; Ex. 1002 ¶¶ 19, 26).  We agree with BASF and find that BASF Catalog teaches the recited chemical composition or chemical structure of the claimed suppressor.

Enthone does not dispute BASF's arguments, other than to argue that Petitioner's arguments are not based on the knowledge in the art at the time of the invention and that BASF cites nothing to demonstrate an expectation of success that any suppressor would satisfy the performance requirements of the claims.  PO Resp. 60–61; PO Remand Br. 13–14.

IPR2016-00696
Patent 7,303,992 B2

For the reasons discussed above with regard to claims 1, 2 and 17, and based on our findings that Barstad and Alling suggest using Tetronic compounds as a suppressor for superfilling processes, and the teachings of BASF Catalog that disclose Tetronic compounds that meet the recited limitations, we are persuaded that the compounds would inherently meet the addition performance requirements recited in these claims. Therefore, we are persuaded that these claims would have been obvious over the combination of Barstad, BASF Catalog, and Alling.

### 5. Claims 5 and 20

Claims 5 and 20 depend from claim 1 and recite a PO:EO ratio between about 2:3 and about 3:2. Ex. 1001, 19:18–20, 21:1–3. BASF contends that seven of the 22 Tetronic compounds disclosed by BASF catalog possess PO:EO ratios that fall within the claimed range. Pet. 52–53 (citing Ex. 1002, ¶ 25).

Enthone asserts that claims 5 and 20 recite a narrow PO:EO ratio and "[a] very limited minority of the BASF Tetronic compounds have a PO:EO ratio falling within that range." PO Resp. 60, (citing Ex. 2031, ¶¶ 78, 105). Enthone further argues that Barstad and Alling do not identify a particular Tetronic compound or suggest a PO:EO range, which provides "a particularly beneficial balance of properties for superfilling" that is not recognized in the art. *Id.* at 60–61 (citing Ex. 2031, ¶¶ 31–37, 105). Enthone also asserts that BASF's arguments are not based on the knowledge in the art at the time of the invention and that BASF cites nothing to demonstrate an expectation of success that any suppressor would satisfy the performance requirements of the claims. PO Remand Br. 13–14.

Enthone's arguments do not dispute Dr. Pound's determination that some of the Tetronic compounds disclosed by BASF Catalog possess the claimed PO:EO ratios. For the reasons discussed above with regard to claims 2 and 17, we determine that one of ordinary skill would have considered it obvious to use

IPR2016-00696
Patent 7,303,992 B2

Tetronic compounds to achieve an electroplating process that addresses the defect issue identified by Barstad. As demonstrated by BASF Catalog and Dr. Pound, several of the Tetronic compounds known in the art possessed the PO:EO ratios of claims 5 and 20. Therefore, we are persuaded that claims 5 and 20 would have been obvious over the combination of Barstad, BASF Catalog, and Alling.

*6. Claims 14 and 22*

Claims 14 and 22 depend from claim 1 and recite a suppressor concentration between about 50 mg/L and about 200 mg/L. Ex. 1001, 20:13–15, 21:6–8.

BASF asserts that based on the correspondence between 1 mg/L and 1 ppm, Alling discloses a suppressor concentration of about 1 to 10,000 ppm based on the weight of the bath. *See* Pet. 57 (citing Ex. 1006, ¶¶ 43–44; Ex. 1002, ¶ 27). BASF also argues that in addition to suggesting the use of Tetronic compounds, Barstad provides a concentration for surfactants as suppressor agents, even if it does not provide a separate suppressor concentration. Reply 10 (citing Ex. 1003, 6:59–62).

Enthone argues that the range taught in Alling does not render the claimed range obvious because the broad genus disclosed by Alling for conformal plating does not suggest the much narrower claimed concentration range, which is tailored to the particular balanced requirements of superfilling. *See* PO Resp. 61. Enthone notes that the narrower claimed range lies at the extreme end of Alling's broad range. *See id.* Relying on Dr. Barkey's testimony, Enthone argues there would not have been a motivation to select a suppressor concentration in the range required by claims 14 and 22. *See id.*, (citing Ex. 2031, ¶ 106).

We are persuaded by BASF's argument that the methods of claims 14 and 22 would have been obvious. BASF's arguments do not rely merely on either Alling's disclosure of a concentration range or the range taught by Barstad. As discussed above, we are persuaded that Barstad teaches using Tetronic compounds

31

as suppressors in superfilling methods. Thus, the range taught in Barstad and Alling would be relevant to this use.

Patent Owner does not dispute that Barstad's concentration range encompasses the claimed concentration range. An overlap between ranges indicates obviousness. *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003). Instead, Patent Owner argues it would not have been obvious to select the claimed smaller concentration ranges from within Barstad's broader range. We do not agree with Patent Owner because the only evidence cited is the opinion by Dr. Barkey, which merely reiterates, without further credible explanation, Enthone's argument. *See* Ex. 1006, ¶ 106. As a result, the preponderance of the evidence, including the overlapping concentration range disclosed by Barstad, weighs in favor of obviousness. For these reasons, claims 14 and 22 would have been obvious over the combination of Barstad, BASF Catalog, and Alling.

For the foregoing reasons and based on the full record, we find that Petitioner has shown by a preponderance of the evidence that claims 1–15, 17–22, and 26–28 would have been obvious over Barstad, Alling, and BASF Catalog.

### B. Asserted Ground of Obviousness of Claims 1–15, 17–22, and 26–28 over Morrissey, Alling, and BASF Catalog

BASF asserts that claims 1–15, 17–22, and 26–28 are unpatentable under 35 U.S.C. § 103 as obvious over the combination of Morrissey, Alling, and BASF Catalog. Pet. 32–43.

### 1. Summary of Morrissey

Morrissey discloses a process for electroplating copper onto submicron, high-aspect-ratio features of a semiconductor integrated circuit device substrate, while minimizing the concentrations of the organic additives in the plating bath. Ex. 1004 ¶¶ 11, 47. Morrissey seeks to achieve this through use of two different

32

acids in the bath. *Id*. at Abs. Morrissey states that its plating compositions "are particularly useful to plate difficult work pieces, such as circuit board substrates with small diameter, high aspect ratio microvias and other apertures." *Id*. ¶ 46. Morrissey notes that surfactants may be added to the electroplating baths, with particularly suitable surfactants containing Tetronic polymers. *Id*. ¶ 42.

### 2. *Analysis*

BASF argues that Morrissey discloses copper electroplating processes for filling high-aspect ratio, sub-micron features, such as vias or trenches, where the solutions employed may contain accelerators and suppressors, and that both Morrissey and Alling teach that their electroplating compositions may contain Tetronic polymers. Pet. 14–15. BASF argues that Alling provides that Tetronic polymers are particularly suitable as suppressor agents and that BASF Catalog provides for compounds having PO:EO ratios that fall within the claimed ranges. *Id*. at 15. BASF argues further that Morrissey discloses electroplating compositions having "suppressor agents" and surfactants, including Tetronic polymers. *See* Pet. 8 (citing Ex. 1004, ¶ 42; Ex. 1002, ¶ 17). According to BASF, it would have been obvious to a person of ordinary skill in the art to use Tetronic polymers as suppressor agents in the electroplating solutions of Morrissey. *Id*. at 15–16.

BASF argues further that because the genus of Tetronic products is small and that all such polymers are comprised of propylene oxide and ethylene oxide groups with the same general chemical structure, it would have been expected that they would act similarly. *See* Pet. 16. BASF asserts that Alling does not identify any Tetronic polymers that would *not* work and concludes that a person of ordinary skill in the art would have been motivated to use Tetronic polymers, as provided in BASF Catalog, as suppressors in Morrissey's compositions. Pet. 19.

IPR2016-00696
Patent 7,303,992 B2

Enthone opposes BASF's argument, asserting that Morrissey describes "suppressors" and "surfactants" as separate components for an electrodeposition bath. *See* PO Resp. 35 (citing Ex. 1004, ¶¶ 2, 26). We agree with this argument. Similar to Barstad, Morrissey initially describes a plating solution and discloses that it may contain "additives (such as surfactants, brighteners, levelers and suppressants)." Ex. 1004, ¶ 2. Morrissey continues to discuss surfactants and suppressors, disclosing that its electroplating solutions "may optionally contain one or more additives, such as halides, accelerators or brighteners, suppressors, levelers, grain refiners, wetting agents, surfactants and the like." *Id.* ¶ 26. Morrissey discusses suppressor agents and what type of polymeric materials they may be. *Id.* ¶¶ 39–40. But, separately, Morrissey then discloses that "[s]urfactants may optionally be added to the electroplating baths" and that the Tetronic and Pluronic products are "[p]articularly suitable surfactants for plating compositions of the invention." *Id.* ¶ 42.

BASF does not direct us to a teaching in Morrissey that suggests Tetronic and Pluronic products function as a suppressor for plating methods disclosed. For instance, Morrissey does not disclose "a surfactant-type suppressor agent" or disclose that a Pluronic product is a suppressor in examples, as Barstad does. Furthermore, the testimony of Dr. Pound cited by BASF does not support suppressor activity for Tetronic copolymers. *See* Ex. 1002, ¶¶ 17–19; *see* Pet. 8, 35. Therefore, we are not persuaded that Morrissey provides a reason to use a Tetronic product for its superfilling process.

Although we determine as discussed above and in regard to BASF's grounds of unpatentability based on Barstad, that Alling is directed to superfilling, Alling does not expressly teach that Tetronic products are suitable suppressors for a superfilling process. Alling merely discloses that Tetronic products are

34

IPR2016-00696
Patent 7,303,992 B2

particularly suitable suppressor agents for plating compositions of its invention. *Id.* ¶ 43. Thus, Alling does not link the use of Tetronic products as suppressors to a superfilling process and fails to cure the deficiency of Morrissey.

For these reasons, Petitioner has not demonstrated by a preponderance of the evidence that claims 1–15, 17–22, and 26–28 of the '992 patent are unpatentable over the combination of Morrissey, Alling, and BASF Catalog.

## III. CONCLUSION

For the reasons discussed above, we conclude that Petitioner has demonstrated by a preponderance of the evidence that the challenged claims 1–15, 17–22, and 26–28 of the '992 patent are unpatentable.[11]

---

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2016-00696
Patent 7,303,992 B2

The table below summarizes our conclusions:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–15, 17–22, 26–28 | 103(a) | Barstad, Alling, BASF Catalog | 1–15, 17–22, 26–28 | |
| 1–15, 17–22, 26–28 | 103(a) | Morrissey, Alling, BASF Catalog | | 1–15, 17–22, 26–28 |
| **Overall Outcome** | | | 1–15, 17–22, 26–28 | |

ORDER

For the foregoing reasons, it is:

ORDERED that claims 1–15, 17–22, and 26–28 of the '992 patent are held *unpatentable*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

36

**Appx36**

IPR2016-00696
Patent 7,303,992 B2


For PETITIONER:

Holmes Hawkins
Russell Blythe
Joseph Eng
KING & SPALDING LLP
HHawkins@kslaw.com
rblythe@kslaw.com
jeng@kslaw.com


For PATENT OWNER:

Marc Vander Tuig
John Roedel
Robert Evans
Paul Fleischut
John Schroeder
SENNIGER POWERS LLP
mvandertuig@senniger.com
jroedel@senniger.com
revans@senniger.com
pfleischut@senniger.com
jschroeder@senniger.com

US007303992B2

(12) **United States Patent**
Paneccasio et al.

(10) Patent No.: **US 7,303,992 B2**
(45) Date of Patent: **Dec. 4, 2007**

(54) **COPPER ELECTRODEPOSITION IN MICROELECTRONICS**

(75) Inventors: **Vincent Paneccasio**, Madison, CT (US); **Xuan Lin**, Northford, CT (US); **Paul Figura**, Orange, CT (US); **Richard Hurtubise**, Clinton, CT (US)

(73) Assignee: **Enthone Inc.**, West Haven, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/272,999**

(22) Filed: **Nov. 14, 2005**

(65) **Prior Publication Data**

US 2006/0141784 A1    Jun. 29, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/627,700, filed on Nov. 12, 2004.

(51) **Int. Cl.**
*H01L 21/31* (2006.01)

(52) **U.S. Cl.** ..................................... **438/687**; 438/678

(58) **Field of Classification Search** ................ 438/678, 438/687
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,832,291 | A | 8/1974 | Arcilesi |
| 4,336,114 | A | 6/1982 | Mayer et al. |
| 4,347,108 | A | 8/1982 | Willis |
| 4,374,709 | A | 2/1983 | Combs |
| 4,376,685 | A | 3/1983 | Watson |
| 4,512,856 | A | 4/1985 | Paneccasio |

| | | | |
|---|---|---|---|
| 4,898,652 | A | 2/1990 | Bammel et al. |
| 5,174,887 | A | 12/1992 | Federman et al. |
| 5,328,589 | A | 7/1994 | Martin |
| 5,433,840 | A | 7/1995 | Dahms et al. |
| 6,024,856 | A | 2/2000 | Haydu et al. |
| 6,113,771 | A | 9/2000 | Landau et al. |
| 6,129,830 | A | 10/2000 | Senge et al. |
| 6,338,411 | B1 | 1/2002 | Katabe |
| 6,350,366 | B1 | 2/2002 | Landau et al. |
| 6,379,522 | B1 | 4/2002 | Landau et al. |
| 6,444,110 | B2 | 9/2002 | Barstad et al. |
| 6,518,182 | B1 | 2/2003 | Ishikawa et al. |
| 6,544,399 | B1 | 4/2003 | Landau et al. |
| 6,551,487 | B1 | 4/2003 | Reid et al. |
| 6,596,151 | B2 | 7/2003 | Landau et al. |
| 6,607,654 | B2 | 8/2003 | Lee et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

DE    2610705    9/1977

OTHER PUBLICATIONS

International Preliminary Report on Patentability, PCT/US2005/040996, dated May 15, 2007, 4 pages.

*Primary Examiner*—Alexander Ghyka
(74) *Attorney, Agent, or Firm*—Senniger Powers

(57) **ABSTRACT**

An electrolytic plating method and composition for electrolytically plating Cu onto a semiconductor integrated circuit substrate having submicron-sized interconnect features. The composition comprises a source of Cu ions and a suppressor compound comprising polyether groups. The method involves superfilling by rapid bottom-up deposition at a superfill speed by which Cu deposition in a vertical direction from the bottoms of the features to the top openings of the features is substantially greater than Cu deposition on the side walls.

**28 Claims, 3 Drawing Sheets**



BASF
Exhibit 1001

**US 7,303,992 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,610,191 B2 | 8/2003 | Landau et al. |
| 6,660,153 B2 | 12/2003 | Merricks et al. |
| 6,740,221 B2 | 5/2004 | Cheung et al. |
| 6,776,893 B1 * | 8/2004 | Too et al. .................... 205/123 |
| 6,797,142 B2 | 9/2004 | Crosby |
| 6,800,188 B2 | 10/2004 | Hagiwara et al. |
| 6,926,922 B2 | 8/2005 | Leung et al. |
| 2002/0112964 A1 | 8/2002 | Gandikota et al. |
| 2002/0153260 A1 | 10/2002 | Egli et al. |
| 2003/0094376 A1 | 5/2003 | Seita et al. |
| 2003/0168343 A1 | 9/2003 | Commander et al. |
| 2004/0138075 A1 | 7/2004 | Brown et al. |
| 2004/0154926 A1 | 8/2004 | Sun et al. |
| 2004/0168928 A1 | 9/2004 | Hardikar |
| 2004/0217009 A1 | 11/2004 | Mikkola et al. |
| 2004/0222104 A1 | 11/2004 | Wang et al. |
| 2005/0045485 A1 | 3/2005 | Shih et al. |
| 2005/0045488 A1 | 3/2005 | Paneccasio, Jr. et al. |
| 2005/0081744 A1 | 4/2005 | Klocke et al. |
| 2005/0189233 A1 | 9/2005 | Shih et al. |
| 2005/0199507 A1 | 9/2005 | Shih et al. |
| 2005/0211564 A1 | 9/2005 | Shih et al. |
| 2005/0241946 A1 | 11/2005 | Nagai et al. |
| 2005/0274622 A1 | 12/2005 | Sun et al. |
| 2006/0118422 A1 | 6/2006 | Ko et al. |

* cited by examiner

# FIG. 1



# FIG. 2A



# FIG. 2B



# FIG. 3A



# FIG. 3B



US 7,303,992 B2

1

# COPPER ELECTRODEPOSITION IN MICROELECTRONICS

### FIELD OF THE INVENTION

This invention relates to a method, compositions, and additives for electrolytic Cu metallization in the field of microelectronics manufacture.

### BACKGROUND OF THE INVENTION

Electrolytic Cu metallization is employed in the field of microelectronics manufacture to provide electrical interconnection in a wide variety of applications, such as, for example, in the manufacture of semiconductor integrated circuit (IC) devices. The demand for manufacturing semiconductor IC devices such as computer chips with high circuit speed and high packing density requires the downward scaling of feature sizes in ultra-large-scale integration (ULSI) and very-large-scale integration (VLSI) structures. The trend to smaller device sizes and increased circuit density requires decreasing the dimensions of interconnect features. An interconnect feature is a feature such as a via or trench formed in a dielectric substrate which is then filled with metal to yield an electrically conductive interconnect. Further decreases in interconnect size present challenges in metal filling.

Copper has been introduced to replace aluminum to form the connection lines and interconnects in semiconductor substrates. Copper has a lower resistivity than aluminum and the thickness of a Cu line for the same resistance can be thinner than that of an aluminum line.

The use of copper has introduced a number of requirements into the IC manufacturing process. First, copper has a tendency to diffuse into the semiconductor's junctions, thereby disturbing their electrical characteristics. To combat this occurrence, a barrier layer, such as titanium nitride, tantalum, tantalum nitride, or other layers as are known in the art, is applied to the dielectric prior to the copper layer's deposition. It is also necessary that the copper be deposited on the barrier layer cost-effectively while ensuring the requisite coverage thickness for carrying signals between the IC's devices. As the architecture of ICs continues to shrink, this requirement proves to be increasingly difficult to satisfy.

One conventional semiconductor manufacturing process is the copper damascene system. Specifically, this system begins by etching the circuit architecture into the substrate's dielectric material. The architecture is comprised of a combination of the aforementioned trenches and vias. Next, a barrier layer is laid over the dielectric to prevent diffusion of the subsequently applied copper layer into the substrate's junctions, followed by physical or chemical vapor deposition of a copper seed layer to provide electrical conductivity for a sequential electrochemical process. Copper to fill into the vias and trenches on substrates can be deposited by plating (such as electroless and electrolytic), sputtering, plasma vapor deposition (PVD), and chemical vapor deposition (CVD). It is generally recognized electrochemical deposition is the best method to apply Cu since it is more economical than other deposition methods and can flawlessly fill into the interconnect features (often called "bottom up" growth). After the copper layer has been deposited, excess copper is removed from the facial plane of the dielectric by chemical mechanical polishing, leaving copper in only the etched interconnect features of the dielectric. Subsequent layers are produced similarly before assembly into the final semiconductor package.

2

Copper plating methods must meet the stringent requirements of the semiconductor industry. For example, Cu deposits must be uniform and capable of flawlessly filling the small interconnect features of the device, for example, with openings of 100 nm or smaller.

Electrolytic Cu systems have been developed which rely on so-called "superfilling" or "bottom-up growth" to deposit Cu into high aspect ratio features. Superfilling involves filling a feature from the bottom up, rather than at an equal rate on all its surfaces, to avoid seams and pinching off that can result in voiding. Systems consisting of a suppressor and an accelerator as additives have been developed for superfilling. As the result of momentum of bottom-up growth, the Cu deposit is thicker on the areas of interconnect features than on the field area that does not have features. These overgrowth regions are commonly called overplating, mounding, bumps, or humps. Smaller features generate higher overplating humps due to faster superfill speed. The overplating poses challenges for later chemical and mechanical polishing processes that planarize the Cu surface. A third organic additive called a "leveler" is typically used to reduce the overgrowth.

As chip architecture gets smaller, with interconnects having openings on the order of 100 nm and smaller through which Cu must grow to fill the interconnects, there is a need for enhanced bottom-up speed. That is, the Cu must fill "faster" in the sense that the rate of growth on the feature bottom must be substantially greater than the rate of growth on the rest of areas, and even more so than in conventional superfilling of larger interconnects.

In addition to superfilling and overplating issues, microdefects may form when electrodepositing Cu for filling interconnect features. One defect that can occur is the formation of internal voids inside the features. As Cu is deposited on the feature side walls and top entry of the feature, deposition on the side walls and entrance to the feature can pinch off and thereby close access to the depths of the feature especially with features which are small (e.g., <100 nm) and/or which have a high aspect ratio (depth: width) if the bottom-up growth rate is not fast enough. Smaller feature size or higher aspect ratio generally requires faster bottom-up speed to avoid pinching off. Moreover, smaller size or higher aspect ratio features tend to have thinner seed coverage on the sidewall and bottom of a via/trench where voids can also be produced due to insufficient copper growth in these areas. An internal void can interfere with electrical connectivity through the feature.

Microvoids are another type of defect which can form during or after electrolytic Cu deposition due to uneven Cu growth or grain recrystallization that happens after Cu plating.

In a different aspect, some local areas of a semiconductor substrate, typically areas where there is a Cu seed layer deposited by physical vapor deposition, may not grow Cu during the electrolytic deposition, resulting in pits or missing metal defects. These Cu voids are considered to be "killer defects," as they reduce the yield of semiconductor manufacturing products. Multiple mechanisms contribute to the formation of Cu voids, including the semiconductor substrate itself. However, Cu electroplating chemistry has influence on the occurrence and population of these defects.

Other defects are surface protrusions, which are isolated deposition peaks occurring at localized high current density sites, localized impurity sites, or otherwise. Copper plating chemistry has influence on the occurrence of such protrusion defects. Although not considered as defects, Cu surface

US 7,303,992 B2

**3**

roughness is also important for semiconductor wafer manufacturing. Generally, a bright Cu surface is desired as it can reduce the swirl patterns formed during wafer entry in the plating solution. Roughness of Cu deposits makes it more difficult to detect defects by inspection, as defects may be concealed by peaks and valleys of rough surface topography. Moreover, smooth growth of Cu is becoming more important for flawlessly filling of fine interconnect structures as the roughness can cause pinch off of feature and thereby close access to the depths of the feature. It is generally recognized that Cu plating chemistry, including suppressor, accelerator, and leveler, has great influence on the roughness of Cu deposits.

## SUMMARY OF THE INVENTION

The invention is directed to an electrolytic plating composition for electrolytically plating Cu onto a semiconductor integrated circuit substrate having a planar plating surface and submicron-sized interconnect features by immersion of the semiconductor integrated circuit substrate into the electrolytic solution. The composition comprises a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features and a suppressor compound comprising a combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1 and bonded to a nitrogen-containing species, wherein the molecular weight of the suppressor compound is between about 1000 and about 30,000.

In another aspect the invention is directed to a method for electrolytically plating Cu onto a substrate employing the foregoing composition.

In another aspect the invention is directed to a method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical interconnect features including submicron-sized features having bottoms, sidewalls, and top openings, the method comprising immersing the semiconductor integrated circuit device substrate into the electrolytic plating composition comprising a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features, an accelerator, and a suppressor; and supplying electrical current to the electrolytic composition to deposit Cu onto the substrate and superfill the submicronsized features by rapid bottom-up deposition at a vertical Cu deposition growth rate in features from the bottoms of the features to the top openings of the features which is greater than 50% faster than a comparable vertical Cu deposition growth rate of comparable process which is equivalent in all respects except that it employs a commercially available suppressor.

Other objects and features will be in part apparent and in part pointed out hereinafter.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a graph comparing the fill speeds of electrolytic plating baths comprising a suppressor compound of the present invention (-■-) against the fill speed of an electrolytic plating bath comprising a commercially available suppressor compound (-●-). The electrolytic plating bath comprising the suppressor compound of the present invention comprises the bath components listed in Example 1 and was plated according to the method of Example 7. The electrolytic plating bath comprising the commercially available

**4**

suppressor compound comprises the bath components listed in Comparative Example 1 and was plated according to the method of Example 7.

FIGS. **2**A and **2**B are SEM images showing superfilled test trenches prepared according to the method of Example 7. The trenches in FIG. **2**A were filled using an electrolytic plating bath comprising the additives listed in Example 1, including a suppressor compound of the present invention. The trenches in FIG. **2**B were filled using an electrolytic plating bath comprising the additives listed in Comparative Example 1, including a commercially available suppressor compound.

FIGS. **3**A and **3**B are SEM images showing superfilled test trenches prepared according to the method of Example 8. The trenches in FIG. **3**A were filled using an electrolytic plating bath comprising the additives listed in Example 5, including a suppressor compound of the present invention. The trenches in FIG. **3**B were filled using an electrolytic plating bath comprising the additives listed in Comparative Example 5, including a commercially available suppressor compound.

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with this invention, compositions are provided suitable for plating semiconductor integrated circuit substrates having challenging fill characteristics, such as interconnect features that are poorly seeded or not substantially seeded, interconnect features having a complex geometry, and large diameter interconnect features as well as small diameter features (less than about 0.5 μm), and features with high aspect ratios (at least about 3:1) or low aspect ratios (less than about 3:1) where Cu must fill all the features completely and substantially defect-free.

The compositions for Cu superfilling of semiconductor integrated circuit substrates having challenging fill characteristics of the present invention comprise a suppressor compound and a source of Cu ions. These compositions also typically comprise a leveler, an accelerator, and chloride. The above-listed additives find application in high Cu metal/low acid electrolytic plating baths, in low Cu metal/high acid electrolytic plating baths, and in mid acid/high Cu metal electrolytic plating baths. The compositions can also comprise other additives which are known in the art such as halides, grain refiners, quaternary amines, polysulfide compounds, and others. Compositions comprising the suppressor, leveler, and accelerator of the present invention can be used to fill small diameter/high aspect ratio features.

Preferred suppressors for the Cu plating compositions of the present invention comprise polyether groups covalently bonded to a cationic species. The cationic polyether suppressor preferably comprises a nitrogen atom. Exemplary cationic species comprising a nitrogen atom include primary, secondary, tertiary, and quaternary amines. By "cationic," it is meant that the polyether suppressor either contains or can contain a positive charge in solution. Primary, secondary, and tertiary amines are weakly basic and become protonated and positively charged when added to a solution comprising an acid. Quaternary amines comprise four nitrogen-substituents, and a quaternized nitrogen possesses a positive charge regardless of the solution pH. The primary, secondary, tertiary, and quaternary amines can be substituted or unsubstituted alkyl amines, substituted or unsubstituted cycloalkyl amines, substituted or unsubstituted aromatic amines, substituted or unsubstituted het-

US 7,303,992 B2

5

eroaryl amines, substituted or unsubstituted alkylether amines, and substituted or unsubstituted aromatic alkyl amines.

The suppressors comprising polyether groups covalently bonded to a cationic species preferably comprise at least one amine functional group, preferably between two amine functional groups and five amine functional groups. Accordingly, the cationic species can be an amine, a diamine, a triamine, a tetraamine, a pentaamine, or an even higher amine. The alkyl group of the alkylamine can be a substituted or unsubstituted alkyl, preferably a short chain hydrocarbon having between 1 and 8 carbons, which may be branched or straight chained. Exemplary alkylamines can include methylamine, ethylamine, propylamine, n-butylamine, isobutylamine, t-butylamine, ethylenediamine, diethylenetriamine, 1,3-diaminopropane, 1,4-diaminobutane, 2-butene-1,4-diamine, and others. The cycloalkyl group of the cycloalkyl amine typically comprises a 5- or 6-carbon ring, although bicyclic, tricyclic, and higher multicyclic alkyl amines are applicable. Exemplary cycloalkyl amines include substituted or unsubstituted cyclopentylamines, cyclohexylamines, cyclopentylamines, cyclopentyldiamines, cyclohexylamines, cyclopentylamines, cylcoalkyltriamines, and higher cycloalkyl amines. Alkylether amines preferably comprise an ether moiety defined by short chain hydrocarbons typically having between 1 and 8 carbons, such as diethylene glycol diamine and triethylene glycol diamine.

The polyethers comprise a chain of repeat units, wherein the chain of repeat units can be formed by the polymerization of epoxide monomers. In a preferred embodiment, the epoxide monomers are selected from ethylene oxide monomer, propylene oxide monomer, and a combination thereof. Preferably, the polyether comprises a chain of repeat units formed by the polymerization of both ethylene oxide monomer and propylene oxide monomer. Accordingly, the ratio of ethylene oxide (EO) repeat units and propylene oxide (PO) repeat units in the polyether can be between about 1:9 and about 9:1. In one embodiment, the ratio is between about 2:3 and about 3:2, such as about 1:1. In one embodiment, the polyether comprises between about 1 and about 30 EO repeat units and between about 30 and about 1 PO repeat units, such as between about 7 and about 15 EO repeat units and between about 15 and about 7 PO repeat units. In a currently preferred embodiment, the polyether comprises, for example, about 11 EO repeat units and about 13 PO repeat units. In another preferred embodiment, the polyether comprises about 7 or 8 EO repeat units and about 9 PO repeat units. Accordingly, the molecular weight of the polyether can be between as low as about 100 g/mol and as high as about 3600 g/mol, preferably between about 1000 g/mol and about 1800 g/mol, and in one embodiment, between about 1200 g/mol and about 1400 g/mol.

The polyether preferably comprises EO repeat units and PO repeat units in random, alternating, or block configurations. In a random configuration, the EO repeat units and PO repeat units have no discernable linear pattern along the polyether chain. In an alternating configuration, the EO repeat units and PO repeat units alternate according to some defined pattern, such as repeating units of EO-PO, PO-EO, and other alternating patterns. The co-polymer can be arranged in a block configuration. In the block configuration, the linear portion of the polyether chain comprises a block of EO repeat units bonded to a block of PO repeat units. The polyether chain may comprise a diblock. That is, the chain may comprise a first block of EO repeat units bonded to a second block of PO repeat units. Alternatively, the chain may comprise a first block of PO repeat units bonded to a second block of EO repeat units. In more complicated block configurations, the polyether chain may comprise a triblock

6

(EO block-PO block-EO block or PO block-EO block-PO block), tetrablock, pentablock, or higher block arrangements. It has been discovered that a PO block-EO block-PO triblock configuration is effective to reduce polyether suppressor foaming in electrolytic solution. In one embodiment of the block configuration, each block of repeat units comprises between about 1 and about 30 repeat units, more preferably between about 7 and about 15 repeat units. In a preferred embodiment involving a PO block-EO block-PO block tri-block configuration, the first PO-block bonded to the cationic species comprises between about 7 and about 15 PO repeat units, the second EO-block bonded to the PO-block comprises between about 7 and about 15 repeat units, and the third PO-block bonded to the second EO-block comprises between about 1 and about 5 repeat units.

Optionally, the PO/EO polyethers are capped by a substituted or unsubstituted alkyl group, aryl group, aralkyl, or heteroaryl group. A preferred capping moiety for its ease of manufacture and low cost is a methyl group.

The suppressor compounds comprising polyether groups covalently bonded to a cationic species comprise a positive charge in acidic solution and repeat units, EO and PO. It is thought that the separate functionalities of the positive charge, the EO repeat units, and the PO repeat units contribute different chemical and physical properties which affect, and thereby enhance, the function of the polyether as a suppressor in the Cu plating compositions of the present invention. Without being bound to a particular theory, it is thought that the positive charge of the cationic species enhances the attraction of the suppressor compound to Cu deposited into interconnect features, which, during an electrolytic plating operation, functions as the cathode. It is believed that the PO repeat unit is the active repeat unit in the suppressors of the present invention. That is, the PO repeat unit has suppressor functionality and affects the quality of the Cu deposit. Without being bound to a particular theory, it is thought that the PO repeat units, being relatively hydrophobic form a polarizing film over a Cu seed layer and electrolytically deposited Cu.

A Cu seed layer is typically deposited over the barrier layer in interconnect features by CVD, PVD, and other methods known in the art. The Cu seed layer acts as the cathode for further reduction of Cu that superfills the interconnects during the electrolytic plating operation. Cu seed layers can be thin, i.e., less than about 700 Angstroms. Or they may be thick, i.e., between about 700 Angstroms and about 1500 Angstroms. However, the copper thickness on the bottom or sidewall of features is typically much thinner than those on the feature top and unpatterned areas due to the non-uniform deposition rates of PVD processes. In some extreme circumstances, the copper coverage on the bottom or sidewall could be so thin that the seed is discontinuous. Accordingly, in some instances the substrate comprises surface portions which have a Cu seed thereon which is less than about 700 angstroms thick, and in some instances the seed is discontinuous. In another case, the seed coverage on the top of features is thicker than on other feature areas, which is often called "seed overhang." Generally, the uniformity of seed coverage degrades significantly with shrinking feature size and increasing aspect ratio. The present invention has been shown to perform well, and better than the prior art, with thin or overhanged seed layers.

The suppressor compound with somewhat hydrophobic PO repeat units covalently bonded to a nitrogen-containing cationic species is able to form a suppressive film over the Cu seed layer. In the case of thin copper seed coverage, this polarizing organic film will cause the current to be more evenly distributed over the entire interconnect feature, i.e., the bottom and sidewalls of the via or trench. Even current distribution is believed to promote faster bottom up growth

US 7,303,992 B2

7

relative to sidewall growth, and may also reduce or eliminate bottom and sidewall voiding. This strongly suppressive suppressor is also desirable to suppress copper growth at the seed overhang areas on the top of the interconnect features, reducing the formation of internal voids from early pinching off. It has been discovered that the suppressor compound comprising a polyether group covalently bonded to a cationic species of the present invention is effective at suppressing Cu deposition over thin or thick Cu seed layers. A polyether constituted only of PO repeat units, being relatively hydrophobic, lacks the solubility necessary to act as an adequate suppressor. That is, while PO is a superior suppressor, a polymer constituted only of PO repeat units may not be soluble enough to go into the Cu plating solution so that it can adsorb onto the Cu seed layer in a high enough concentration to form a polarizing film. Accordingly, the polyether group further comprises EO repeat units to enhance its hydrophilicity and thus its solubility.

In those embodiments where the cationic species comprises a nitrogen atom, the nitrogen atom can be covalently bonded to one, two, or three PO/EO polyethers. Preferably, the nitrogen atom is covalently bonded to two PO/EO polyethers. In embodiments where the cationic species is a primary, secondary, or tertiary amine, the nitrogen atom can be alkylated to quaternize the nitrogen atom and render it positively charged. Preferably, the alkyl group is a short chain hydrocarbon radical having between 1 and 8 carbons, such as methyl, ethyl, n-propyl, isopropyl, and the like. Preferably the alkyl group is a methyl group. Accordingly, the nitrogen atom can form a quaternary amine having a positive charge where the suppressor comprises, for example, two PO/EO polyethers covalently bonded to a methylated alkylamine.

In those embodiments where the cationic species comprises a nitrogen atom, the cationic species can have any of the following structures (1), (2), (3), or (4):

$$
\begin{array}{c}
R_2 \\
| \\
R_1 - N - R_3 - R_4
\end{array} \tag{1}
$$

$$
\begin{array}{c}
R_1 - N - R_3 - R_4 \\
| \\
R_3 - R_4
\end{array} \tag{2}
$$

$$
\begin{array}{c}
R_2 \\
|\oplus \\
R_1 - N - R_3 - R_4 \\
| \\
R_3 - R_4
\end{array} \tag{3}
$$

$$
\begin{array}{c}
R_3 - R_4 \\
|\oplus \\
R_1 - N - R_3 - R_4 \\
| \\
R_3 - R_4
\end{array} \tag{4}
$$

wherein

$R_1$ is a substituted or unsubstituted alkyl group, preferably a straight chained or branched alkyl group having between 1 and 8 carbons, and preferably, $R_1$ is substituted with another amino group to which a polyether group is covalently bonded, the polyether group comprising EO repeat units, PO repeat units, or a combination thereof arranged in random, alternating, or block configurations,

$R_2$ is selected from the group consisting of hydrogen and alkyl group, and where $R_2$ is an alkyl group, it is preferably a methyl group,

8

$R_3$ is a polyether group preferably comprising EO repeat units, PO repeat units, or a combination thereof arranged in random, alternating, or block configurations, and

$R_4$ is selected from the group consisting of hydrogen, substituted or unsubstituted alkyl group, aryl group, aralkyl, or heteroaryl group.

The suppressor compounds of the invention have a molecular weight between about 1000 and about 30,000. Exemplary suppressor compounds comprising a polyether group covalently bonded to a cationic species wherein the polyether is covalently bonded to a nitrogen atom are shown by structures (5), (6), (7), (8), and (9) below.

Structure (5) is a PO/EO block copolymer of ethylenediamine having the structure:

$$
\begin{array}{c}
H-(OC_2H_4)_n-(OC_3H_6)_m \\
\qquad\qquad\qquad\qquad H_2\ H_2 \\
\qquad\qquad\qquad\qquad N-C-N \\
H-(OC_2H_4)_n-(OC_3H_6)_m \qquad\qquad (C_3H_6O)_m-(C_2H_4O)_n-H,
\end{array} \tag{5}
$$

and wherein n can be between 1 and about 30 and m can be between 1 and about 30. Accordingly a suppressor compound having the structure (5) comprises between about 4 and about 120 total PO repeat units and between about 4 and about 120 total EO repeat units on the four PO/EO block copolymers. The molecular weight of the PO (hydrophobic unit) block on a single PO/EO block copolymer can be between about 50 g/mol and about 1800 g/mol, and the molecular weight of the EO (hydrophilic unit) block on a single PO/EO block copolymer can be between about 40 g/mol and about 1400 g/mol. The molecular weight of a single PO/EO copolymer can be between about 100 g/mol about 3600 g/mol. An exemplary suppressor compound having the structure (5) is available from BASF Corporation of Mt. Olive, N.J. under the trade designation Tetronic® 704. This suppressor compound comprises about 13 PO repeat units per PO/EO block copolymer for a total of about 52 PO repeat units on all four PO/EO block copolymers and about 11 EO repeat units per PO/EO block copolymer for a total of about 44 EO repeat units on all four PO/EO block copolymers. Accordingly, the total MW of Tetronic® 704 is between about 5000 g/mol and about 5500 g/mol. Another exemplary block copolymer of structure (5) is also available from BASF Corporation under the trade designation Tetronic® 504. This suppressor compound comprises about 9 PO repeat units per PO/EO block copolymer for a total of about 36 PO repeat units on all four PO/EO block copolymers and about 7.5 EO repeat units per PO/EO block copolymer for a total of about 30 EO repeat units on all four PO/EO block copolymers. Accordingly, the total MW of Tetronic® 504 is between about 3200 g/mol and about 3600 g/mol. The bath composition can comprise a mixture of block copolymers of structure (5).

Structure (6) is an N-methylated PO/EO block copolymer of ethylenediamine having the general structure:

$$
\begin{array}{c}
\qquad\qquad\qquad\qquad\qquad CH_3 \\
H-(OC_2H_4)_n-(OC_3H_6)_m \qquad\qquad | \\
\qquad\qquad\qquad\qquad H_2\ H_2\ (C_3H_6O)_m-(C_2H_4O)_n-H, \\
\qquad\qquad\qquad\qquad N-C-C-N \\
H-(OC_2H_4)_n-(OC_3H_6)_m \qquad\qquad (C_3H_6O)_m-(C_2H_4O)_n-H
\end{array} \tag{6}
$$

wherein n can be between 1 and about 30 and m can be between 1 and about 30. A source of the suppressor compound having structure (6) is N-methylated Tetronic® 504 or N-methylated Tetronic® 704.

**Appx785**

009

US 7,303,992 B2

**9**

Structure (7) is a methyl-capped PO/EO block copolymer of ethylenediamine having the general structure:

$$CH_3-(OC_2H_4)_n-(OC_3H_6)_m \quad (C_3H_6O)_m-(C_2H_4O)_n-CH_3,$$
$$N-\overset{H_2}{C}-\overset{H_2}{C}-N$$
$$CH_3-(OC_2H_4)_n-(OC_3H_6)_m \quad (C_3H_6O)_m-(C_2H_4O)_n-CH_3$$
(7)

and wherein n can be between 1 and about 30 and m can be between 1 and about 30. A source of the suppressor compound having structure (7) is methyl-capped Tetronic® 504 or methyl-capped Tetronic® 704. In various alternatives, one of the terminal oxygen atoms can be bonded to a methyl group and the other three terminal oxygen atoms can be bonded to a hydrogen atom; or two of the terminal oxygen atoms can be bonded to a methyl group and two of the terminal oxygen atoms can be bonded to a hydrogen atom; or three of the terminal oxygen atoms can be bonded to a methyl group and one of the terminal oxygen atoms can be bonded to a hydrogen atom; or all of the terminal oxygen atoms can be bonded to a methyl group.

In yet another alternative, the block copolymer is methylated and capped as described above, as long as the cloud point is such that it is compatible with copper solution.

Structure (8) is a PO/EO/PO tri-block copolymer of ethylenediamine having the general structure:

$$H-(OC_3H_6)_o-(OC_2H_4)_n-(OC_3H_6)_m \quad (C_3H_6O)_m-(C_2H_4O)_n-(C_3H_6O)_o-H,$$
$$N-\overset{H_2}{C}-\overset{H_2}{C}-N$$
$$H-(OC_3H_6)_o-(OC_2H_4)_n-(OC_3H_6)_m \quad (C_3H_6O)_m-(C_2H_4O)_n-(C_3H_6O)_o-H$$
(8)

and wherein n can be between 1 and about 30, m can be between 1 and about 30, and o can be between about 1 and about 5, or such that the cloud point is compatible with copper solution. Preferably, o is 1 or 2. A source of a suppressor compound having structure (8) is PO-capped Tetronic® 504 or PO-capped Tetronic® 704.

Structure (9) is a PO/EO block copolymer of triethylene glycol diamine having the structure:

$$H-(OC_2H_4)_n-(OC_3H_6)_m \quad (C_3H_6O)_m-(C_2H_4O)_n-H,$$
$$N-H_2CH_2C-O-CH_2CH_2-O-CH_2CH_2-N$$
$$H-(OC_2H_4)_n-(OC_3H_6)_m \quad (C_3H_6O)_m-(C_2H_4O)_n-H$$
(9)

and wherein n can be between 1 and about 30 and m can be between 1 and about 30. Triethylene glycol diamine, to which the PO/EO block co-polymers can be covalently bonded, is available from Huntsman LLC of Salt Lake City, Utah under the trade designation Jeffamine XTJ-504. The structure of the PO/EO block copolymer in suppressor compounds having structure (9) can be substantially the same as the PO/EO block copolymers in Tetronic® 504 and Tetronic® 704. Accordingly, the MW of a suppressor compound having structure (9) can be between about 5200 g/mol and about 5800 g/mol.

**10**

The suppressor compounds described above can be present in an overall bath concentration between about 10 mg/L to about 1000 mg/L, preferably between about 50 mg/L to about 200 mg/L. Adding the weakly cationic polyether suppressors to Cu plating compositions within these concentration ranges is sufficient to fill complex features in an integrated circuit device, with the added benefits of reducing early pinching off, bottom voiding, or sidewall voiding.

The composition of the invention also preferably includes a leveler which has an enhanced leveling effect without substantially interfering with superfilling of Cu into high aspect ratio features. One such preferred leveler is disclosed in U.S. Pat. Pub. No. 2005/0045488, filed Oct. 12, 2004, the entire disclosure of which is expressly incorporated by reference. This leveler does not substantially interfere with superfilling, so the Cu bath can be formulated with a combination of accelerator and suppressor additives which provides a rate of growth in the vertical direction which is substantially greater than the rate of growth in the horizontal direction, and even more so than in conventional superfilling of larger interconnects. One such preferred leveler is a reaction product of 4-vinyl pyridine and methyl sulfate available from Enthone Inc. under the trade name ViaForm L700. The leveler is incorporated, for example, in a concentration between about 0.1 mg/L and about 25 mg/L.

With regard to accelerators, in a system currently preferred by the applicants, the accelerators are bath soluble organic divalent sulfur compounds as disclosed in U.S. Pat. No. 6,776,893, the entire disclosure of which is expressly incorporated by reference. In one preferred embodiment, the accelerator corresponds to the formula (10)

$$R_1-(S)_n RXO_3 M \tag{10},$$

wherein

M is hydrogen, alkali metal or ammonium as needed to satisfy the valence;

X is S or P;

R is an alkylene or cyclic alkylene group of 1 to 8 carbon atoms, an aromatic hydrocarbon or an aliphatic aromatic hydrocarbon of 6 to 12 carbon atoms;

n is 1 to 6; and

$R_1$ is $MO_3XR$ wherein M, X and R are as defined above.

An accelerator which is especially preferred is 1-propanesulfonic acid, 3,3'-dithiobis, disodium salt according to the following formula (11):

010

US 7,303,992 B2

**11**                                                    **12**

(11)



The accelerator is incorporated typically in a concentration between about 0.5 and about 1000 mg/L, more typically between about 2 and about 50 mg/L, such as between about 5 and 30 mg/L. A significant aspect of the current invention is that it permits the use of a greater concentration of accelerator, and in many applications in fact it must be used in conjunction with a greater concentration of accelerator than in conventional processes. This permits achieving the enhanced rates of superfilling demonstrated in Example 7 below.

Optionally, additional leveling compounds of the following types can be incorporated into the bath such as the reaction product of benzyl chloride and hydroxyethyl polyethylenimine as disclosed in U.S. Pat. Pub. No. 2003/0168343, the entire disclosure of which is expressly incorporated herein by reference.

The components of the Cu electrolytic plating bath may vary widely depending on the substrate to be plated and the type of Cu deposit desired. The electrolytic baths include acid baths and alkaline baths. A variety of Cu electrolytic plating baths are described in the book entitled Modern Electroplating, edited by F. A. Lowenheim, John Reily & Sons, Inc., 1974, pages 183-203. Exemplary Cu electrolytic plating baths include Cu fluoroborate, Cu pyrophosphate, Cu cyanide, Cu phosphonate, and other Cu metal complexes such as methane sulfonic acid. The most typical Cu electrolytic plating bath comprises Cu sulfate in an acid solution.

The concentration of Cu and acid may vary over wide limits; for example, from about 4 to about 70 g/L Cu and from about 2 to about 225 g/L acid. In this regard the compounds of the invention are suitable for use in all acid/Cu concentration ranges, such as high acid/low Cu systems, in low acid/high Cu systems, and mid acid/high Cu systems. In high acid/low Cu systems, the Cu ion concentration can be on the order of 4 g/L to on the order of 30 g/L; and the acid concentration may be sulfuric acid in an amount of greater than about 100 g/L up to about 225 g/L. In one high acid/low Cu system, the Cu ion concentration is about 17 g/L where the $H_2SO_4$ concentration is about 180 g/L. In low acid/high Cu systems, the Cu ion concentration can be on the order of greater than about 30 g/L, 40 g/L, and even up to on the order of 60 g/L Cu (50 g/L Cu corresponds to 200 g/L $CuSO_4.5H_2O$ Cu sulfate pentahydrate). The acid concentration in these systems is less than 50 g/L, 40 g/L, and even 30 g/L $H_2SO_4$, down to about 2 g/L. In one exemplary low acid/high Cu system, the Cu concentration is about 40 g/L and the $H_2SO_4$ concentration is about 10 g/L. In mid acid/high Cu systems, the Cu ion concentration can be on the order of 30 g/L to on the order of 60 g/L; and the acid concentration may be sulfuric acid in an amount of greater than about 50 g/L up to about 100 g/L. In one mid acid/high Cu system, the Cu ion concentration is about 50 g/L where the $H_2SO_4$ concentration is about 80 g/L.

Chloride ion may also be used in the bath at a level up to 200 mg/L, preferably about 10 to 90 mg/L. Chloride ion is added in these concentration ranges to enhance the function of other bath additives. These additives system include accelerators, suppressors, and levelers.

A large variety of additives may typically be used in the bath to provide desired surface finishes for the Cu plated metal. Usually more than one additive is used with each additive forming a desired function. At least two additives are generally used to initiate bottom-up filling of interconnect features as well as for improved metal plated physical (such as brightness), structural, and electrical properties (such as electrical conductivity and reliability). Particular additives (usually organic additives) are used for grain refinement, suppression of dendritic growth, and improved covering and throwing power. Typical additives used in electrolytic plating are discussed in a number of references including Modern Electroplating, cited above. A particularly desirable additive system uses a mixture of aromatic or aliphatic quaternary amines, polysulfide compounds, and polyethers. Other additives include items such as selenium, tellurium, and sulfur compounds.

Plating equipment for plating semiconductor substrates are well known and are described in, for example, Haydu et al. U.S. Pat. No. 6,024,856. Plating equipment comprises an electrolytic plating tank which holds Cu electrolytic solution and which is made of a suitable material such as plastic or other material inert to the electrolytic plating solution. The tank may be cylindrical, especially for wafer plating. A cathode is horizontally disposed at the upper part of tank and may be any type substrate such as a silicon wafer having openings such as trenches and vias. The wafer substrate is typically coated first with a barrier layer, which may be titanium nitride, tantalum, tantalum nitride, or ruthenium to inhibit Cu diffusion and next with a seed layer of Cu or other metal to initiate Cu superfilling plating thereon. A Cu seed layer may be applied by chemical vapor deposition (CVD), physical vapor deposition (PVD), or the like. An anode is also preferably circular for wafer plating and is horizontally disposed at the lower part of tank forming a space between the anode and cathode. The anode is typically a soluble anode such as copper metal.

The bath additives are useful in combination with membrane technology being developed by various tool manufacturers. In this system, the anode may be isolated from the organic bath additives by a membrane. The purpose of the separation of the anode and the organic bath additives is to minimize the oxidation of the organic bath additives on the anode surface.

The cathode substrate and anode are electrically connected by wiring and, respectively, to a rectifier (power supply). The cathode substrate for direct or pulse current has a net negative charge so that Cu ions in the solution are reduced at the cathode substrate forming plated Cu metal on the cathode surface. An oxidation reaction takes place at the anode. The cathode and anode may be horizontally or vertically disposed in the tank.

During operation of the electrolytic plating system, Cu metal is plated on the surface of a cathode substrate when the rectifier is energized. A pulse current, direct current, reverse periodic current, or other suitable current may be employed. The temperature of the electrolytic solution may be maintained using a heater/cooler whereby electrolytic solution is removed from the holding tank and flows through the heater/cooler and then is recycled to the holding tank.

In the case of thin copper seed coverage, less current will be delivered to the lower portions of interconnect features,

**13**

which may lead to bottom or sidewall voids and slow bottom-up growth. For features which have seed overhang, the electrolytic copper growth may have early pinching off on the feature tops before the bottom-up growth can reach the surface. Conventional suppressors may not distribute enough current to the bottom of the interconnect feature to promote bottom-up superfilling rapid enough to prevent the pinching off of interconnect features by Cu electrolytic deposition leading to the formation of internal voids, especially for features seeded with a thin Cu seed layer. Also, conventional suppressors may not have strong enough suppression to suppress copper growth on seed overhang areas to prevent early pinching off. Without being bound to a particular theory, it is thought that the suppressor compounds of the present invention function to inhibit the formation of internal voids and enhance the bottom-up superfilling deposition rate by up to twice the rate over a typical electrolytic plating solution not comprising the suppressor compounds of the present invention by forming a polarizing film over the Cu seed layer. Also, the suppressor compounds of the present invention possess stronger suppression (more polarizing) than most conventional suppressors, which allows the current to be distributed more evenly over the Cu seed layer deposited on the bottom and sidewalls of the interconnect feature leading to the reduction or elimination of bottom and sidewall voids. An even current distribution enhances Cu growth at the bottom of the feature relative to deposition at other regions to such an extent that bottom-up superfilling occurs so rapidly that deposition at the side and top of the feature will not cause a pinching off of the deposit and the formation of internal voids. The suppressor compounds of the present invention are effective at rapid bottom-up superfilling over thin or overhanged Cu seed layers. For example, the suppressor compounds have been found effective to superfill an interconnect feature seeded with a thin Cu seed layer on the bottom and side walls of an interconnect feature having a thickness between about 1 Angstrom and about 100 Angstroms.

An advantage of adding the suppressor compounds of the present invention to electrolytic Cu plating solutions is the reduction in the occurrence of internal voids as compared to deposits formed from a bath not containing these compounds. Internal voids form from Cu depositing on the feature side walls and top entry of the feature, which causes pinching off and thereby closes access to the depths of the feature. This defect is observed especially with features which are small (e.g., <100 nm) and/or which have a high aspect ratio (depth:width), for example, >4:1. Those voids left in the feature can interfere with electrical connectivity of copper interconnects. The suppressor compounds of the invention appear to reduce the incidence of internal voids by the above-described rapid superfilling mechanism and strong suppression.

It is an optional feature of the process that the plating system be controlled as described in U.S. Pat. No. 6,024,856 by removing a portion of the electrolytic solution from the system when a predetermined operating parameter (condition) is met and new electrolytic solution is added to the system either simultaneously or after the removal in substantially the same amount. The new electrolytic solution is preferably a single liquid containing all the materials needed to maintain the electrolytic plating bath and system. The addition/removal system maintains a steady-state constant plating system having enhanced plating effects such as constant plating properties. With this system and method the plating bath reaches a steady state where bath components are substantially a steady-state value.

**14**

Electrolysis conditions such as electric current concentration, applied voltage, electric current density, and electrolytic solution temperature are essentially the same as those in conventional electrolytic Cu plating methods. For example, the bath temperature is typically about room temperature such as about 20-27° C., but may be at elevated temperatures up to about 40° C. or higher. The electrical current density is typically up to about 100 mA/cm$^2$, typically about 2 mA/cm$^2$ to about 60 mA/cm$^2$. It is preferred to use an anode to cathode ratio of about 1:1, but this may also vary widely from about 1:4 to 4:1. The process also uses mixing in the electrolytic plating tank which may be supplied by agitation or preferably by the circulating flow of recycle electrolytic solution through the tank. The flow through the electrolytic plating tank provides a typical residence time of electrolytic solution in the tank of less than about 1 minute, more typically less than 30 seconds, e.g., 10-20 seconds.

The following examples further illustrate the practice of the present invention.

EXAMPLES

Example 1

Low Acid/High Cu Superfill Electrolytic Plating Bath with Suppressor of the Invention

To superfill a small diameter/high aspect ratio integrated circuit device feature, a Low acid/High Cu electrolytic plating bath was prepared comprising the following components:

160 g/L CuSO$_4$.5H$_2$O (copper sulfate pentahydrate)

10 g/L H$_2$SO$_4$ (concentrated sulfuric acid)

50 mg/L Chloride ion

9 mL/L ViaForm® Accelerator

200 mg/L of Cationic Suppressor (PO/EO block copolymer of ethylenediamine having a MW of 5500 g/mol corresponding to structure (5)).

The bath (1 L) was prepared as follows. CUSO$_4$.5H$_2$O (160 g) was fully dissolved in deionized water. Concentrated sulfuric acid (10 g) was added followed by addition of hydrochloric acid sufficient to yield 50 mg chloride ion in solution. Deionized water was added for a total volume of 1 liter. The final plating bath was prepared by further addition of ViaForm Accelerator (9 mL) and PO/EO block copolymer of ethylenediamine having a MW of 5500 g/mol corresponding to structure (5) (200 mg).

Comparative Example 1

Low Acid/High Cu Superfill Electrolytic Plating Bath with Comparative Suppressor

A comparative Low acid/High Cu electrolytic plating bath was prepared comprising the following components:

160 g/L CuSO$_4$.5H$_2$O (copper sulfate pentahydrate)

10 g/L H$_2$SO$_4$ (concentrated sulfuric acid)

50 mg/L Chloride ion

9 mL/L ViaForm® Accelerator

US 7,303,992 B2

15

200 mg/L Commercially Available Suppressor having the following formula:

$$H_2C\text{---}O\text{---}(C_3H_6O)_e\text{---}(C_2H_4O)_h\text{---}H$$
$$HC\text{---}O\text{---}(C_3H_6O)_f\text{---}(C_2H_4O)_i\text{---}H$$
$$H_2C\text{---}O\text{---}(C_3H_6O)_g\text{---}(C_2H_4O)_j\text{---}H$$

wherein the sum of e+f+g=21 and the sum of h+i+j =27, available from Enthone Inc. under the tradename ViaForm.

### Example 2

High Acid/Low Cu Superfill Electrolytic Plating Bath with Suppressor of the Invention

To superfill a small diameter/high aspect ratio integrated circuit device feature, a High Acid/Low Cu electrolytic plating bath was prepared comprising the following components:

70 g/L $CuSO_4.5H_2O$ (copper sulfate pentahydrate)
180 g/L $H_2SO_4$ (concentrated sulfuric acid)
50 mg/L Chloride ion
3 mL/L ViaForm® Accelerator
400 mg/L Cationic Suppressor (PO/EO block copolymer of ethylenediamine having a MW of 5500 g/mol corresponding to structure (5)).

### Example 3

Mid acid/High Cu Superfill Electrolytic Plating Bath with Suppressor of the Invention

To superfill a small diameter/low aspect ratio integrated circuit device feature, a Mid acid/High Cu electrolytic plating bath was prepared comprising the following components:

200 g/L $CUSO_4.5H_2O$ (copper sulfate pentahydrate)
80 g/L $H_2SO_4$ (concentrated sulfuric acid)
50 mg/L Chloride ion
8 mL/L ViaForm® Accelerator
200 mg/L Cationic Suppressor (PO/EO block copolymer of ethylenediamine having a MW of 5500 g/mol corresponding to structure (5))
4 mL/L ViaForm® L700.

### Example 4

Low Acid/High Cu Superfill Electrolytic Plating Bath with Suppressor of the Invention

To superfill a small diameter/high aspect ratio integrated circuit device feature, a High Acid/Low Cu electrolytic plating bath was prepared comprising the following components:

160 g/L $CuSO_4.5H_2O$ (copper sulfate pentahydrate)
10 g/L $H_2SO_4$ (concentrated sulfuric acid)
50 mg/L Chloride ion
18 mg/L 1-propanesulfonic acid, 3,3'-dithiobis, disodium salt
200 mg/L Cationic Suppressor (PO/EO block copolymer of triethylene glycol diamine having a MW of 5700 g/mol corresponding to structure (9))
2 mL/L ViaForm® L700.

16

### Example 5

Low Acid/High Cu Superfill Electrolytic Plating Bath with Suppressor of the Invention

A comparative Low acid/High Cu electrolytic plating bath was prepared comprising the following components:

160 g/L $CuSO_4.5H_2O$ (copper sulfate pentahydrate)
10 g/L $H_2SO_4$ (concentrated sulfuric acid)
50 mg/L Chloride ion
9 mL/L ViaForm Accelerator
200 mg/L Cationic Suppressor (PO/EO block copolymer of ethylenediamine having a MW of 3400 g/mol corresponding to structure (5)).

### Comparative Example 5

Low Acid/High Cu Superfill Electrolytic Plating Bath with Comparative Suppressor

To superfill a small diameter/high aspect ratio integrated circuit device feature, a Low acid/High Cu electrolytic plating bath was prepared comprising the following components:

160 g/L $CUSO_4.5H_2O$ (copper sulfate pentahydrate)
10 g/L $H_2SO_4$ (concentrated sulfuric acid)
50 mg/L Chloride ion
9 mL/L ViaForm® Accelerator
200 mg/L Commercially Available Suppressor of Example 1.

### Example 6

Low Acid/High Cu Superfill Electrolytic Plating Bath with Suppressor of the Invention

To superfill a small diameter/high aspect ratio integrated circuit device feature, a Low acid/High Cu electrolytic plating bath was prepared comprising the following components:

160 g/L $CuSO_4.5H_2O$ (copper sulfate pentahydrate)
10 g/L $H_2SO_4$ (concentrated sulfuric acid)
50 mg/L Chloride ion
9 mL/L ViaForm® Accelerator
200 mg/L Cationic Suppressor (PO/EO/PO block copolymer of triethylene glycol diamine having a MW of 5600 g/mol corresponding to structure (8)).

### Example 7

Superfilling Test Trenches with Low acid/High Cu Superfill Electrolytic Plating Bath

Test trenches (140 nm; aspect ratio between 3 and 4:1)) were superfilled with Cu using the low acid/high Cu electrolytic plating bath of Example 1 comprising a cationic suppressor of the invention and compared to test trenches superfilled with Cu using the low acid/high Cu electrolytic plating bath of Comparative Example 1 comprising a commercially available suppressor.

The test trenches superfilled with the bath of Example 1 filled faster (i.e., more growth on the bottom) as compared to the test trenches superfilled with the conventional electrolytic plating bath of Comparative Example 1. FIG. **1** is a graph showing the plating speeds achieved with the bath of Example 1 (-■-) compared to the plating speeds achieved with the bath of Comparative Example 1(-●-). In both cases,

US 7,303,992 B2

17

the Cu was deposited at a current density of 7 mA/cm² for 0 to 6 seconds to compare bottom growth speeds. This illustrates that rapid bottom-up deposition is achieved at a superfill speed by which Cu deposition in a vertical direction from the bottoms of the features to the top openings of the features is greater than 15 times faster and even greater than 20 times faster than Cu deposition on planar surfaces outside the features. That is, for example, the vertical growth rate for the invention is about 3600 angstroms in six seconds, or 600 angstroms per second; while the field thickness growth rate is about 150 angstroms in six seconds, or about 25 angstroms per second. So in this example the vertical growth rate is 24 times the field thickness growth rate (600 v. 25 angstroms/sec). The vertical growth rate for the comparative process is about 1500 angstroms in six seconds, or 250 angstroms per second; while the field thickness growth rate is about 150 angstroms in six seconds, or about 25 angstroms per second (250 v. 25 angstroms/sec). This corresponds to a comparative vertical growth rate of about 10 times the field thickness growth rate. The foregoing deposition growth rates are calculated over the first six seconds of deposition. These data also reveal that the process of the invention achieves a rate of vertical growth in the features which is 1.5 times, or 50%, (e.g., between 1.5 and 3 times) greater than processes comparable in all respects except that they employ the stated commercially available suppressor. "Vertical" in this respect refers to the orientation of the growth with respect to the feature opening and feature bottom, and does not refer to any particular orientation of the substrate with respect to the deposition tank.

It was also observed that the plating bath of Example 1 deposited Cu on extremely thin or discontinuous seed with significantly less bottom and sidewall voiding as compared to plating with the bath of Comparative Example 1. See FIGS. 2A and 2B, which are SEM image of test vias plated with the bath of Example 1 (FIG. 2A) and the bath of Comparative Example 1 (FIG. 2B). Electrolytic deposition occurred at a current density of 10 mA/cm². It can be observed that electrolytic plating using the bath of Example 1 resulted in significantly less bottom and sidewall voiding as compared to electrolytic plating using the bath of Comparative Example 1.

Example 8

Superfilling Test Trenches with Low acid/High Cu Superfill Electrolytic Plating Bath

Test trenches were superfilled with Cu using the low acid/high Cu electrolytic plating bath of Example 5 comprising a cationic suppressor of the invention and compared to test trenches superfilled with Cu using the low acid/high Cu electrolytic plating bath of Comparative Example 5 comprising a commercially available suppressor. SEM images of the electrolytically plated Cu deposit in the test trenches are shown in FIGS. 3A and 3B. FIG. 3A is an SEM image of the test trenches electrolytically plated with the bath of Example 5. FIG. 3B is an SEM image of the test trenches electrolytically plated with the bath of Comparative Example 5. Both deposits were plated at a current density of 7 mA/cm² for 10 seconds to reveal the progression of bottom-up growth. It can be seen from the SEM images that superfilling using the bath of Example 5 achieved more complete via filling than electrolytically superfilling using the bath of Comparative Example 5.

When introducing elements of the present invention or the preferred embodiment(s) thereof, the articles "a", "an",

18

"the" and "said" are intended to mean that there are one or more of the elements. For example, that the foregoing description and following claims refer to "an" interconnect means that there are one or more such interconnects. The terms "comprising", "including" and "having" are intended to be inclusive and mean that there may be additional elements other than the listed elements. As various changes could be made in the above without departing from the scope of the invention, it is intended that all matter contained in the above description and shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense. The scope of invention is defined by the appended claims and modifications to the embodiments above may be made that do not depart from the scope of the invention.

What is claimed is:

1. A method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical interconnect features including submicron-sized features having bottoms, sidewalls, and top openings, the method comprising:

immersing the semiconductor integrated circuit device substrate including submicron-sized features having bottoms, sidewalls, and top openings wherein said submicron-sized features include high aspect ratio features having dimensions such that the high aspect ratio features have aspect ratios of at least about 3:1 into an electrolytic plating composition comprising a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features and a polyether suppressor compound comprising a combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1 and bonded to a nitrogen-containing species, wherein the molecular weight of the suppressor compound is between about 1000 and about 30,000; and

supplying electrical current to the electrolytic composition to deposit Cu onto the substrate and superfill the submicron-sized features by rapid bottom-up deposition at a rate of growth in the vertical direction which is greater than a rate of growth in the horizontal direction.

2. A method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical interconnect features including submicron-sized features having bottoms, sidewalls, and top openings, the method comprising:

immersing the semiconductor integrated circuit device substrate into the electrolytic plating composition comprising a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features, an accelerator, and a suppressor; and

supplying electrical current to the electrolytic composition to deposit Cu onto the substrate and superfill the submicron-sized features by rapid bottom-up deposition at a vertical Cu deposition growth rate in features from the bottoms of the features to the top openings of the features which is greater than 50% faster than a comparable vertical Cu deposition growth rate of comparable process which is equivalent in all respects except that it employs a comparative suppressor having the formula:

US 7,303,992 B2

**19**

$$H_2C-O-(C_3H_6O)_e-(C_2H_4O)_h-H$$
$$HC-O-(C_3H_6O)_f-(C_2H_4O)_i-H$$
$$H_2C-O-(C_3H_6O)_g-(C_2H_4O)_j-H$$

wherein the sum of e+f+g=21 and the sum of h+i+j=27.

**3**. The method of claim **2** wherein the suppressor compound comprises a combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1 and bonded to a nitrogen-containing species.

**4**. The method of claim **3** wherein the suppressor compound has a molecular weight between about 1000 and about 30,000.

**5**. The method of claim **1** wherein the propylene oxide repeat units and ethylene oxide repeat units are present in a PO:EO ratio between about 2:3 and about 3:2.

**6**. The method of claim **1** wherein the EO and PO repeat units are arranged in a block co-polymer sequence.

**7**. The method of claim **1** wherein the nitrogen-containing species comprises at least one amine functional group.

**8**. The method of claim **3** wherein the nitrogen-containing species comprises at least one amine functional group.

**9**. The method of claim **1** wherein the nitrogen-containing species comprises between two and five amine functional groups.

**10**. The method of claim **1** wherein the nitrogen-containing species comprises a diamine.

**11**. The method of claim **1** wherein the nitrogen-containing species is selected from the group consisting of ethylene diamine and triethylene glycol diamine.

**12**. The method of claim **1** wherein the suppressor compound comprises a structure selected from the group consisting of:

$$R_1-\underset{\underset{R_2}{|}}{N}-R_3-R_4; \quad R_1-\underset{\underset{R_3-R_4}{|}}{\overset{\overset{R_2}{|}}{N}}-R_3-R_4; \quad R_1-\underset{\underset{R_3-R_4}{|}}{\overset{\overset{R_2}{|}}{\overset{\oplus}{N}}}-R_3-R_4;$$

$$R_1-\underset{\underset{R_3-R_4}{|}}{\overset{\overset{R_3-R_4}{|}}{\overset{\oplus}{N}}}-R_3-R_4;$$

and combinations thereof;

wherein

$R_1$ is a substituted or unsubstituted alkyl group;

$R_2$ is selected from the group consisting of hydrogen and alkyl group;

$R_3$ is a polyether comprising repeat units selected from the group consisting of ethylene oxide repeat units, propylene oxide repeat units, and a combination thereof;

**20**

and

$R_4$ is selected from the group consisting of hydrogen, substituted at unsubstituted alkyl group, aryl group, aralkyl, or heteroaryl group.

**13**. The method of claim **12** wherein the $R_1$ alkyl group has between 1 and 8 carbons, and $R_1$ is substituted with another amino group to which a polyether group is covalently bonded, the polyether comprising ethylene oxide repeat units, propylene oxide repeat units, or a combination thereof arranged in random, alternating, or block configurations.

**14**. The method of claim **1** wherein the polyether suppressor is present in a concentration between about 50 mg/L and about 200 mg/L.

**15**. The method of claim **1** wherein the polyether suppressor comprises the structure:

$$H-(OC_2H_4)_n-(OC_3H_6)_m \underset{\underset{H-(OC_2H_4)_n-(OC_3H_6)_m}{}}{\overset{}{N-\overset{H_2}{C}-\overset{H_2}{C}-N}} \overset{(C_3H_6O)_m-(C_2H_4O)_n-H,}{\underset{(C_3H_6O)_m-(C_2H_4O)_n-H}{}}$$

wherein n is between 1 and about 30 and m is between 1 and about 30.

**16**. The method of claim **1** wherein the polyether suppressor comprises the structure:

$$H-(OC_2H_4)_n-(OC_3H_6)_m \underset{\underset{H-(OC_2H_4)_n-(OC_3H_6)_m}{}}{\overset{}{N-H_2CH_2C}} \overset{O}{\diagup} \overset{CH_2CH_2}{\diagup} \overset{O}{\diagup} \overset{CH_2CH_2}{\diagup} \underset{\underset{(C_3H_6O)_m-(C_2H_4O)_n-H}{}}{\overset{(C_3H_6O)_m-(C_2H_4O)_n-H,}{}}$$

wherein n is between 1 and about 30 and m is between 1 and about 30.

**17**. A method for electroplating a copper deposit onto a semiconductor integrated circuit device substrate with electrical interconnect features including submicron-sized features having bottoms, sidewalls, and top openings, the method comprising:

immersing the semiconductor integrated circuit device substrate into the electrolytic plating composition comprising a source of Cu ions in an amount sufficient to electrolytically deposit Cu onto the substrate and into the electrical interconnect features, an accelerator, and a suppressor; and

supplying electrical current to the electrolytic composition to deposit Cu onto the substrate and superfill the submicron-sized features by rapid bottom-up deposition at a vertical Cu deposition growth rate in features from the bottoms of the features to the top openings of the features which is greater than 15 times faster than a field deposition growth rate on substrate surfaces outside the features.

**18**. The method of claim **17** wherein the suppressor compound has a molecular weight between about 1000 and about 30,000 and comprises a combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units present in a PO:EO ratio between about 1:9 and about 9:1.

**19**. The method of claim **17** wherein the vertical Cu deposition growth rate is greater than 20 times faster than the field deposition thickness growth rate.

015

US 7,303,992 B2

21

**20**. The method of claim **15** wherein the propylene oxide repeat units and ethylene oxide repeat units are present in a PO:EO ratio between about 2:3 and about 3:2.

**21**. The method of claim **15** wherein the EO and PO repeat units are arranged in a block co-polymer sequence.

**22**. The method of claim **15** wherein the polyether suppressor is present in a concentration between about 50 mg/L and about 200 mg/L.

**23**. The method of claim **16** wherein the propylene oxide repeat units and ethylene oxide repeat units are present in a PO:EO ratio between about 2:3 and about 3:2.

**24**. The method of claim **16** wherein the EO and PO repeat units are arranged in a block co-polymer sequence.

**25**. The method of claim **16** wherein the polyether suppressor is present in a concentration between about 50 mg/L and about 200 mg/L.

22

**26**. The method as set forth in claim **2** wherein said 50% faster growth rate is achieved in an electrolytic plating solution comprising an amine suppressor compound.

**27**. The method as set forth in claim **17** wherein said 50% faster growth rate is achieved in an electrolytic plating solution comprising an amine suppressor compound.

**28**. The method as set forth in claim **1** wherein said combination of propylene oxide (PO) repeat units and ethylene oxide (EO) repeat units bonded to said nitrogen-containing species is bonded to a nitrogen of said nitrogen-containing species.

*    *    *    *    *